IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| **G. WARE TRAVELSTEAD,** | * | Case No. 96-5-4979-SD |
| | | (Chapter 11) |
| Debtor. | * | |

* * * * * * * * * * * * *

### MOTION OF LIQUIDATING AGENT FOR AUTHORITY TO SELL INTERESTS IN OR ASSETS OF HINSUA BARCELONA, S.L. FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES

Joel I. Sher, Liquidating Agent, by his undersigned counsel, moves, pursuant to section 363(b) of the Bankruptcy Code, the confirmed Third Modified Fourth Amended Plan of Reorganization and the terms of this motion, for authority to sell all of the Debtor's direct and/or indirect right, title and beneficial interests in Hinsua Barcelona, S.L. or its assets to BCN 2001, S.L. ("BCN"), free and clear of liens, claims and encumbrances and, in support thereof, states:

1. On December 31, 1997, the Bankruptcy Court entered the Order (the "Order") Approving Debtor's Modified Fifth Amended Disclosure Statement and Confirming the Debtor's Third Modified Fourth Amended Plan of Reorganization (the "Plan").

2. On that same date, the Bankruptcy Court entered its order authorizing the appointment of Joel I. Sher as the liquidating agent. Furthermore, section 6.1 of the Plan appoints Joel I. Sher as the liquidating agent (the "Liquidating Agent").

3. Pursuant to the terms of the Plan, the Liquidating Agent's responsibilities include, *inter alia*, "the exclusive right to sell or refinance assets upon notice ... and hearing pursuant to Section 363(b) of the Bankruptcy Code, provided that any such sale or refinancing shall be pursuant to the terms of the Plan." Among the assets set forth in the Plan that the Liquidating

Agent is charged with a duty to liquidate is the Debtor's beneficial interest in Hinsua Barcelona S.L. ("Hinsua") or its assets. *See* Section 5.5 (b) of the Plan.

4. By this motion the Liquidating Agent seeks to sell all of the Debtor's direct and/or indirect right, title and legal and beneficial interest in Hinsua pursuant to a Letter of Intent dated April 29, 2003 with BCN. Hinsua is one of the last remaining substantial known assets of the Debtor and the transaction contemplated herein will enable the Liquidating Agent to satisfy claims in accordance with the Plan.

### Hinsua Barcelona, S.L.

5. Hinsua is a corporation organized under the law of Spain and is a wholly owned subsidiary of Peawick, B.V. ("Peawick"). Peawick is an organization formed under the laws of the Netherlands. The Debtor is the sole stockholder of Peawick.

6. Hinsua is the owner of certain interests and/or government concessions representing 116 parking spaces (basement level 2) situated in a business rental zone located on the ocean front in Barcelona, Spain (the "Hinsua Spaces"). Under Spanish Federal law, the government is the owner of all property within a designated zone within approximately 200 meters of the ocean front. In certain instances, private parties may develop property within that zone, but rather than obtaining a fee interest in the land, the developer is given a government concession (similar to a leasehold interest in the United States) for the property. The original developer of the parking spaces, now owned by Hinsua, obtained such a government concession, which was for an original term of 30 years. At present the concession expires in May, 2019, at which point, absent renewal of the concession, the improvements revert to the Spanish government.

2

7. The parking spaces owned by Hinsua are part of a larger underground parking garage adjacent to the Hotel Arts. The garage contains a total of approximately 560 parking spaces. The 116 spaces owned by Hinsua are situate in the bottom floor rear of the garage. After the Debtor acquired the parking spaces (*see* discussion below) the Debtor entered into an agreement (the "Parking Agreement") dated December 31, 1996, with the owner of the remaining spaces, which agreement provides for, *inter alia*, access to the spaces, common management and a sharing of income and expenses. Absent the Parking Agreement, the Debtor would have to manage the parking spaces, provide separate access to the spaces, collect all parking charges and arrange for all services for the spaces.

8. In order to finance the acquisition of the parking spaces, the Debtor obtained two loans from Banc Sabadell in the original approximate amount of US $450,000. Those loans are secured by mortgages upon the parking spaces and have been paid down in the ordinary course. As of the date of this motion, the two loans have an outstanding balance of approximately 127,000 Euros (approximately US $130,000)

## BACKGROUND OF THE DEBTOR'S INTERESTS

9. In conjunction with the 1982 Olympics, the Debtor was selected to design and develop various commercial and retail establishments on the ocean front in Barcelona, Spain, including most notably the Hotel Arts, which to this day continues to be one of Europe's most prestigious resort properties. In this regard, the Debtor selected as his partner in these endeavors Sogo Co. Ltd. ("Sogo"), a Japanese corporation, and entered into a series of agreements and partnerships for the purpose of undertaking the project to develop commercial and retail properties on the ocean front in Barcelona, Spain. These ventures included the Hotel Arts (the

3

"Hotel"), an event hall (now a casino), a commercial office building, various retail business spaces, including a Planet Hollywood restaurant franchise, and a parking garage.

10. Sogo was the 100% stockholder of USA Sogo, Inc., a California corporation ("USA Sogo").

11. The Debtor formed Travelstead Barcelona Limited Partnership, a Delaware limited partnership, for the purpose of acquiring a 50% partnership interest in T-S Barcelona Partners, a New York limited partnership. USA Sogo held the remaining 50% partnership interest in T-S Barcelona Partners.

12. T-S Barcelona Partners in turn was the 100% stockholder of Yoldo Ventures, B.V., a corporation organized under the laws of the Netherlands ("Yoldo"). Yoldo was the 98.4% stockholder of Hotel de la Villa Olympica, S.A ("Hovisa"), a Spanish corporation. Hovisa was the direct owner of the Hotel.

13. Yoldo was also the 99.9% stockholder of T.G. Office Spain, S.A., a Spanish corporation, which in turn was the 100% stockholder of Traplaya, S.L. ("Traplaya"), a Spanish corporation. Traplaya was the entity formed for the purpose of owning and operating the parking concessions.

14. In addition, the Debtor, USA Sogo and Ray Velazquez also associated to form Planet Barcelona S.L., a corporation organized under the law of Spain, to acquire and operate a Planet Hollywood franchise in one of the retail spaces. As a result of various disputes, the three owners were unable to make corporate decisions, resulting in a deadlocked board. Ultimately, the restaurant operation became insolvent. Despite various efforts by the Liquidating Agent and

the Debtor, including a court supervised stockholders meeting in Barcelona, the deadlock was not resolved and in 1999 the business ceased operating.

15. On February 25, 1993, the Debtor and USA Sogo entered into a detailed and complicated Settlement Agreement, pursuant to which the Debtor was granted, *inter alia*, an option to purchase certain parking spaces then owned by Traplaya.

16. After the execution of the Settlement Agreement, the Debtor, through Hinsua, exercised his option to purchase 130 parking spaces (the "Hinsua Spaces"). As noted above, the Hinsua Spaces and the Traplaya Spaces are held pursuant to a concession agreement with the Spanish government (the "Concession Agreement"). The Concession Agreement terminates in 16 years. The Concession Agreement does not contain a renewal provision. There are no assurances that the Concession Agreement will be renewed.

17. On or about September 10, 1997 the Debtor sold ten (10) of the Hinsua Spaces to an individual in Barcelona by the name of Oscar Matons. Thereafter, an additional six (6) spaces were sold. As a result Hinsua was left with 114 parking spaces.

18. In connection with the demise of Planet Barcelona S.L., Ray Velasquez filed various criminal charges against the Debtor in the courts of Barcelona. Pursuant to an order of the Bankruptcy Court, the Liquidating Agent posted a bond on behalf of the Debtor in the approximate amount of US $65,000.

19. In addition, the court in Barcelona directed that a bond be posted to cover the alleged damages of Mr. Velázquez. Since neither the Debtor nor the Liquidating Agent had sufficient funds to cover this amount, Mr. Velasquez sought an order establishing an embargo (lien) on the Hinsua Spaces. The Liquidating Agent and the Debtor both believed that Mr.

Velázquez desired to acquire the Hinsua Spaces and was using the proceeding to facilitate that end.

20. During this period the Debtor and Liquidating Agent presented an agreed upon order which was entered by the Bankruptcy Court on December 13, 1999. The order provides, *inter alia*, that "the Debtor's interest in the parking spaces owned by Hinsua is subject to the jurisdiction of this Court and the disposition thereof is subject to the sole authority of the Liquidating Agent pursuant to the terms of the Plan..."

21. Thereafter, the Liquidating Agent appeared before the court in Barcelona and agreed that he would not dispose of the Hinsua Spaces without first notifying that court and the Bankruptcy Court. The practical effect of Mr. Velazquez actions was to create a cloud over the Debtor's interests in the Hinsua Spaces. Had an attempt been made to sell the Hinsua Spaces during this period, it was anticipated that the court in Barcelona would have embargoed a portion of the sale proceeds (approximately US$350,000).

22. During this time period the Liquidating Agent and the Debtor traveled to Spain on several occasions to attend to the preservation of, and to prevent any adverse actions being taken against, the Hinsua Spaces. In addition, during this time period the Debtor introduced the Liquidating Agent to potential acquirers for the Hinsua Spaces and assisted the Liquidating Agent's efforts to investigate opportunities for recovery by the estate on these assets.

23. Thereafter, in February 2002, the Debtor appeared for his criminal trial in Barcelona. The Debtor's failure to appear for said trial would have resulted in the forfeiture of the bond posted by the Liquidating Agent and other restrictions on any future disposition of the

Hinsua Spaces. At the conclusion of the trial, the Debtor was acquitted of all charges. As a result, the cloud on the Debtor's interests in the Hinsua Spaces was lifted.

### Efforts To Dispose Of the Hinsua Spaces

24. Based upon discussions with a number of parties, including numerous meetings with the Debtor, his professionals, and various persons in Barcelona, and having conducted an inspection of the Hinsua Spaces and a review of relevant documents, the Liquidating Agent has concluded that the most likely way to dispose of the Hinsua Spaces is to sell them, or the Debtor's stock interest in Hinsua, to a buyer who also owned or was buying the remaining parking spaces in the garage. In essence, the Hinsua Spaces are landlocked in the garage and the Parking Agreement is terminable. The location problem coupled with the concession nature of the spaces means that the Debtor and a solo buyer who does not own or control all of the remaining spaces is subject to decreased revenues and increased costs if the Parking Agreement is terminated.

25. During the course of this case, the Liquidating Agent and Debtor's counsel met with representatives of USA Sogo, reviewed numerous documents from its files and initiated a 2004 exam of its corporate designee. The Liquidating Agent and the Debtor engaged in this effort in order to investigate the Debtor's claims with respect to his continued interests in T-S Barcelona Partners and the apartment options established pursuant to the Settlement Agreement, as well as to understand various issues concerning the Hinsua Spaces and their management.

26. In January 2000, the Debtor initiated litigation against USA Sogo seeking, *inter alia*, to recover on claims of the estate arising out of the Debtor's interests in T-S Barcelona

Partners. This litigation, which would have been another potential source of recovery for creditors, is now stayed by virtue of USA Sogo's own bankruptcy case.

27. During the course of that litigation and the Liquidating Agent's investigation, the Liquidating Agent and representatives of USA Sogo had a number of discussions aimed at resolving all disputes and disposing of the Hinsua Spaces (USA Sogo owned the remaining spaces in the garage by virtue of its control of Traplaya). These negotiations proceeded slowly. In June 2001, the Liquidating Agent and USA Sogo entered into a tentative agreement that provided for the sale of the Hinsua Spaces. However, USA Sogo wanted the Liquidating Agent to (i) assign the Debtor's interest in Hinsua Spaces, (ii) sell the Debtor's interests in the Apartment Options, (iii) permit USA Sogo to exercise the call on the Debtor's interest in T-S Barcelona Partners, (iv) assign the Debtor's interests in any trademarks, and (v) enjoin the Debtor from asserting any other claims. USA Sogo offered the Liquidating Agent US $2.3M. However, USA Sogo would not buy the Hinsua Spaces without the other terms set forth above. The Liquidating Agent concluded that the USA Sogo proposal could have triggered tax liabilities in excess of US $10 million based on the Debtor's interest in T-S Barcelona Partners. After further discussions, USA Sogo refused to structure the deal in a tax advantageous fashion, and thus the Liquidating Agent elected not to go forward with the USA Sogo proposal.

28. The Liquidating Agent's ability to conclude discussions with USA Sogo was also severely hindered when its parent company, Sogo Co. Ltd., became the subject of a bankruptcy proceeding in Japan. An administrator was appointed to liquidate the holdings of Sogo Co. Ltd

and USA Sogo. Due to the uncertainty surrounding USA Sogo's assets, the ability to dispose of the Hinsua Spaces was hampered.[1]

29. During 2001, various properties associated with the Hotel and controlled by USA Sogo were offered for sale. The Liquidating Agent also attempted to meet with parties who expressed an interest in acquiring the Hinsua Spaces. In addition through efforts of the Debtor, the Liquidating Agent was brought into negotiations with parties who expressed an interest in acquiring the Hotel and the Hinsua Spaces. However, the control of the process by the Japanese administrator for Sogo Co. Ltd. and litigation with USA Sogo made these efforts problematic.

30. Ultimately the assets controlled by USA Sogo, including the Hotel and the Hinsua Spaces, were sold by the Japanese administrator to a group controlled by Deutsche Bank with funding provided by the Royal Bank of Scotland. In conjunction with that sale, Deutsche Bank engaged the services of an attorney in Barcelona, Javier Faus, to assist it in managing the Hotel and other properties it acquired.[2] Over the course of the last year, the Liquidating Agent has had a number of discussions with Mr. Faus in an attempt to dispose of the Hinsua Spaces.

31. During 2002, the group controlled by Deutsche Bank began disposing of the assets ancillary to, but not engaged in, the operation of the Hotel. In December 2002, Deutsche Bank caused the parking spaces owned by Traplaya to be sold to BCN. Mr. Faus is the administrator of BCN.

---

[1] Demonstrative of the problems with this matter, USA Sogo recently filed a Chapter 7 bankruptcy case.
[2] Mr. Faus had also represented certain of the companies owned by the Debtor during the Debtor's tenure in Barcelona.

9

32. BCN paid 9,941.19 Euros per space to Deutsche Bank. The Liquidating Agent believes this recent transaction provides a basis against which to measure the value of the instant transaction. The purchase price paid was based on an appraisal by Sociedad de Tasacion (a leading Spanish firm) dated November 18, 2002, which the Liquidating Agent has reviewed. The Liquidating Agent has also reviewed documents relating to the BCN acquisition.

33. As a part of the transaction, all of the parking spaces in the garage were re-platted, each space with separate metes and bounds, whereas previously the Traplaya and Hinsua Spaces were two separately recorded properties. As a result of that re-platting, the number of the Hinsua Spaces was increased from 114 spaces to 116 spaces.

34. Since his purchase of the Traplaya Spaces, BCN has advised the Liquidating Agent that it has also received two offers for the Traplaya Spaces– 8,000 Euros per space and 9,000 Euros per space, each of which BCN has rejected.

35. The Liquidating Agent and Mr. Faus have engaged in a number of discussions over the last year about the Hinsua Spaces, as Mr. Faus had expressed an interest in purchasing the spaces. The Liquidating Agent recently traveled to Barcelona and met personally with Mr. Faus in order to determine if they could arrive at a mutually satisfactory agreement for the disposition of the Hinsua Spaces. As a result of this meeting, the Liquidating Agent and Mr. Faus, on behalf of BCN, reached an agreement to transfer the Hinsua Spaces, as more fully set forth in the Letter of Intent discussed below. The Liquidating Agent and Mr. Faus are cognizant of certain tax implications and accordingly they seek to structure the transaction in a tax advantageous fashion in order to increase the net proceeds available to creditors of the Debtor. The structure agreed upon is designed to allow a maximization of the return to this estate. While

the proposed transaction is not yet finalized and all of the costs, taxes, transaction fees and expenses have not been quantified, the Liquidating Agent believes pursuing the sale or a transaction contemplated as set forth in the Letter of Intent is appropriate at this time.

### The Letter Of Intent

36.     The Letter of Intent sets forth the framework for the sale of all the Hinsua Spaces, with an option to structure the transaction so as to attempt to effectuate the conveyances contemplated therein by a transfer of the capital stock (the "Stock") of Hinsua. A copy of the Letter of Intent is attached hereto as Exhibit A. As set forth below, the Letter of Intent is subject to a definitive agreement. The Letter of Intent provides, *inter alia*, that BCN will purchase from the Liquidating Agent, and the Liquidating Agent will sell to BCN, the Hinsua Spaces, or the Stock, subject to certain conditions set forth in the Letter of Intent.

37.     In the event of a transfer of the Property to Purchaser, the Purchaser shall pay to the Liquidating Agent at closing a cash purchase price of One Million One Hundred Sixty Thousand Euros (1.160.000 Euros) (the "Property Purchase Price"). In the event of a transfer of the Stock to Purchaser, the Purchaser shall pay to the Liquidating Agent at closing a cash purchase price of One Million Eighty Thousand Euros (1.080.000 Euros) (the "Stock Purchase Price"), each subject to normal adjustments as are customary in similar transactions.

38.     BCN shall pay a deposit of Fifty Eight Thousand Euros (58.000 Euros) in escrow to a person mutually acceptable to the parties at the time of execution of a definitive agreement.

39.     The Letter of Intent also provides that the Liquidating Agent and the Purchaser mutually agree to negotiate in good faith the final structure of the transaction as either a transfer of the Stock or the Property, taking into account international and national financial, corporate

and tax concerns. The decision as to the structure must maximize the funds which the Liquidating Agent will have available to pay the Debtor's creditors (after taking into account the tax liabilities arising from the Transaction).

40.  The Letter of Intent contains certain conditions, including the following summarized conditions precedent:

> A.  Negotiation and execution of the Agreement with terms, provisions and conditions mutually acceptable to the Liquidating Agent and BCN.
>
> B.  Entry of one or more orders by the United States Bankruptcy Court for the District of Maryland, Baltimore Division, in Case No. 96-5-4979-SD (the "Bankruptcy Court"), authorizing the Liquidating Agent to take all steps necessary to consummate the Transaction including, but not limited to, authorizing the Liquidating Agent to direct Peawick or its successors in interest to transfer all of the Stock or cause the transfer of the Property to Purchaser free and clear of all liens, claims or encumbrances.
>
> C.  Purchaser's receipt of evidence, satisfactory to Purchaser, that the Liquidating Agent has the authority, on behalf of Peawick, to transfer all of the Stock or the Property to Purchaser.
>
> D.  At closing, (i) repayment of the outstanding loans to Banc Sabadell (using proceeds from the Purchase Price), which loans are secured by the Property, the aggregate amount of such loans being approximately 127.000 Euros on the date of the Letter of Intent, or (ii) a reduction of the Purchase Price in an amount equal to the aggregate amount of such loans as of the date of Closing, as mutually agreed by the parties.
>
> E.  Upon the closing, neither the Debtor, Peawick nor the Liquidating Agent, shall have any further obligation with respect to the Concession Agreement or the obligations to Banc Sabadell discussed above.
>
> F.  Receipt of all necessary consents or approvals for the Transaction.
>
> G.  Appropriate confirmation as to compliance with representations, warranties and covenants at the Closing of the Transaction, as are customary in similar transactions.

41.  The Letter of Intent will not be binding until such time as:

       (1)     Formal documents are prepared and settled by the respective advisors and executed by the parties to the Letter of Intent; and

       (2)     The terms of the transaction are approved by an order of the United States Bankruptcy Court for the District of Maryland.

42.     The closing of the transaction as contemplated in the Letter of Intent shall be no later than July 30, 2003.

43.     In determining how to dispose of the Debtor's interests in Hinsua, the Liquidating Agent has had to consider the potential tax implications of any transaction. Moreover, in negotiating the terms of the Letter of Intent the Liquidating Agent and BCN have agreed to attempt to structure the transaction in a tax advantageous fashion. Thus, the Letter of Intent allows flexibility in the final structure of the transaction.

44.     For instance, if the Hinsua Spaces are transferred, Hinsua may have a Spanish tax liability of approximately thirty-three percent (33%) of the imputed profit (gross sale price minus tax basis under Spanish law). The Liquidating Agent has been advised that the basis of the Hinsua Spaces is approximately 200,000 Euros. However, the Liquidating Agent believes that certain of the fees and expenses of this estate attributable to preserving the Hinsua Spaces will be recognized under Spanish tax law, thereby increasing the tax basis of the Hinsua Spaces. Assuming that the recognized amount of those fees and expenses is approximately 400,000 Euros (it may be more or less than this amount), the tax basis of the Hinsua Spaces will increase to approximately 600,000 Euros. At a Property Purchase Price of 1,160,000 Euros, the net inputted profit will be 560,000 Euros, and thus Hinsua may have a Spanish tax obligation of approximately 185,000 Euros. After reserving this amount (these taxes would not be payable until 2004) and paying off the Banc Sabadell loans, the net proceeds that this estate could

reasonably expect to realize from a sale of the Hinsua Spaces is approximately 849,000 Euros, subject to U.S. taxes. As noted herein, this amount could vary depending on the treatment for these taxes and other costs and expenses that may be incurred in the sale process.[3] Further analysis of this transaction is being undertaken.

45. Alternatively, if the sale is ultimately structured as a sale of the Stock, the estate may be able to avoid the payment of the Spanish taxes described above, with the exception of taxes customarily paid by a seller, although U.S. capital gains taxes may be proportionately greater and the tax ramifications, if any, in the Netherlands are still being determined (in addition the Liquidating Agent is investigating the status of Peawick in the Netherlands, which may effect the net proceeds to the estate as well). In order to incentivize BCN to structure the deal as a sale of the Stock and to accommodate additional tax obligations that BCN may incur in a purchase of the Stock, the Letter of Intent provides for a cash purchase price of 1.080.000 Euros as a Stock Purchase Price.

46. However, the Liquidating Agent and BCN are still exploring all of the issues surrounding this transaction and they have not yet finally determined if they can affect a transfer via a sale of the Stock. Questions still remain about the viability of Peawick, clouds that may remain on the Hinsua Stock and additional obligations that BCN may incur as a result of a sale of the Stock. However, both the Liquidating Agent and BCN expect to resolve the myriad of complex international and national tax, financial, corporate and tax issues in order to complete the transaction in a mutually satisfactory and tax advantageous fashion.

---

[3] For instance if the allowed fees and expenses are $300,000, the Spanish tax obligation will increase to approximately 215,000 Euros. Conversely, if the allowed fees and expenses are $500,000, the Spanish tax obligation will decrease to approximately 152,000 Euros.

14

47. The Liquidating Agent has quantified the bottom range of expected net recoveries from a transfer of the Hinsua Spaces and in his business judgment he believes that this is a reasonable return that creditors can expect from these assets. Therefore, the Liquidating Agent has determined that the approval process for this transaction must begin immediately.

48. The Liquidating Agent continues to consult with Spanish counsel and work with BCN to finalize the final structure. In so doing, the Liquidating Agent will continue to work to enhance the return to creditors. In addition the Liquidating Agent has been advised that the Debtor may present an alternative recovery for these assets. However, as the Liquidating Agent believes that time is of the essence, he now seeks authority to finalize and close upon the transaction as contemplated by the terms of the Letter of Intent. Thus, the Liquidating Agent seeks authority from the Court to consummate the transaction (if an acceptable agreement is arrived at) as a sale of the Hinsua Spaces.[4]

### Fulfillment of Obligations of
### Liquidating Agent Under Letter of Intent

49. In order to fulfill his obligations under the Letter of Intent, the Liquidating Agent requires all the rights and powers that the Debtor has as the sole shareholder of Hinsua and Peawick, including, but not limited to, the right to vote the Debtor's shares of Peawick and Hinsua at any meetings of shareholders required to consider the transaction proposed in the Letter of Intent, or otherwise act in accordance with the Letter of Intent.

50. That the Liquidating Agent would succeed to the Debtor's rights, including his rights as a shareholder (including obtaining the Debtor's proxy) was contemplated during the

---

[4] The Liquidating Agent employed, and the Court approved, the same procedural mechanism for the Blockless transaction several years ago.

15

plan confirmation process and agreed upon by the Debtor. When questioned at the confirmation hearing whether the Debtor would be willing to give his proxy to the Liquidating Agent in order to effect a sale, the Debtor responded:

> It depends on the timing that you would be talking about. One of the reasons to have -- in my understanding, in my approach to life, one of the reasons to have the liquidating agent and I there together is to take the onus off these assets so that the assets can be marketed without an immediate shadow hanging over them and people circling around trying to get distressed prices. So one of the things that was very important to me in the Plan was to maintain a relationship so that the outside world can understand that there is not going to be any fire sale taking place here tomorrow or the next day. So if the Liquidating -- if, for example I just gave a blanket proxy to the Liquidating Agent right now over the shares, I don't think that would be in the best interest of the value of the shares and so forth because I think that would send a signal out that may depreciate the value. *And I think -- but if push comes to shove and I don't want to do something and Mr. Sher thinks that it should be done, that's the way I would affect it. I would give him my proxy and he could go to the meeting and vote my shares.*

*Transcript of 12/22/97 Confirmation Hearing,* at p. 77 (emphasis added).

### Benefit to Creditors and the Bankruptcy Estate

51. The approval of this motion authorizing the sale as set forth in the Letter of Intent, free and clear of all liens, claims, encumbrances and interests is in the best interest of creditors and this bankruptcy estate because, *inter alia*, (i) the purchase price is a reasonable and favorable offer for the assets being purchased, (ii) the structure of the transaction will be concluded in a tax advantageous fashion, and (iii) the net proceeds[5] of the transaction will enable the Liquidating Agent to make further distributions in accordance with the Plan.

---

[5] In accordance with the Plan, the Liquidating Agent will also seek to reserve sums for the payment of United States taxes that may be incurred as a result of the transaction. The amount of this reserve may depend on the resolution of certain tax obligations of the Debtor currently being decided by this Court.

52. The Liquidating Agent has undertaken an analysis of the value of the Debtor's interest in Hinsua and the Hinsua Spaces. In that regard, the Liquidating Agent has, *inter alia*, (i) considered appraisals and valuations of the Hinsua assets, (ii) interviewed various professionals and interested parties, (iii) consulted with the Debtor and his professionals, (iv) reviewed the claims against Hinsua, and (v) made such additional inquiries as he deemed prudent.

53. Any valuation of the Hinsua Spaces is extremely complex because of certain variables which affect the value of the Debtor's interest, including: the concession nature of the parking spaces, the Parking Agreement, the physical location of the spaces, Spanish and Dutch components of Hinsua and Peawick and the up-streaming of value to the shareholder.

54. The offer set forth in the Letter of Intent is squarely within the range of the amount that the Liquidating Agent believes is reasonable based upon the valuations conducted by independent third parties, the testing of the market and the Liquidating Agent's analysis.

### Sale Free and Clear of Liens, Claims or Interests

55. Pursuant to Section 363(b)(1) of the Bankruptcy Code, a trustee, after notice and hearing, may use, sell or lease property of the estate other than in the ordinary course of business. Pursuant to Section 363(f) of the Bankruptcy Code, a trustee may sell property free and clear of any interest in such property of an entity other than the estate if (i) permitted under applicable non-bankruptcy law, (ii) the party asserting such interest consents, (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property, (iv) the interest is the subject of a bona fide dispute, or (v) the party asserting the interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.

56. Section 363(f) of the Bankruptcy Code is stated in the disjunctive when a sale is being made pursuant to Section 363(b). In such circumstances, as here, the Liquidating Agent, with the powers provided by the Plan and order, need only satisfy one of the five conditions of Section 363(f). The Liquidating Agent believes, and therefore avers, that he will be able to demonstrate that he has satisfied one or more of these conditions with respect to each and every entity having an interest in or lien upon such property and that he should be authorized to sell the Shares free and clear of all such liens, claims, encumbrances and interests except as set forth herein. Specifically, each of the parties claiming an interest in or lien upon the Shares being sold either (a) have or will consent to the sale under Section 363(f)(2); (b) hold liens that are in bona fide dispute; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property or (d) the interests are liens and the entity asserting the lien could be compelled, in a legal equitable proceeding, to accept a money satisfaction for such lien.

### Conclusion

57. The Liquidating Agent believes that the sale of either the Hinsua Spaces or the Stock to BCN, 2001 S.L., pursuant to the Letter of Intent, is in the best interest of creditors.

WHEREFORE, for the foregoing reasons, the Liquidating Agent respectfully requests the following relief:

A. That the Motion be granted;

B. That the Order in the form submitted herewith be approved;

C. That the Liquidating Agent be authorized to sell either the Stock or the Hinsua Spaces to BCN 2001, S.L., pursuant to the Letter of Intent in exchange for the consideration set forth in the Letter of Intent;

D. That the Liquidating Agent be authorized to take any and all actions as may be necessary and appropriate to effectuate the terms of the sale and the Letter of Intent, to settle in connection with the Letter of Intent and to consummate the transactions contemplated therein, including, without limitation, executing and delivering in the name of the Debtor as his attorney-in-fact any and all documents, instruments of transfer, conveyance documents and other documents (both before and after closing) necessary to consummate and settle the Letter of Intent and the transactions contemplated thereby;

E. That the Liquidating Agent be authorized, as needed, to stand in the shoes of the Debtor, and be granted and endowed with all the Debtor's rights and powers appurtenant to his 100% shareholder position, including without limitation a proxy to vote the Debtor's Shares at any meeting of the shareholders of Hinsua or Peawick; and

F. That the Liquidating Agent be granted such other and further relief as is just and equitable.

/s/   Joel I. Sher
Joel I. Sher, Bar No. 00719
Richard M. Goldberg, Bar No. 07994

Shapiro Sher Guinot & Sandler
36 South Charles Street, 20th Floor
Baltimore, Maryland 21201
410-385-0202

*Attorneys for Joel I. Sher, Liquidating Agent*

F:\LIT\JSHER\WPDATA\008js817.pld.doc 46322.001

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this the 7th day of May, 2003, a copy of the foregoing was mailed by first class, postage prepaid, to:

>Paul M. Nussbaum, Esquire
>Stephen F. Fruin, Esquire
>Whiteford, Taylor & Preston
>7 St. Paul Street
>Baltimore, MD 21202-1626
>
>Mark A. Neal, Esquire
>Assistant U.S. Trustee
>Office of the United States Trustee
>300 West Pratt Street, Suite 350
>Baltimore, MD 21201
>
>Edward T. McDermott, Esquire
>Pollack & Kaminsky
>114 West 47th Street, 19th Floor
>New York, NY 10036

/s/     Joel I. Sher

F:\LIT\JSHER\WPDATA\008js817.pld.doc;;jg46322.001