IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION


- - - - - - - - - - - - - - - - X
In re:                          :
                                :    Case No. 96-54979-SD
G. WARE TRAVELSTEAD,            :
                                :    (Chapter 11)
                                :
        Debtor                  :
- - - - - - - - - - - - - - - - X    June 17, 2003

                                        Baltimore, Maryland


        **EXPEDITED MOTION TO COMPEL (p. 1140);**
    **RESPONSE (p. 1145); MOTION TO SELL INTEREST IN**
        **OR ASSETS OF HINSUA BARCELONA, S.L.**
          **FREE AND CLEAR OF LIENS (p. 1142)**

BEFORE:                         HONORABLE E. STEPHEN
DERBY, Judge


APPEARANCES:                    PAUL NUSSBAUM, Esq.
                        Whiteford, Taylor and Preston
                        Seven Saint Paul Street
                        Baltimore, Maryland 21202-1626
                            Attorney for Debtor

                        JOEL I. SHER, Esq.
                        RICHARD GOLDBERG, Esq.
                        Shapiro, Sher, Guinot, Sandler
                        36 South Charles Street
                        Twentieth Floor
                        Baltimore, Maryland 21201
                            Liquidating Agent and
                        Attorney for Liquidating Agent


Audio Operator:                 Evelyn Faucette

Transcription Company:          CompuScribe
                                9537 Elvis Lane
                                Seabrook, Maryland 20706
                                301/577-5882


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

jtw                                                                              2

APPEARANCES CONTINUED:          JAVIER FAUS, Esq.
                                BCN 2001, S.L.
                                Passeig de Garcia, 74
                                08007, Barcelona, Spain
                                Attention: Don Javier
                                Faus Santasnsana
                                    Principal Buyer

                                EDWARD T. McDERMOTT, Esq.
                                Pollack and Kaminsky
                                114 West 47th Street, 19th Floor
                                New York, New York 10036
                                    Attorney for Eduardo Canet

<u>I N D E X</u>

                                                              <u>Page</u>

General discussion                                             4

Comments by Joel I. Sher, Esq.
     Liquidating Agent
  5

Comments by Javier Faus, Esq.
     Principle Buyer
32

Comments by Paul Nussbaum, Esq.
     Attorney for the Debtor
34

Comments by Edward T. McDermott, Esq.
     Attorney for Eduardo Canet                              45

Comments by Joel I. Sher, Esq.
     Liquidating Agent
47

Ruling by E. Stephen Derby, Judge
54

Comments by Paul Nussbaum, Esq.
     Attorney for the Debtor
57

Comments by Joel I. Sher, Esq.
     Liquidating Agent
65

Comments by Edward T. McDermott, Esq.
     Attorney for Eduardo Canet                              66

Ruling by E. Stephen Derby, Judge
76

<u>EXHIBITS</u>                    <u>FOR IDENTIFICATION</u>    <u>IN EVIDENCE</u>
<u>For the Liquidating Agent</u>

     1 (Debtor's proposal)              24                    24

     2 (Letter of Intent)               24                    54

KEYNOTE:    "---" indicates inaudible in the transcript.

1                           P R O C E E D I N G S

2                                                          (10:10 a.m.)

3           THE CLERK:  We have the case of G. Ware

4    Travelstead, case number 96-5 dash 4979.  Beginning with

5    counsel in the Courtroom, will you please identify

6    yourself and your client for the record.

7           MR. SHER:  Good morning, Your Honor.  Joel Sher,

8    liquidating agent.  And with me is also my counsel,

9    Richard Goldberg.  And to my immediate right, Your Honor,

10   I would like to introduce you to Mr. Javier Faus, who is

11   an attorney admitted to practice in Barcelona, Spain and

12   is also a principle of the proposed buyer BCN 2000.

13          THE COURT:  Thank you.  Welcome to Baltimore.

14          MR. FAUS:  Thank you.  Thank you very much.

15          MR. NUSSBAUM:  Good morning, Your Honor.  Paul

16   Nussbaum for Mr. Travelstead.  Let me apologize in

17   advance.  I have a bit of laryngitis.  And I will try not

18   to talk too much, which I am sure everyone will be pleased

19   to hear.  It's good to see you, by the way, it's been a

20   long time.

21          THE COURT:  Thank you.

22          THE CLERK:  Mr. McDermott.

23          MR. McDERMOTT:  Yes.  This is Edward McDermott

24   from Pollack and Kaminsky, counsel for creditor, Eduardo

25   Canet.

jtw                                                                              6

1          THE CLERK:  Thank you.

2          MR. McDERMOTT:  Thank you very much.

3

4          THE COURT:  Mr. McDermott, is this your motion?

5          MR. McDERMOTT:  No, Your Honor.  I believe it's

6  Mr. Sher's motion.

7          THE COURT:  Mr. Sher's motion.

8          MR. McDERMOTT:  Yes, Your Honor.

9          THE COURT:  I thought you were trying to make

10  him pay some money.  No.  Or, whatever it is.

11          MR. SHER:  I think there are two matters on for

12  today.  There is the motion --

13          THE COURT:  You want to sell.

14          MR. SHER:  Right.  And somebody wants me to pay.

15          THE COURT:  And somebody wants you to pay.

16          MR. SHER:  Right.  The motion to compel payment

17  perhaps, it was filed by the Debtor.  I filed a response.

18  It was on behalf of a third party attorney.  Our response

19  is in the record.  I don't know that -- it seems to me,

20  perhaps, we ought to do the motion to sell first, because

21  I think one follows the other.  But that is just my

22  perspective.

23          THE COURT:  Good.  Then let's do it that way.

24          MR. SHER:  If I may proceed then.

25          THE COURT:  Please do.

jtw                                                                    7

1          MR. SHER:  Your Honor, on May 7th, I filed my

2   motion for authority to sell substantially all of the

3   interest of Mr. Travelstead in certain assets located in

4   Barcelona, Spain, which is the I guess remaining major

5   asset of the estate.

6          It's his interest in parking spaces located on

7   the waterfront in Barcelona that is connected to the Hotel

8   Arts project, which was also an asset that Mr. Travelstead

9   had an interest in at one time.

10          And I think it would be helpful, Your Honor, if

11   I give you a little background.  I am also in receipt and

12   I will move into evidence a proposal made by the Debtor

13   yesterday to me, which I shared with all parties.  And

14   then the response I received this morning from counsel for

15   Mr. Canet.

16          And, if I can spend a few moments giving you an

17   overview of the motion, Your Honor.  And perhaps without

18   the need for me taking the stand, I can, if no one opposes

19   or objects, I can present from the podium.

20          THE COURT:  Good luck.

21          MR. SHER:  Thank you.

22          THE COURT:  Do you object, Mr. ---

23          MR. NUSSBAUM:  No, as long as I may cross

24   examine Mr. Sher from where he is standing.

25          THE COURT:  And then he will be welcome to get

jtw                                                                    8

1   up on the stand because it's hard to cross examine when

2   you are standing right next to each other.

3        MR. NUSSBAUM:  I will pass on cross examination

4   today, Your Honor.

5

6        THE COURT:  Oh, okay.  Thank you.

7        MR. SHER:  Your Honor, if you recall back in

8   December of, it seems like another century, December of

9   1997, that the Debtor's plan for reorganization was

10  affirmed and by virtue of the terms of the plan, I was

11  appointed liquidating agent of the plan.  And then there

12  were some subsequent orders entered consistent with that.

13       It gave me, as I view it, the sole authority to

14  sell assets of the estate.  The plan does reserve to the

15  Debtor under certain circumstances the right to refinance

16  assets.   And it is set forth in the terms of the plan.

17       Among the assets, and if you remember the first

18  go round where the Debtor's interest in assets in

19  Australia, which was owned by a Dutch holding company, and

20  we were able to sell those within a year.

21       These assets, Your Honor, the parking garage

22  proved  a little bit more tricky because along the way,

23  the Debtor was subject to, first an investigation and a

24  criminal indictment in Spain.  As part of that proceeding,

25  the plaintiff in that action, and it's kind of a hybrid

1   proceeding as both there are civil aspects to it and

2   criminal aspects to the proceeding.

3          And once the court there found, I guess, cause

4   to hold Mr. Travelstead over for trial, Mr. Valasquez, who

5   Your Honor is familiar with, was who was the movant was

6   entitled to have a bond posted in his favor in case the

7   courts there found that there was grounds for his

8   complaint and/or a criminal indictment should be, or a

9   criminal conviction should be found.

10         And so the sole remaining asset in Spain that

11  Mr. Valasquez sought to get was either money for the

12  spaces embargo, the parking spaces.  I went to the courts

13  in Barcelona and advised them as best I could that the

14  spaces were subject to the jurisdiction of this Court and

15  that I was charged with sole responsibility to liquidate

16  them and manage them.

17         And rather than trying to weed through, I guess,

18  the complicated issues of what court had jurisdiction and

19  whether or not the courts in Barcelona should defer to the

20  Courts here, or vice versa, an agreement was reached with

21  the prosecutors in Barcelona where I agreed that I would

22  not sell the spaces absent coming both to that court and

23  this Court for authority to sell the spaces.

24         So, while effectively they weren't technically

25  embargoed, had I sold them I would have to have gotten

1  permission, I thought, from both courts.  And any monies

2  that would have come out of that sale would have probably

3  have to have remained in Spain as a bond in case Mr.

4  Travelstead was convicted.

5          Mr. Travelstead went on trial in February of

6  2002 in Barcelona.  And I ended up being a witness in that

7  trial as did Mr. Faus, which is where he and I, I mean we

8  have known about each other, but that is where we first

9  met.

10          Interestingly enough, as an aside, Your Honor,

11  in a three judge panel, and what I thought was rather

12  interesting, is the witnesses get sworn in, but the

13  defendant and the plaintiff, if you will, do not get sworn

14  in.  I guess under that view, if they assume that both the

15  plaintiff and the defendant will of course lie, but no one

16  else will.  But we all testified.

17          At the conclusion of that trial, the prosecutor

18  stood up in that proceeding and advised the court that

19  based on the evidence that he heard, he no longer wanted

20  to go forward.  And he found no grounds for criminal

21  conviction to be entered against Mr. Travelstead.

22          Mr. Valasquez' lawyer was still free to go

23  forward and still argue for it.  But ultimately, the three

24  judge panel in Barcelona issued an order, and I am

25  thinking that was in, perhaps by March of 2002, where they

1   found that there was no cause for criminal conviction.

2   Mr. Travelstead was then exonerated of the charges by Mr.

3   Valasquez.

4              And subsequently, or right about that time, I

5   think it was subsequent to that, Mr. Valasquez and Mr.

6   Travelstead entered into a settlement for a general

7   release of their litigation that had gone on for years and

8   years.

9              So, that left me free at that time to begin in

10  earnest, Your Honor, disposing of the parking spaces.

11  However, at the parking spaces were owned in part by

12  Mr. Travelstead.  He acquired approximately 110 spaces

13  prior to his confirmation proceeding, and actually prior

14  to his bankruptcy.

15             I think the total number of spaces in the garage

16  is about 500.  And it was a condominium garage, if you

17  will.  Mr. Travelstead owns perhaps the worst spaces in

18  the garage.  They are in the basement in the back.

19             There was another company called Cherplia that

20  owned substantially all the other spaces.  Cherplia was

21  the entity that Mr. Travelstead at one time owned 50/50

22  with Sogo.

23             When Mr. Travelstead developed the Hotel Arts,

24  he developed it with a Japanese company called Sogo.  Sogo

25  was a chain of department stores in Japan.  And Sogo went

jtw                                                                    12

1    into its own receivership in Japan.  And ultimately Sogo's

2    American subsidiary called USA Sogo went into a bankruptcy

3    in California.

4          And so all of Mr. Travelstead's interest then

5    got tied up, not only in this proceeding and in the

6    Spanish criminal proceeding, but in the bankruptcy

7    proceeding that was going on in Japan because Sogo was

8    going through its own receivership.

9          So there was a period of time when I had

10   basically nobody to talk to, except a lot of people who

11   wanted to talk to me.  But none of whom had authority to

12   do anything.

13         Eventually, Sogo sold out its interest in the

14   hotel, which Mr. Travelstead developed, it's the Hotel

15   Arts, which is how we get here.  And their interest in the

16   parking spaces, The Deutsche Bank, a group led by Deutsche

17   Bank, they ended up buying.

18         I haven't quite figured out how they did all

19   that because Mr. Travelstead still asserts a claim of

20   50 percent interest in the underlying partnership.  But

21   that is a matter for another day.

22         But essentially, as of the end of 2002, the

23   hotel was then controlled by a group in which Deutsche

24   Bank and some private equity --- bank controlled the

25   hotel.  They also controlled the rest of the parking

1  garage.

2          It was my perspective that the buyer of the

3  remaining assets would want to be a strategic buyer who

4  would want to buy the entire garage.

5          And I began having discussions with Mr. Fraus

6  mid- I guess, fall of 2002, because Mr. Fraus became an

7  administrator for the whole Hotel Arts project, including

8  all of the parking spaces.  And I believe Mr. Fraus also

9  has a partial, a small equity interest in the whole

10  project.

11          So, I was led to believe from my discussions

12  that Deutsche Bank was looking to sell all this interest

13  in the parking spaces, and there are some retail spaces.

14  As you can imagine, Your Honor, this is a hotel about 200

15  yards off the ocean.  And behind it there is a bunch of

16  nightclubs.  And underground is the parking spaces.

17          Under Spanish law, because this was within a

18  certain distance of the waterline, the owners do not have

19  a fee interest.  But they have a concession.  Basically, a

20  leasehold interest.

21          And so what Mr. Travelstead owned was not a fee

22  in the parking spaces, but a leasehold interest, which as

23  of today has about 16 more years to run.  It's a

24  concession from the Federal Government of Spain, which is

25  then -- the concession goes to the City of Barcelona.  And

jtw                                                                        14

1    the City of Barcelona entered into a concession with all

2    these entities a long time ago.

3          Late in 2002, a group headed by Mr. Fraus called

4    BCN 2000, purchased the remaining part of the garage.  The

5    other, I guess it's 370 spaces.  And it began then that

6    Mr. Fraus and I began having discussions in earnest about

7    his interest in buying the remaining rights of Mr.

8    Travelstead in the parking garage.

9          The valuation for these spaces was rather tricky

10   because it's a concession right, not a fee interest.  And

11   so while, and I have looked at some appraisals for the

12   spaces, you can value anything.  But because it's a

13   dwindling asset, if you will, when you discount back the

14   cash flow, it became tricky.  Also, because the parking

15   spaces are under five retail spaces and a casino which

16   have been opened and closed, opened and closed, because of

17   some of the problems with that project.   There was never

18   really a consistent cash flow to really give you a sense

19   of what it was worth.

20        In 2003, I met with Mr. Fraus in Barcelona right

21   after I learned that Mr. Fraus had acquired the remaining

22   spaces.  And Mr. Fraus provided me copies of an appraisal

23   that he obtained.

24        There is an eight member board of directors that

25   controlled the project.  He is a member of the board, but

1  he also negotiated with the board to buy the other spaces.

2  And he and I have been able to review the appraisals that

3  Mr. Fraus commissioned, in his due diligence, to buy the

4  spaces.

5         And I guess, if you would, a fairness, what

6  amounts to kind of a fairness opinion.  And his deed where

7  he acquired his spaces, and, again, the same concession

8  rights.  And he acquired his spaces as I recall for

9  approximately $9,940 Euros a piece.  That was his purchase

10 price for the 300 spaces, or 378 spaces.

11        We began a process of negotiation and we arrived

12 at a dollar amount for these spaces that I control for

13 10,000 Euros a piece.  And we did this all in Euros.  And

14 so, at today's conversion rate, as of this morning, the

15 Euro was multiplied a Euro times 1.18.  The dollar by

16 1.18.  So that, for instance, our deal was $10,000 ended

17 up being worth, went and did the math, about $11,000.

18 10,000 Euros would be about $11,000.

19        So we agreed to a purchase price for the, there

20 are 116 spaces.  Each individually recorded, of 10,000

21 Euros a piece, for 1,160,000 Euros, which is approximately

22 U.S. Dollars $1,300 in today's exchange rate.

23        And we agreed, we did a letter of intent which

24 we filed with Your Honor which provided that we could

25 either sell the spaces for 1,160 Euros.  Or, if the buyer

jtw                                                                      16

1   wanted to buy the stock Hinsua, the entity that actually

2   owns the spaces, it would be a slight reduction to account

3   for certain taxes that would be, that the buyer would have

4   to pay to Spain.  And it's approximately 1,080 Euros,

5   which is about a five or six percent reduction.

6           The assets, the parking spaces are owned by a

7   Spanish company called Hinsua, H-i-n-s-u-a.  And true to

8   Mr. Travelstead's form, Hinsua is owned by a Dutch holding

9   company called Peawick Investments, B.V.  And so, here we

10  go again trying to figure the structure out.

11          And a lot of what we have tried to draft here is

12  really tax driven.  And this is where I have to kind of go

13  through the numbers and explain to Your Honor ultimately

14  what is my opinion on how we should go forward.  And I

15  have read Mr. Canet's response.

16          And I, of course, Mr. McDermott is a creditor

17  and he has his right to be heard.  But I think putting

18  recriminations aside for a moment, I think there is an

19  easier way to resolve this issue today than perhaps is

20  readily apparent.

21          As set forth in the papers, Your Honor, if the

22  spaces are sold, Hinsua will have to pay a tax, a Spanish

23  tax, of approximately 35 percent.  So on a sale of 1,100 -

24  - and by the way, Your Honor, I have Spanish counsel, who

25  I have been working with who has given me what amounts to

1    a tax opinion.  Although it's a little bit different than

2    what we are used to.

3              But, the basis, the tax basis, just like the

4    United States, it would be 35 percent on the net profit,

5    which would be 1,160,000 minus the basis in the spaces.

6    And the basis in the spaces are approximately 213,000

7    Euros.

8              So, you would be looking at a profit of

9    approximately, if you sold them as set forth in the

10   proposal, of approximately 946,000 Euros, which would then

11   be subject to a Spanish tax of about 326,000 Euros.

12             So if we did the deal just like that.  Paid the

13   taxes.  We would net, again at the Spanish level,

14   707,000 Euros, approximately 707,000.  Because it would be

15   1,160,000.  We would have to pay off the existing

16   mortgage.  There is a mortgage on the property of 126,000

17   Euros.  And then you deduct from that 326,000 Euros.  And

18   it's approximately 707,000 Euros net profit, after taxes,

19   which converts to about $834,000 U.S.

20             Now, that is the starting point for our

21   analysis.  In speaking with counsel and as set forth in

22   our papers, to the extent in my activity as a liquidating

23   agent, I render services to protect, if you will, Hinsua.

24             And if this Court were to authorize that portion

25   of my fee, subject to whatever prorations, whatever other

1  protections needed to be put in there, to be paid by

2  Hinsua.  Then that would be treated as an expense of

3  Hinsua, it would have to happen in this year.  And that

4  would reduce the tax that would be paid in Spain.

5          So if you took 100 percent of my fees and

6  expenses, which have not been paid with relation to this

7  matter, plus my out-of-pocket expenses, had that deducted

8  from the net profit, if you will, you could increase the

9  net to this estate by approximately 106,000 Euros, or

10  about $125,000. So we could increase the net result to the

11  estate to about $902,000.

12          So the range that depending on how we end up

13  structuring the deal will be between $834,000 --.

14          THE COURT:  And that then becomes the tax, a

15  deduction that reduces the profit.

16          MR. SHER:  Well, that would be after.  In other

17  words, if -- yes.  My --.

18          THE COURT:  Your fee would reduce the profit.

19          MR. SHER:  Exactly.  It would be an expense in

20  the calendar year.  As I understand the way their system

21  works, whether it's capital gains or ordinary income, it's

22  all treated as profit during that calendar year.  So you

23  then back out any expenses for that calendar year.

24          And so it could reduce it by about -- for every

25  dollar fees that this Court would authorize to be paid

1  over there, you reduce the tax by 35 percent, is

2  essentially how you do the math.

3          But from what I have seen, Your Honor, the

4  range, before we get the U.S. taxes, is between $834,000

5  and $900,000.  Now that is step one.

6          Step two is then we have to get the money from

7  Spain up to the Netherlands, which because they are EU

8  countries, we have gotten an opinion that that can be

9  moved up.  There will be some expenses of getting the

10 Peawick investments apparently needs to be resurrected in

11 the Netherlands.  I am not sure exactly that expense.

12         But putting to the side for a second, then the

13 money would come up out of Peawick.  And if you liquidated

14 Peawick, or if you paid it out of Peawick, it would then

15 come to Mr. Travelstead, at which point we would have to

16 deal with U.S. taxes.

17         Now, I am laying all this out, Your Honor, to

18 explain where we are at the end of the day.  If you start

19 with the range I just laid out of between $830,000 and

20 $902,000, there are two potential treatments of this.

21         This will either going, when it gets to

22 Mr. Travelstead, it will either be ordinary income or

23 capital

24 gains.  If it is ordinary income, it's going to get taxed

25 at about 38 percent tax rate, Federal.

1        And then Virginia, I believe, is about three and

2   a half percent, because he is now a resident of Virginia.

3   So basically about 40 percent tax rate would be charged if

4   it was treated as ordinary income.

5        If this was treated as capital gains, it would

6   be 15 percent under the new bill that just went through,

7   whatever it's called, Congress, I guess.

8        And then what you would have to do again, it

9   would be taxed on the, if you look at Mr. Travelstead's

10  tax basis here in the United States, you take and you

11  would deduct that from either the $834,000 or the

12  $902,000, and then you would have tax of about 15 percent

13  or about 40 percent, depending on how it is treated.

14       I believe it can be structured in such a way, I

15  believe that it can be treated as capital gains.  But

16  there is a possibility that it could end up being ordinary

17  income.

18  And, again, we have gotten tax advice from both my firm.

19       I have talked to Mr. Nussbaum's firm, because

20  they have worked with Mr. Travelstead.  I talked to Grant

21  Thornton.  I have to acknowledge that there is a

22  possibility it could be ordinary income or -- although I

23  like to think optimistically we can do it as capital

24  gains.

25       And as Your Honor knows, the plan also requires

1    me to reserve for taxes.  And it's been my consistent

2    position that any of these deals I am going to reserve for

3    taxes because I don't want there to be an issue about any

4    personal liability on my part, having trust fund monies

5    coming through my hands.

6           So, we would then have to reserve.  So, having

7    said -- a long winded way of giving you what I think is

8    the bottom line range of what are the potential recoveries

9    to the estate, putting aside fees for a second and

10   expenses, on the very absolute low range it would be about

11   $515,000 U.S. net.  That would be assuming that I couldn't

12   have the fees deducted in Spain.  And everything was taxed

13   at an ordinary income rate.  Under my calculation, Your

14   Honor, it's about $513,000 net to the estate.

15          And I would have to then reserve about $300,000

16   for taxes.  Again, the 40 percent tax.  And that would not

17   be distributed until there was a finding by this Court or

18   by the IRS in what the actual taxes were.  But the

19   initial, on the higher range, Your Honor, assuming that

20   it's capital gains, the maximum amount to the estate,

21   again, before fees, would be approximately $767,000, based

22   on my calculations.  With a reserve of about $135,000.

23          And so that is the range that we have.  Now

24   against that whole background, Your Honor, the goal here

25   is to get this deal closed by July 31, because in Spain as

jtw                                                                22

1  of

2  August 1st, nothing happens until September.

3          And I talked with Mr. Fraus this morning, I mean

4  nothing happens after -- basically everyone goes on

5  holiday.  And it just seems to be nothing going on at all.

6  So, what the reason we filed this so quickly is I am

7  trying to hit that -- trying to get this thing closed

8  within the next 30 days.

9          We structured term sheet in a way that we could

10  try to do this in a tax advantageous way.  For instance,

11  if you notice, the term sheet says we can either sell this

12  in fee, if you will, or sell the concession rights, it's

13  not really a fee.  But sell the concession rights.

14          Everything I have just laid out to Your Honor

15  has to do with the concession rights being sold as an

16  asset.  We also laid this out as a potential to sell it as

17  a stock sale to Hinsua so that, if for instance BCN were

18  to buy the stock of Hinsua, the only problem we would then

19  have would be U.S. taxes.  We wouldn't have to pay the 35

20  percent Spanish taxes.  There would be about five percent

21  tax.  But it would be -- it would increase potential to

22  the estate by $300,000 and something.

23          However, there are issues with doing a stock

24  sale that Mr. Fraus has looked at.  He is at this point,

25  and I don't disagree with him.  He is not willing to do --

1   I mean, privately we may disagree with him.  But I think,

2   candidly, and I understand that his concerns, so that a

3   stock sale does not appear to be a possibility because of

4   the unknown liabilities that may be in Hinsua and Peawick.

5          And so, as a buyer at this point in time, and I

6   have met with him extensively.  I know he is ready,

7   willing, and able to close.  He bought the other spaces in

8   December for approximately two million Euros.  He has also

9   bought some -- and I should digress for a moment, Your

10  Honor.

11         Mr. Fraus was in private practice in Barcelona

12  in one of the largest firms in Barcelona.  And then along

13  the way he met Mr. Travelstead back in the 90's and I

14  think he was actually counsel for Mr. Travelstead for

15  three years.  And so, he has had an education in

16  development and has worked closely with Mr. Travelstead.

17  And now he is -- they parted ways, I believe, in 1996.

18  And so he has been on his own since then.  But that I

19  offer as a full disclosure to the Court.

20         I met Mr. Fraus by virtue of an introduction, as

21  it were, from Mr. Travelstead because they had worked

22  together at one time.  But I can represent both to the

23  Court and to Mr. Canet that I am absolutely, positively

24  convinced that there is absolutely no connection between

25  Mr. Fraus and

1   Mr. Travelstead.  And this is truly an arms length

2   negotiation between me and Mr. Fraus.  But I did want to

3   make that disclosure.

4           So, getting back to where we are, Your Honor, we

5   have really not finalized the tax structure.  And we need

6   to get additional tax advice.  I finally got my tax

7   opinion from my Spanish counsel two days ago, in which

8   they confirmed to me that assuming the Court would

9   authorize the payment of fees the way I have laid it out,

10  that that would be a deduction.  And that there are

11  certain other taxes in Barcelona that we would be exempt

12  from.

13          The only thing they have said, and we have taken

14  care of that in our term sheet is that if Mr. Fraus buys

15  the spaces, he would be required to pay to me an

16  additional

17  16 percent over and above the purchase price as value as

18  tax, which I would then have to collect and give it to the

19  Spanish taxing authorities.

20          So, that is the long winded background, if you

21  will, Your Honor, of my due diligence.  I also believe

22  that this is a dwindling asset.  And these assets have to

23  be sold immediately.

24          Now, I was also approached by Mr. Travelstead,

25  oh, a while ago.  Once I entered into this letter of

1   intent with Mr. Fraus, I provided copies, and I will

2   advise Your Honor much like with the Blochless deal, I

3   went off and met with

4   Mr. Fraus without Mr. Travelstead's participation.

5   Although, as I did even then, I told Mr. Nussbaum and Mr.

6   Travelstead that I would be meeting with him, he wasn't

7   part of the negotiations.

8          I provided him with the term sheet.  He

9   approached me a while ago and said that he thought he

10  could structure a higher and better offer.  And the only

11  thing I said to both he and Mr. Nussbaum is they can give

12  me a higher or better offer, I don't care up to the moment

13  of this hearing.

14         But the only prerequisite that I would have

15  would be before I would even discuss it with Your Honor, I

16  though that Mr. Fraus would have to put into Mr.

17  Nussbaum's escrow account some amount of money as a good

18  faith deposit.

19         I am advised by Mr. Nussbaum that I got this

20  letter yesterday from him, which I will move into evidence

21  in a moment Your Honor.  That, in fact, I think, there is

22  $60,000 U.S.  And essentially what Mr. Travelstead is now

23  saying in his offer -- and if I may, Your Honor, I should

24  just put this in evidence so there is a record of this.

25         Your Honor I was presented yesterday morning

1  from Mr. Nussbaum's office a letter in which Mr.

2  Travelstead has made a counteroffer to the proposal which

3  I filed on May 6th.  And I would just put that into

4  evidence, I guess, as Liquidating Agent's Exhibit 1, Mr.

5  Travelstead's proposal.

6          THE COURT: It will be admitted.

7                              (The document referred to was

8                               marked for identification as

9                               Liquidating Agent's Exhibit 1

10                              and was received in

11                              evidence.)

12          MR. SHER:  And Your Honor, I am also going to

13  put into evidence, so there is a full record, the copy of

14  the letter of intent that I executed with Mr. Faus.  And,

15  if I may, Your Honor, move into evidence as Liquidating

16  Agent's Exhibit 2, is the letter of intent dated April 29,

17  2003, between myself and BCN 2000.

18          Both of these documents have been provided to

19  counsel for Mr. Travelstead and I provided Mr. McDermott

20  with, he has received that letter and everything else.

21  And along the way, I have been consulting with him since

22  Mr. Canet is still the largest remaining creditor in the

23  estate.

24                              (The document referred to was

25                               marked for identification as

1                              Liquidating Agent's Exhibit

2                              2.)

3              THE COURT:  This is the letter from Mr. Faus

4    that was attached to your motion.

5              MR. SHER:  Yes, Your Honor.

6              THE COURT:  Is this what you have been calling

7    the term sheet?

8              MR. SHER:  Yes.  Letter of intent, I am sorry.

9              THE COURT:  That is all right.  That is what I

10   assumed and I wanted to make sure I am correct.  Please

11   continue.

12             MR. SHER:  So, what we have, Your Honor, as I

13   understand what Mr. Travelstead is proposing is he is

14   proposing to provide me a competing offer wherein I guess

15   it gives you a higher and better offer of $550,000 U.S.

16   plus what I understand is a waiver of fees of $200,000

17   that he will take care of outside of the bankruptcy.  Or I

18   believe that Mr. Nussbaum will just waive the fees, but I

19   will let Mr. Nussbaum speak to that.

20             So, essentially, as I understand his proposal,

21   $550,000 cash plus $200,000 waiver of fees.  That would be

22   as compared to the offers Mr. Faus has which is set forth

23   in the letter of intent.

24             If Your Honor wants to take a moment to read

25   them, I would like to continue on.

1          THE COURT:  (Reading.)

2          MR. SHER:  So, a brief moment ago, I think

3  Mr. Nussbaum and I had a little discussion.  He will want

4  to clarify it.  Because I gave you my shorthand version of

5  what his letter is.  But, I will let him go through it.

6          And so, Your Honor, what I have before me is the

7  proposal from Mr. Fraus, who flew here at my request from

8  Barcelona for these hearings to answer any questions that

9  either the Court has of him or anyone else, Mr. Nussbaum

10  or Mr. McDermott.

11          And the offer from Mr. Travelstead, which I told

12  him he could submit to me in time.  He chose -- my view

13  being that the plan does reserve to him the right to do

14  certain

15  refinancing under certain circumstances.  So, just like

16  the block of steel, I always said to Mr. Fraus, if you can

17  do something better, the door is always open.

18          The problem, Your Honor, with both deals quite

19  frankly is the tax issues are still a little bit up in the

20  air for me.  I have not had a chance really to discuss

21  with Mr. Fraus whether the $550,000 can come out tax free.

22  So his $550,000 may be $550,000 less taxes, I don't know.

23          Maybe he has some way of doing it that there

24  would be a tax neutral transaction.  But I know that I

25  have not been able to structure a way to do the other

1  transaction in the tax free basis.  I mean, there will be

2  at the very minimum U.S. taxes, which I will absolutely

3  withhold.

4         And then there is the attempt to minimize

5  Spanish taxes.  And so, and I have the range of the deals.

6  And I was just discussing, again, with Mr. Fraus last

7  evening, he flew in last evening from Spain, and again

8  this morning.  We were talking that there may be ways that

9  we can even strengthen his deal in tax basis.

10         And it may be that Mr. Travelstead has the

11  better deal.  I mean, I am not convinced of it, but I am

12  not going to foreclose that possibility.  But I am looking

13  at this

14  July 31st deadline of getting things closed in Barcelona

15  or we are going to be stuck into the Fall.

16         And so what I suggested to both Mr. Nussbaum and

17  Mr. Faus this morning, and this would be subject to

18  however Your Honor views giving me too much discretion.

19  Because giving me too much discretion some people may find

20  troubling.

21         But that I be given the right to consummate one

22  fo the two deals in a way that maximizes the return to the

23  estate.  In other words, I get that authority now.

24         I would be prepared to continue consulting with

25  Mr. McDermott, Mr. Nussbaum, Mr. Faus, and in fact

1  probably getting another tax opinion in Spain because some

2  of these -- because I just think I may need a little

3  stronger help than I have in the firm I am working with.

4         With the goal towards closing one of these

5  transactions by the end of July.  And prior to closing I

6  would give some sort of notice to everyone, some

7  reasonable notice as they, you know, felt that they wanted

8  to come back to Your Honor and try to have an emergency

9  hearing, they would be given that right.

10         As it turns out, Your Honor, I am taking a

11  family vacation the first week of July, and having spent a

12  little bit of time in Barcelona, I am taking my wife

13  there.  So I will be there anyway.  I will meet again with

14  Mr. Faus and whatever tax persons over there.  And

15  hopefully have this thing, at least in my mind, conclude

16  what I think is the best deal.

17         And so what I am suggesting is that I understand

18  the Bankruptcy Code.  And the Plaintiff sells I should

19  sell pursuant to 363.  I think I have gone through a

20  notice of hearing.  I would like to have the authority,

21  and I don't know -- and I will let everyone speak for

22  themselves.

23         That the Court authorize me today to do one of

24  two deals.  I can figure out which one really does have

25  the best return.  I understand Mr. McDermott's concern.  I

1   am not going to leave anything on the table if I can help

2   it.   I mean, there are going to be some taxes left on the

3   table obviously.

4          And, then what I would do is I would give

5   notice.   I would keep talking to him.   Give notice to

6   everyone.   And I would presume that I would close this

7   deal by the

8   31st of July.   I really believe, and I think Mr. Faus can

9   perhaps explain to you the holiday schedules of Barcelona

10  and Capelonia, but if we don't get this closed, we will

11  then be, it will then be, it will probably be actually

12  September, October before I think we get it closed.

13         But in order to get bank approval and do all to

14  get things closed, it's really got to close in the third

15  week of July.   I mean, I have my own personal experience

16  over there, and holidays really seem to get geared up in

17  the fourth week of July, you go right through the end of

18  August, Your Honor.

19         So there is a range that both deals offer.   They

20  both have tax issues that are not resolved in my mind.

21  Depending on this side whether it's capital gains.   How

22  much I can minimize Spanish taxes.

23         And on this side of the ledger whether or not

24  those monies are going to be subject to capital gains

25  taxes.   And I don't really know exactly how Mr.

jtw                                                                    32

1  Travelstead proposes to get the $550,000.  I think his

2  options are either to get the money lent to him from third

3  parties.  I know he is involved in other deals now.

4         And he is actually over trying to do some other

5  deals over there.  Or maybe he is going to refinance at

6  which point there could be all these tax issues.  I just

7  don't know.  It would take more due diligence on my part

8  to know which one is better.

9         But so rather than just continuing this hearing

10 and coming back, Your Honor, for another day, that is the

11 proposal I made to Mr. Nussbaum this morning.  I spoke to

12 Mr. Faus about it.  I think -- Mr. Goldberg reminds me

13 that you approved the Blochless transaction in a similar

14 way.  Because if you remember with Blochless we had a term

15 sheet.

16        But we hadn't even gotten to the definitive

17 documents because we really didn't have the whole deal

18 structured until the eleventh hour.  We literally closed

19 that deal in Amsterdam at midnight.

20        I mean, it's a little different, but it's the

21 same.  Because I am not quite sure -- I always knew in

22 that deal who I was selling to, it was just the tax

23 structure.  Here, it is the same structure having to go up

24 through the Netherlands that I have the same problems

25 again.

1        And so, I am going to have to keep moving

2   forward and it just seems to me the best way to deal with

3   all this is to get preapproval for one of these two deals.

4   I don't anticipate there being any other buyers.

5        I mean I think that it's logical, it's either

6   going to be Mr. Faus or Mr. Travelstead that are going to

7   buy these spaces.  No one else would buy these spaces

8   because of the nature of the spaces.  The way they are

9   located.

10       It's in a condominium regime.  There is a

11  management agreement between Hinsua and the other owner,

12  which is Mr. Faus.  I don't believe a third party or a

13  strategic buyer in Barcelona is going to buy these spaces

14  for the return.  The strategic benefit these spaces is on

15  Mr. Faus' side.  The ability to accumulate the entire

16  garage.  And on Mr. Travelstead's side, I guess he uses

17  something that in the future he can perhaps get the

18  concession extended.  Because the concession runs out in

19  16 years.

20       I believe he optimistic that he can go to the

21  federal government in Madrid and somehow convince them to

22  extend the concession rights.  So, I don't think there are

23  any other buyers, Your Honor.  These are the only two.

24  That is my, I guess, you could --- my case and my

25  suggestion to Your Honor on how to proceed.

1    THE COURT:  Do you have any feel for what the

2  practice is in Spain with these concessions as to what

3  happens at the end of the life of the concession to the

4  properties that have been developed?  Do they revert

5  somewhere?

6    MR. SHER:  Well, technically, what I have been

7  told by several parties that toward the end of the

8  concession, the government will renew the concession to

9  the City.  The City will then have the right to go

10  negotiate.

11    And, again, my understanding is they would first

12  go and speak to the then owners of the spaces.  But, Mr.

13  Faus is here, perhaps, I mean he is has more real estate

14  background.  And he is involved.  So, perhaps, Your Honor,

15  Mr. Faus could explain it.  My understanding is we won't

16  know that for a number of years.  I do not believe that

17  you can get the concession --

18    THE COURT:  Well, you are not going to know with

19  these particular properties.  But I am just trying to

20  understand the system as it works, I am sure, in other

21  places.  Barcelona and elsewhere.

22    MR. SHER:  Could I have Mr. Faus answer that

23  question, Your Honor?

24    THE COURT:  Do you mind commenting on that?

25    MR. FAUS:  Thank you.  This is further law that

1    affects all of the coastline of Spain, entirely.  It was

2    passed in 1998.  And the purpose is to protect the

3    coastline against high rise buildings.  This affects the

4    whole perimeter of the coast of the Country.  That is why,

5    I don't know.

6            The concessions are for 30 years.  By law they

7    cannot be more than 30 years.  That is why this concession

8    was signed in 1999 and runs to 2019.  That concession, by

9    law, is not renewable.  The law says this is a coastline -

10   -- of Spain, the concessions cannot be renewed.

11           So, the concession expires, no matter what they

12   say about extensions.  It's illegal.  You don't extend a

13   concession.  The only thing that they would do is that

14   they can open a new concession of 30 more years.

15           But the law does not provide for any extensions.

16   There are no precedents, because the law was --- in 1989,

17   and 30 years have not gone by yet.  The only precedent

18   that we have are auto concessions, like oil concessions,

19   gas concession, highway concessions.  Those usually are --

20   sometimes they are renewed.  Sometimes they give new

21   concession, but, of course, for a different price.

22           This concession has a very small price to pay to

23   the government, various ---.  Due to the fact that it was

24   an obligation, it was a lien on the concession to build

25   out of the public space for the Olympic games.  Roadways,

jtw                                                                          36

1   et cetera.

2          No one knows 16 years from now what is going to

3   happen, because that lien really hasn't been adopted.  The

4   users of that concession paid for those roads.  And now

5   what is a complete unknown is --- concession will be the

6   price.

7          We are all sure that the price will not be the

8   same as it is now.  So, it is unknown.  We all expect that

9   we will have some rights against third parties to get

10  those concessions, --- at least, reassigned to us.  And

11  what is a complete unknown is a surprise.

12         THE COURT:  Thank you.  Can you answer one more

13  question, while you are right there?

14         MR. FAUS:  Of course.

15         THE COURT:  How are these particular parking

16  spaces important to you and how you manage the facility,

17  manage the building?

18         MR. FAUS:  Well, this parking space system right

19  now they are part of my portfolio, the work that I

20  operate.  I operate all the parking spaces at this time.

21  Both my spaces and Mr. Travelstead's spaces through a

22  management contract, that I operate it for them.

23         And I give them a prorata basis of the revenues.

24  For me, it's part of my company.  My company deals with

25  real estate.  I am in real estate management.  I have part

1    of the garage.  I also have part of retail stores in

2    Barcelona and I have these parking spaces.

3            We operate them in a day to day basis.  They are

4    public operated spaces.  You can go there, pay a fee, pay

5    a ticket, or lease on a monthly basis.  For me they are

6    very important.  They are very important to consolidate

7    the whole garage.  For me to --- Mr. Travelstead, I have

8    no idea why they are so strategic.

9            THE COURT:  Thank you.  Mr. Nussbaum, do you

10   wish to comment?

11           MR. NUSSBAUM:  If I may, Your Honor.

12           THE COURT:  Please.  If you speak at the

13   microphone, then you won't have to speak very loudly.

14           MR. NUSSBAUM:  I will do that.  Thank you.  I

15   will keep my remarks generally brief.  Because I believe

16   Mr. Sher is substantially accurate in his overview of what

17   has transpired over the past several years and the

18   activities and events.  Some of them more proportionate

19   that took place in Spain.

20           I would, however, like to, I believe Mr. Sher

21   was remarked on this, but I would like to state it so that

22   it is clear on the record and both the parties, especially

23   in light of the somewhat --- pleading that was filed late

24   last night by Mr. Canet's counsel, which basically assails

25   Mr. Travelstead in this offer he is making for the same

1   old reasons.  I have another copy, if Your Honor would

2   like.

3            THE COURT:  I haven't seen it, Mr. McDermott.

4            MR. NUSSBAUM:  For the same reasons pretty much

5   that many of his positions in this case have been

6   following.  And I am not going to go into it.  I will

7   reserve if

8   Mr. McDermott, when he speaks to the Court, wants to go

9   into

10  what his reasons are for opposing any deal by

11  Mr. Travelstead, or even consideration of the offer

12  presented.

13           And for the reasons he states, I will be happy

14  to respond at that time.  Perhaps there won't be a need

15  for us to debate that today because I can state right now

16  that what Mr. Sher suggested to me this morning and what

17  he has submitted to the Court as a means of proceeding is

18  agreeable to the Debtor in respect of these proceedings

19  and specifically in the handling of the offer that was

20  tendered.

21           I would like to just point out though that

22  something that is important in respect of all the

23  activities over the past few years in Spain.  Many of them

24  were done together between Mr. Travelstead and Mr. Sher.

25           As Mr. Sher correctly noted, Mr. Travelstead

1    introduced him to the parties who might be interested,

2    that otherwise were not available, or Mr. Sher did not

3    have contacts with.  And in good faith and with the full

4    intention of assisting Mr. Sher in disposing of the Hinsua

5    parking lots with the best value to the estate.

6            That is how the relationship was handled.  And I

7    am sure Mr. Sher would confirm that.  Indeed, he was

8    gracious in his pleading, which was not on Mr.

9    Travelstead's behalf in paragraph 22 to specifically refer

10   to the fact that

11   Mr. Travelstead introduced him to potential buyers and

12   assisted him in his efforts in dealing with all aspects of

13   the Hinsua spaces.

14           Mr. Travelstead has had, I am not going to --

15   this is not a sob story, or there is no violins that

16   should be playing in the background.  But he has had a

17   rough time.  He is not a young man and he has been trying

18   without any assets to enjoy from his estate to make the

19   best of it in trying to develop additional an future

20   business opportunities for himself.

21           And as Mr. Mr. Sher correctly noted,

22   Mr. Travelstead has developed some opportunities for

23   himself in Spain.  And I am sure many of us wish the best

24   for him in that regard.

25           In so doing, he has worked with and made

1   connections with various investors doing other projects in

2   Spain and substantial parties, money parties, who he

3   brought the letter of intent that Mr. Sher has entered

4   into with

5   Mr. Faus to.  And discussed it with them.

6           And said to them, essentially, I can generate a

7   transaction that will result in my bankruptcy estate

8   receiving greater net value for distribution to betters.

9   Here is how much I would need from you to give to me or

10  lend to me that I would essentially just pay to the

11  bankruptcy estate.

12          Critically important, and something to clarify

13  that Mr. Sher I don't believe was focused on when he was

14  discussing the proposal we made with Your Honor moments

15  ago, is that there will be no tax consequence to the

16  bankruptcy estate, whatsoever.

17          And there will be no analysis needed.  There

18  will be no tax opinions required.  There will be no

19  foreign taxes due in the Netherlands.  There will be no

20  foreign taxes due in Spain.  And, most significantly,

21  whether ordinary income tax or capital gains tax, there

22  will be no tax payable from this bankruptcy estate from

23  what Mr. Travelstead proposes.

24          The reason for that, so it is not just my

25  representation, which it could be in the deal, because we

1  can make it crystal clear.  The requirement for the

2  payment of taxes is something that was part of the plan as

3  a negotiated aspect for the Debtor's benefit if there is

4  going to be an asset sale and he is going to be personally

5  saddled, that is what it is about, with an income tax, the

6  plan provides that the estate reserves.  And that is what

7  Mr. Sher's charge is.

8          There is a simple way of handling that.  He is

9  just not going to require, and if there is a tax liability

10  he is going to be personally responsible for it.  But that

11  is not necessary here.  Because if you turn to page two of

12  the letter I provided to Mr. Sher, which Your Honor was

13  not done at the last minute and provided to him yesterday

14  for any strategic reason.

15          To the contrary, I have been discussing this

16  with Mr. Sher for many weeks and doing a lot of due

17  diligence on this.  And I, in fact, remarked about it when

18  we were on the conference call status conference on June

19  2nd.

20          But the preamble to the first point, I stand

21  corrected, on the first page.  This proposal is in

22  consideration not for a sale of the stock.  Not for a sale

23  of the parking lots to Mr. Travelstead.  What this would

24  simply require is for an order to be entered that the

25  estate no longer has any interest in what Mr. Travelstead

1    already owns.

2            Consequently, there is no transaction taking

3    place through which there will be a taxable event.

4    Moreover, the proposal offers a net cash dollar amount of

5    $550,000.  No amount of that is earmarked for anyone.

6    That amount would go to Mr. Sher and be immediately

7    distributable without reserve to creditors who have claims

8    and/or for whatever administration claims need to be dealt

9    with or otherwise in accordance with the plan.

10           Mr. Sher correctly noted that I received

11   confirmation from, I believe it is Banc Sabadell in Spain.

12   A wire transfer that arrived Friday in my office of 53,000

13   Euros which equates to $64,000.

14           That amount was required by Mr. Sher because he

15   felt given some of the parties' concerns about

16   Mr. Travelstead, justified or not, he needed to have

17   legitimacy backing this proposal in order to move forward,

18   despite our disagreement that that was required, since

19   there is no deposit on hand from Mr. Faus.

20           Nonetheless, Mr. Travelstead obtained those

21   funds from his investors and wired those funds into my

22   account.  And the deposit is available to be remitted upon

23   approval of in the process by Mr. Sher of this proposal.

24           I will skip over the second -- third.  Excuse

25   me.  I can go right to the third point.  Mr. Sher

1    incorrectly states that what this tantamount to is a

2    waiver by

3    Mr. Nussbaum or my law firm of fees.  That is not the

4    case.  Your Honor, Mr. Sher has made the, maybe a number

5    of things, but one thing he is in the parlance a minch in

6    certain respects.  Or in other words, a gentleman in so

7    far as his personal needs and his firm's economic exposure

8    to this case.

9          He has not sought fees pretty much in the last

10   four or five years that have accrued for him and his law

11   firm.  And expenses he has underwritten.  He has

12   requested, and for the most part my firm too, has bided

13   the time of filing a fee applications over the last few

14   years.

15         Those fees accrued, not yet approved, are

16   substantial for both firms.  I can tell you that I

17   anticipate just what I have already seen in Mr. Canet's

18   response to this matter.  That he will challenge

19   Whiteford, Taylor and Preston's fees as he has in the

20   past.

21         I can assure the Court that we have, we are not

22   foolish, nor are we confident that our fees are simply

23   going to be approved.  We will have to meet the standards

24   and demonstrate benefit and the other requirements.

25         But, nonetheless, we are substantially sure that

1   a great amount of those fees are justifiably warranted.

2   Were done for many things.  Not just in Spain.  In

3   conjunction or at the request of the liquidating agent and

4   to enhance the estate.

5          One way or the other we have accrued and

6   approved fees in excess of $100,000 that haven't been

7   paid, already allowed.  We have in excess of half a

8   million dollars in additional accrued and unpaid fees.

9   And another $50,000/$75,000 in expenses.

10         And what Mr. Travelstead has agreed to do, and

11  it will be backed up by his investors, is to assume

12  responsibility for the payment of what would be allowed,

13  fees and expenses of professionals, specifically

14  Whiteford, Taylor and Preston.  It may include others.

15  But, at least that.  In the amount of $200,000.

16         That amount would then be not waived, but the

17  estate's obligation to pay it upon the assumption by

18  Mr. Travelstead's group, the estate would be relieved of

19  the obligation to pay those.

20         The next item which Mr. Sher did not mention,

21  but he eluded to in his opening presentation is the issue

22  of expenses.  And Mr. Canet's response misunderstands this

23  as well.  Because the expenses referred to of the

24  additional professional fees, are not those of Whiteford,

25  Taylor and Preston.

1        What those fees are referring to is in

2   consultation with Mr. Sher, I inquired as to what all was

3   involved in his having to go forward under the letter of

4   intent with Mr. Faus for the various transactions

5   contemplated.

6        And there are a number of things, including --

7   this letter of intent is an agreement to agree.  If Your

8   Honor looks at the various conditions in the letter of

9   intent, and there are several, one of them, without

10  assailing it, is that actual agreement to close.  A

11  substantial complete agreement has to be negotiated.  And,

12  completed.

13       I am not going to suggest that that won't

14  happen.  But we all know the devil is in the details.  And

15  that undertaking has to go froward.

16       There is also tax issues, corporate issues, and

17  other transactional issues which Mr. Sher and I discussed,

18  or I asked him to explain to me, which involve matters in

19  Spain.  Matters in the Netherlands.  And here in the

20  United States.

21       All amounting to anywhere from $100,000 to

22  $200,000 in what will be yet un-incurred, but will be

23  additional administrative expense claims that have to be

24  paid, for among others, Mr. Sher's law firm.  And the tax

25  lawyers in Spain.  The new tax lawyers that Mr. Sher said

jtw                                                                        46

1    he needs to get another opinion from.

2            The attorneys and agents that he has been in

3    discussions with in the Netherlands, and others in Spain

4    that he needs to just have help him complete the

5    transaction.  They will be incurred.

6            Mr. Travelstead's offer says they need not be.

7    Because he is prepared to close without any further

8    activity and with the incurrence of that cost.

9    Consequently, although Mr. Sher advised me yesterday that

10   the number I put in here of $200,000 is high, in his

11   estimation.

12           There is a number that won't by operation of

13   what Mr. Travelstead is proposing be incurred.  That is a

14   net gain to the estate.  Because these expenses will have

15   to be paid by the estate as administrative priority

16   expenses.  And it's a cost of that deal that reduces the

17   value coming in.

18           Mr. Travelstead is prepared to close on this

19   transaction by July 15th.  And our analysis isn't that

20   this -- Mr. Travelstead's analysis -- and it doesn't

21   matter if this case isn't a great opportunity for me to

22   seize upon.  In fact, it was completely to contrary up to

23   the point in time when this letter of intent came in.

24           He worked exclusively to assist Mr. Sher in

25   trying to do what could be done to garner the greatest

jtw                                                                      47

1  value.  Looking at this proposal, he talked to his

2  investors.  He spoke with me.  I conferred with Mr. Sher

3  and what was put together was this offer, which we suggest

4  was submitted to Mr. Sher is valuable.  Excuse me.  I

5  restate it.  Presents the estate in excess of $300,000 net

6  benefit over the proposal being submitted by Mr. Faus.

7        And the numbers Mr. Sher presented actually

8  confirm this, although it could be much more, or something

9  less.  But, certainly there is better value to Mr.

10 Travelstead's offer, depending upon the range that he gave

11 us of between $515,000 and $767,000 that would come

12 depending on the taxes in Spain and depending upon the

13 taxes here in the United States.

14       I am not here to argue that the offer is better.

15 Your Honor should approve or require Mr. Sher to prove it.

16 In fact, Mr. Sher has suggested as a way to proceed makes

17 sense.  Because there is a lot yet that he needs to

18 understand.

19       I don't think he is ready even to accept under

20 all circumstances the letter of intent from Mr. Faus given

21 some of the issues he still needs to deal with.  But

22 regardless, we are prepared to proceed consisting with

23 what Mr. Sher has suggested.  And I think it makes sense.

24 And in good faith negotiate the best deal for the estate

25 that can be obtained.

jtw                                                                      48

1          In the end, what Mr. Travelstead has put

2    together is something that he, as you heard from Mr. Faus,

3    is taking or having his investors take some of the risk in

4    gambling.  I don't think Mr. Travelstead disagrees with

5    the explanation that Mr. Faus, I think very accurately,

6    made to Your Honor about the concessions and how they

7    work.

8          There is no certainty.  If there is an upside to

9    Mr. Travelstead in this, it's likely years and years out.

10   And it will depend upon whether or not whether he is able

11   to achieve what Mr. Faus explained is a new concession

12   that could be gotten for his parking lots.

13         That is the extent of what I can clarify for

14   Your Honor in this proposal.  And, hopefully one way or

15   the other, the best proposal that brings the greatest

16   amount for distribution to creditors is what Mr. Sher, and

17   I am sure he will, prove and then have Your Honor give

18   your blessing to as well.  Unless you have any questions

19   for me, I am done.

20         THE COURT:  Thank you.  No, I will hear from

21   Mr. McDermott now.

22         MR. McDERMOTT:  Good morning, Your Honor.  Thank

23   you.  I will be very brief.  First, with respect to

24   Mr. Sher's presentation, if Your Honor does decide to give

25   them authority, I wish to request that such authorization

jtw                                                                    49

1   stress that Mr. Sher be given and has full power to take

2   all necessary steps to minimize taxes that would be

3   incurred in any transaction.

4          In particular, if need be, to arrange and to

5   structure any corporate entities in Europe, such as

6   Peawick or Hinsua so that he could arrange the transaction

7   and the flow funds so as to minimize taxes to the estate.

8   I think that is what Mr. Sher wants.  By the same time we

9   wish to give him support for the full authorization.

10          Next, with respect to Mr. Travelstead's

11   proposal,  we believe that the offer truly understood

12   amount is little more than $550,000.  That the two forms

13   of non-cash consideration involved, the assumption of

14   certain fee obligations really do not amount to very much.

15

16          Secondly, the so-called transaction cost that

17   would be avoided here, I think those numbers today have

18   been reduced by $100,000, with Mr. Nussbaum's statement.

19   But, more importantly, I think those also ignore the costs

20   that will be incurred by Mr. Sher in negotiations with Mr.

21   Faus, that I believe giving what Mr. Nussbaum said, would

22   have to be paid.

23          Second, going back to the consideration in the

24   form of obligations.  Much of fees that are ultimately

25   being -- fee obligations, rather, that are being assumed

jtw                                                                    50

1  by

2  Mr. Travelstead have not been paid for a very good reason.

3  It didn't benefit the services led to those fees did not

4  bring any benefit to the estate.

5           They involve, and I will not go into any great

6  detail at this time because this is not the final moment

7  for consideration by the Court, obviously.  But they

8  involve transactions with express, among others, that

9  ended in no benefit, whatsoever, to the estate.

10          Now, it may appear that we are necessarily

11  hostile to any offer by Mr. Travelstead.  That would be a

12  mistake.  If Mr. Travelstead wishes to put in more cash

13  than the amount put in by Mr. Faus, then we would be much

14  more receptive.  But the non-cash consideration that is

15  being proposed is really worth very little, if anything.

16          Finally, Your Honor, I think a remark has to be

17  made here about the way which this offer could easily be

18  used by Mr. Travelstead to enrich himself.  This is an

19  assets whose value is one point three million dollars, at

20  the current time.

21          His proposal would amount to an opportunity for

22  him to double his investments.  His personal take on this

23  would probably be much greater.  In those circumstances,

24  we believe the Court should be extremely cautious before

25  allowing his offer to receive any priority over others.

1  And that is all we have to say today, unless Your Honor

2  has any questions.

3          THE COURT:   No.   I don't think I have questions.

4  Are there any questions that either Mr. Nussbaum or

5  Mr. McDermott that you wish to ask of the Trustee?

6          MR. NUSSBAUM:   No, Your Honor.

7          THE COURT:   Mr. McDermott?

8          MR. McDERMOTT:   Not at this time, Your Honor.

9  And I am sure Mr. Sher would be willing to answer those

10 questions in the next few weeks if they arise.

11         THE COURT:   You wish to add any final comments,

12 Mr. Sher?

13         MR. SHER:   No, Your Honor.   I think I have

14 labored on for a while.   I think the, just the bottom line

15 analysis, is either I am going -- I reserve to come back

16 for subsequent hearings, which I think is a hardship

17 obviously on Mr. Faus and other people, or get the

18 authority today.   And, against the deadline.   And since I

19 am a creature of a plan with power from the plan, I think

20 that the proposal I made works.

21         I would still use the form word that were

22 submitted because ultimately I want all -- and we learned

23 this in the Blochless transaction, where I actually had to

24 sign all the power -- all the documents with a power of

25 attorney.   And we didn't --- from the Netherlands, excuse

jtw                                                                          52

1   me, a notary from the Netherlands who sat through the

2   closing.

3            So, having been down this road once before I

4   realize that I need some of the protections that are in

5   the order if I am going to do this.  What I would propose

6   is take this order, circulate it between Mr. Faus, Mr.

7   Nussbaum,

8   Mr. McDermott --

9            THE COURT: Is this an order I haven't seen yet?

10           MR. SHER:  Now.  There is an order attached to

11  the motion.

12           THE COURT:  Yes.

13           MR. SHER:  And I was going to take that order

14  and add in some language basically, if Your Honor were to

15  approve it, giving me the authority within certain

16  parameters, but then keeping the rest of the structure of

17  the order the way it is.

18           But, I would again circulate this.  And I have

19  not drafted such an order because frankly I wanted to

20  speak with Mr. Faus last night and this morning and Mr.

21  Nussbaum this morning.  And, the proposal I made wasn't

22  something that I was thinking about until in the shower

23  this morning.

24           THE COURT:  Now, Mr. Nussbaum has said that he

25  can live with your proposal.  Can Mr. Faus live with it at

jtw                                                                          53

1   this juncture?

2           MR. FAUS:  Yes.

3           THE COURT:  You have not choice.

4           MR. FAUS:  If I come by the spaces, fine.  And

5   if I cannot, also fine.

6           MR. SHER:  I have discussed this with Mr. Faus.

7   I wouldn't have done that Your Honor, if I had not

8   discussed that.

9           THE COURT:  Now what you say within parameters.

10          MR. SHER:  Well, I would consult, I mean I have.

11  I do talk to Mr. McDermott from time to time.  I do talk

12  to

13  Mr. Nussbaum.  In fact, I talked to Mr. Travelstead when

14  he -- Mr. Nussbaum is correct.  I mean, he has brought a

15  number of parties to me.  And from time to time we do

16  talk.

17          And so I would -- and Mr. Faus, what I have

18  done, so that I don't have anyone accusing me of anything

19  untoward is when I got my tax information from my

20  attorney, I gave it to Mr. Nussbaum.  I gave it to Mr.

21  Faus.  I mean, I give everyone the same information.  I

22  mean, I still negotiate for what I have to negotiate,

23  which is whatever that is.

24          But, so I would consult.  I think the parameters

25  would be that I would want to close this deal by July 31.

54

1   I would want the right to be able to close it.   And I

2   would want to be able to just give either side, you know,

3   some reasonable notice several business days, whatever

4   deal I am going to do.   So that if they wanted to come

5   back before Your Honor, they would have that opportunity.

6           And I more than willing to make it five business

7   days before I close.   And I would consult with all parties

8   before I do anything.   I mean the real stakeholders are

9   largely here.   I think Mr. Canet is the largest unsecured

10  creditor.   Mr. Nussbaum is representing Mr. Travelstead.

11  Mr. Faus is here.

12          THE COURT:   I assume that the terms would be

13  whatever you did, would be no less favorable than those

14  described in Exhibits 1 and 2.

15          MR. SHER:   Right.   If either of those deals

16  became impossible so that I couldn't hit the bottom, I

17  would walk away from this transaction.   And I would tell

18  Your Honor, one thing I didn't tell you.   About a year and

19  a half ago we had structured transactions with Sogo before

20  they went into bankruptcy for, at that point,

21  substantially more money.

22          But they wanted us to give up certain other

23  rights that would have triggered unbelievable taxes.   We

24  would have been deep in the hole.   So, I mean I am very --

25  these are just -- the structures that I was left with are

jtw                                                              55

1  pretty low on tax issues.  So, I would no less than that

2  would be received by the estate.

3          And I think the low range of that, Your Honor,

4  what were in my presentation.  I don't know that I need

5  that in an order because ultimately I need to take this

6  order and get it inputted.

7          THE COURT:  Your presentation was the effect of

8  the offer.

9          MR. SHER:  Yes.

10         THE COURT:  Well, I think the easier way to

11 describe the parameter is simply what was offered.  You do

12 then need to evaluate the effect, is what you are saying.

13         MR. SHER:  Correct.

14         THE COURT:  Of those offers and/or any

15 enhancements thereof that come through the process as you

16 are looking at what can be done.

17         MR. SHER:  Yes.  And, I -- yes, exactly.

18         THE COURT:  And you are talking about five days

19 before settlement.  Now, that is the tricky one.  Well, I

20 would assume that anybody negotiating against you would

21 play that date down to the last second.  Do you think you

22 can handle that?

23         MR. SHER:  Your Honor, I have had many years of

24 Mr. Travelstead and only a year with Mr. Faus.  And I

25 think we all understand each other.  Yes, I believe I can

1    handle it.  And frankly, Your Honor, it gives --.

2              THE COURT:  You are looking for a settlement

3    before July 31.  That is just an outside to cover.  The

4    parameter would be your attempting to do it by July 15th.

5              MR. SHER:  As soon as possible.

6              THE COURT:  By July 15th, for --.

7              MR. SHER:  I don't know that that is possible

8    with my schedule.  But, --.

9              THE COURT:  Because that would be a parameter

10   that it's before July 31.

11             MR. SHER:  Well, the closing before July 31.

12             THE COURT:  Yes.  I understand.  But if you are

13   measuring your five days of notice for a July 31

14   settlement, you are just asking for trouble.

15             MR. SHER:  Maybe I should shorten my notice

16   then.  I mean, I was just, I, you know.  I am going to

17   give

18   Mr. Nussbaum and Mr. Faus and Mr. McDermott enough time so

19   that they can get in here.  Five days may be generous.

20   It's up to them what they want.  I will let them speak to

21   that issue, Your Honor.  If they are willing to go with

22   ten minutes notice, that is okay with me too.  But I

23   suspect it's more their issue.

24             MR. FAUS:  Can I speak?

25             MR. NUSSBAUM:  I don't have a problem in

1   shortening in time.  I think the number of days is more

2   for Your Honor and I was going to say Mr. Faus.

3        THE COURT:  I am not about to shorten that.  I

4   am just trying to count days.

5        MR. FAUS:  Excuse me, Your Honor.  Actually, I

6   don't need any days.  I mean my offer is here.  I am not

7   going to raise the offer.  I can't no matter what happens.

8   So, my numbers are there.

9        If it wasn't for Mr. Sher to analyze the tax

10  structure and what is the best for the estate.  But no

11  matter what Mr. Sher tells me, I am not going to do

12  anything to my offer.  So I don't need any days,

13  basically.

14       MR. SHER:  Then it would be Mr. Nussbaum and

15  Mr. McDermott how much time they would need, Your Honor.

16  And, of course, Your Honor, I am sorry.

17       THE COURT:  Okay.  Now, Mr. McDermott spoke of

18  that he wants you to have full power to minimize taxes,

19  including to restructure corporate entities.  And I am not

20  sure exactly what is meant by that.  Do you have any

21  feeling, any need of anything for more authority than you

22  have as a trustee?

23       MR. SHER:  I think the language in the proposed

24  -- in the order that was attached to the motion, which was

25  actually copied from powers you previously gave to me in

1   Blochless.  Give me the right that would be recognized in

2   the Netherlands to vote the shares of Peawick, which owns

3   Hinsua.  And so, by that vehicle I can then take steps

4   that need to be taken.

5           So I think the powers that are in the order are

6   probably all that I need.  And if for some reason I need

7   other powers, I can come back.  But, having been down the

8   road once before, this was the language that worked last

9   time.  And I think it will -- and I have already contacted

10  the same law firm in Amsterdam who helped us the last

11  time.  And so, I think this does it.

12          THE COURT:  All right.  I will follow your

13  suggestion, Mr. Sher.  I will approve the sale to

14  basically authorize you to close with either party based

15  on your analysis of which, after consideration of the tax

16  consequences and other costs of closing, will net the

17  greatest cash return to the estate.  I guess that is the

18  concept.

19          That we will have some parameters which is that

20  this authority will extend through July 31st.  The terms

21  of the offers will be no less favorable than those set

22  forth in Exhibits 1 and 2 introduced into the record

23  today.

24                              (The document marked for

25                               identification as Liquidating

1                              Agent's Exhibit 2 was

2                              received in evidence.)

3              THE COURT:  That you will take into account the

4    tax effects, as well as the likelihood of the other

5    benefits being tangible that are proposed being realized.

6    And I am looking at the calendar.  The 31st of July ends

7    up on a Thursday.

8              So there are four business days in that week.

9    And it seems to be any notice that you give, I think four

10   days is a better number than five, for your generosity of

11   telling

12   Mr. McDermott and Mr. Nussbaum, and Mr. Faus, if he has

13   any

14   interest at all, as a courtesy, of which direction you are

15   going in.

16             And I would like you to draw up an order to that

17   effect.  Or modify an order to that effect and I will be

18   glad to sign it.

19             MR. SHER:  Thank you, Your Honor.

20             MR. McDERMOTT:  Your Honor, may I?

21             THE COURT:  Yes, Mr. McDermott.

22             MR. McDERMOTT:  Pardon me for interrupting.

23   But, one request.  And I make this request of Mr. Sher, as

24   well as to the Court, that any notice not be given during

25   the period of July 11th through the 15th.  And the reason

jtw                                                                          60

1    is I am on a long scheduled family vacation, away from the

2    office at that time.  If that courtesy could be granted, I

3    would be very grateful.

4              MR. SHER:  I can't foretell what is going to

5    happen, Your Honor.  I would --

6              THE COURT:  Well, I think you have asked for the

7    courtesy to be extended.  I think as we look at this, the

8    likelihood of Mr. Sher's already told me the likelihood of

9    settlement by the 15th is very small.

10             MR. NUSSBAUM:  I am on vacation too.

11             THE COURT:  And, so that I think that that will

12   be honored but I am not sure whether he can promise the

13   full four days.  I think that is on the record, Mr.

14   McDermott.  I think you will have to make at least some

15   alternative arrangements for receiving the notice if it

16   comes at a different time.  If it comes in before you get

17   back.

18             MR. McDERMOTT:  Thank you, Your Honor.

19             THE COURT:  Anything else?

20             MR. SHER:  Well, I think there is the other

21   motion.

22             THE COURT:  Now, we have the other motion that

23   the Debtor wants to pay.  Right.  Is that what we are

24   talking about?

25             MR. McDERMOTT:  Your Honor, one other thing, if

jtw                                                                          61

1    I may interrupt?

2            THE COURT:  Yes, sir.

3            MR. McDERMOTT:  I would appreciate it if the

4    response of Mr. Canet were offered as part of the record,

5    as Exhibit 3.

6            THE COURT:  Yes.  I have it.  And I was reading

7    it, Mr. McDermott here on the Bench.

8

9            MR. McDERMOTT:  Thank you, Your Honor.

10           THE COURT:  And it will be docketed as your

11   response.  It just hadn't been done that when I was

12   calling it up on the computer.  We just got it just sort

13   of as we were, finally after we came into Court.  So it

14   will be part of the record of this hearing.  And I have

15   read it.

16           MR. McDERMOTT:  Thank you, Your Honor.

17           THE COURT:  Yes.  Now we have the attorney from

18   Spain who would like to get paid.

19           MR. NUSSBAUM:  We actually have two attorneys

20   from Spain that would like to get paid.  One of them has

21   been very aggressive in efforts to get paid.

22           THE COURT: And he advised me of his concern.

23           MR. NUSSBAUM:  And, Your Honor, the matter

24   involves Alfonso Martinez-Almedia, who was engaged and

25   approved by the Court as special counsel.  I think Your

1   Honor is thoroughly familiar with what this matter is and

2   there is an amount outstanding to this gentleman of

3   $14,320.75 U.S.

4          And, there has been a motion, a response, and

5   correspondence as well regarding this.  And I don't really

6   have anything further to add because based on at least

7   what I understand from Mr. Sher, this may not be a problem

8   to have approved.  And there are monies to pay it.  But I

9   will leave that to Mr. Sher.  I am not sure, maybe looking

10  at his face, that is not the case.

11         But, as far as we are concerned, this is an

12  amount that was approved by allowed order.  There was a

13  time period when there were funds unavailable and/or a

14  restraint on expending funds reserved by the liquidating

15  agent, which gave rise, basically, to the delay in payment

16  on the Court approved fee.

17         It would be our request that Your Honor,

18  depending upon what Mr. Sher says, authorize him to go

19  ahead and make this payment, that has been sought.

20         THE COURT:  Is that --

21         MR. NUSSBAUM:  There is not a fee application

22  pending, Your Honor.

23         THE COURT:  I thought there was a fee

24  application approved, or something.

25         MR. NUSSBAUM:  It was.  The fee application, he

jtw                                                                      63

1   was approved by order of the Court.  The fee application,

2   the amount was determined and a portion of it was paid.

3           THE COURT:  A portion of it was paid.  And this

4   is the balance due.

5           MR. NUSSBAUM:  Correct.

6           THE COURT:  Of some $14,000.  And the trustee

7   answer is he needed to reserve for taxes.  Is that

8   basically your answer?  We will find out.

9           MR. SHER:  Yes.  I mean, that was -- well, here

10  is why I did what I did.  And I did make a partial

11  payment.  During calendar year 2002, there were excess

12  fund of Hinsua that I had wired into our escrow account,

13  about $60,000, approximately.

14          So, I am holding, first there is the CD for the

15  tax from the Blochless sale, that as of March 10th, was

16  about $561,000.  And that is still subject to the

17  proceeding that is being moved along now with the IRS.  So

18  once that gets, if that gets resolved, I believe, my

19  understanding of the taxes that were going to be paid out

20  of Blochless is less than $75,000.  I think it was like

21  $59,000.  So a substantial amount of that money will come

22  out.

23          THE COURT:  It's 53, is the number if have been

24  given.  But there will be interest or something that will

25  change that.

jtw                                                                      64

1          MR. SHER:  Right.  There will be interest.  And

2    so there is that $500,000, but it's restricted right now.

3    I can't invade that $500,000.  In addition --.

4          THE COURT:  Can't invade it because of why?

5          MR. SHER:  Because unless you -- well, I could

6    if Your Honor enters a subsequent order.

7          THE COURT:  I don't have any pending before me

8    to decide on this.  Do I?

9          MR. SHER:  Yes.  Let me take a step back.  When

10   we did the Blochless sale, as part of it, we estimated at

11   the hearing $500,000 had to be reserved.  So there is an

12   order from Your Honor, I forget the date, that directs me

13   to reserve $500,000 for the payment of taxes.

14         THE COURT:  Yes.

15         MR. SHER:  So that is why I am still holding it,

16   subject to that prior order.  That is the one fund.  There

17   is a second fund of unrestricted cash, if you will, that

18   is about $74,000.  And then there is a bond that we are

19   still trying to get back from --- in Barcelona.

20         Of the $74,000, I have held some $60,000 of that

21   came from Hinsua.  In order for it to reduce Hinsua's

22   expenses, it has to be used to pay, I believe, the fees of

23   the other attorney that Mr. Faus had used, Mr. Selva.

24   That is a fee app that is pending before Your Honor.  And

25   so, when Your Honor --.

1          THE COURT:  I have one pending?

2          MR. SHER:  Yes, you do.  There is a fee

3   application involved --

4          THE COURT:  Do you have a docket number on that?

5   Mr. Nussbaum will find that.

6          MR. NUSSBAUM:  Yes, Your Honor.  That would be

7   docket number 1147.

8          THE COURT:  That is very recent.

9          MR. NUSSBAUM:   Yes.  That was filed the 19th.

10  It is ripe for consideration.  It was filed actually with

11  the consent of the liquidating agent for Mr. Selva who

12  handled the civil and criminal proceedings relating to

13  Mr. Travelstead, Mr. Valasquez and the Hinsua embargo.

14          We filed that after -- there is actually $60,000

15  that are in Barcelona that Mr. Sher has designated for

16  payment of half of these fees.  And then as he is

17  suggesting now he has $60,000 here.

18          THE COURT:  This fee application is for a lot

19  more than $60,000.

20          MR. NUSSBAUM:  Well, I think that is correct.

21  It's $128,000 and change.

22          THE COURT:  $120 Euros, as I read it.

23          MR. NUSSBAUM:  Which probably amounts to about

24  $145,000 give or take.

25          THE COURT:  Every day it gets more.

1          MR. NUSSBAUM:  We are losing money over here in

2    more ways than one.  But the $60,000 -- I referred to two

3    $60,000 reserves Mr. Sher had discussed.  One is the

4    $60,000 and change in a bank in Barcelona.  The estate's

5    funds, which are the --.

6          THE COURT:  Are to stay there because it getting

7    worth more and more.

8          MR. SHER:  Well, it will stay there because I

9    can't get a release unless Mr. Selva gives me some papers

10   to get a release.  And Mr. Selva is looking at his fees

11   and one thing seems to leading to the other.

12         MR. NUSSBAUM:  I don't think Mr. Selva has done

13   anything but ask for it to be paid.

14         MR. SHER:  Oh, no.  He has done it all

15   appropriately.

16         MR. NUSSBAUM:  And then there is, Mr. Sher is

17   saying, he has $74,000 of unrestricted cash in his bank

18   account, the trustee account, here in the United States.

19   And I believe what Mr. Sher was saying is that $60,000 of

20   it he would like to have paid rather than to Mr. Alfonso

21   Almedia, he would rather have it paid to Mr. Selva because

22   if he does that and he goes forward with the deal with Mr.

23   Faus, he gets a credit for it because it was related to

24   Hinsua.

25         And we have no problem with any of that.  The

1  only question is, is there enough money to pay the $14,000

2  to special counsel.

3          MR. SHER:  And that is the rub, Your Honor.  In

4  fact, I think Mr. Nussbaum is correct.  The $60,000 of the

5  $74,000 came from Hinsua should be used to pay those fees.

6  That leaves the estate with $14,000, approximately, left.

7          And so what I did in the beginning of the year

8  is I made a prorata distribution to everyone.  It's in my

9  papers.  And I tried to explain that to everyone.  And

10  there were a number of people, and including Mr. Almedia.

11          And I explained it to him a couple of times and

12  we just didn't -- you know, and then what happened he got

13  very upset with me and he got upset with Mr. Oestricher.

14  And then he suggested that perhaps he would file a

15  grievance against Mr. Oestricher, he would file a

16  grievance against me.

17          And so, as much as I would like to pay him, I

18  don't feel that I can.  However, if one of these deals

19  close, I will pay him right away off the top.  Forget the

20  proration.  Forget all the, you know, prorated

21  administrative claim level.  I will just pay him.  It's

22  only $14,000.

23          But I just don't feel that if paid him today I

24  have no other money.  And I would like to at least have

25  some reserve for whatever expenses might come along.

jtw                                                                      68

1    Because there are still small expenses coming along.

2              MR. NUSSBAUM:  I might have another suggestion,

3    if I can just have a moment to speak to Mr. Sher, Your

4    Honor?  If that would not be too much of a burden.

5              THE COURT:  Yes.

6              (Pause.)

7              MR. NUSSBAUM:  Your Honor, if I may.

8              THE COURT:  Yes.

9              MR. NUSSBAUM:  What I suggested to Mr. Sher, and

10   it also relates to something that we were talking about on

11   the tax matter with the IRS.  Your Honor, I hope, received

12   a letter I sent yesterday.

13             THE COURT:  I have your letter of the 16th.  And

14   it says you are making progress.

15             MR. NUSSBAUM:  We finally got an appointed IRS

16   agent who will have the authority to review the tax return

17   and set up a meeting to negotiate a possible resolution of

18   this.

19             I heard from Mr. Fogin, literally on Thursday

20   last week with then name of the individual and I have

21   already called her.  And I am processing this matter.  And

22   we are hopeful that in the next few weeks we can sit down

23   and convince them that what the tax return says and what

24   the accountants have as their reasons for the deductions

25   that give rise to the $50,000 some in liability will be

1  acceptable to them.

2          Which will avoid the necessity for a litigation

3  under the trustee's 505 motion, which is being stayed

4  pending these negotiations.

5          So the Court is aware, I had advised Mr. Sher

6  previously.  And I think I mentioned this on the

7  conference call we had on the 2nd, Mr. Travelstead is

8  signing the tax return and is providing it.

9          He had concerns over it.  The determination of

10  the amount, not because he disagrees with it.  He wants to

11  support it.  But the IRS disagrees and they come back in

12  audit and say it's not $53,000, it's $250,000, and the

13  escrow is gone.  And the funds that are reserved are gone.

14  There is no way to pay what ultimately may be determined

15  either by Your Honor or the IRS.  So he had those

16  concerns.

17          Mr. Sher, as well has concerns, Your Honor,

18  irrespective of the Debtor's position, which he can

19  address, if you like, but he wants a determination made

20  either by the IRS or Your Honor as to any issues he might

21  have for potential liability.

22          So it is not just Mr. Travelstead that could

23  simply agree right now that he would let all the monies

24  come out of the tax reserve.  He is prepared to work with

25  that concept with Mr. Sher and discussions we are having

1   involve that.

2            However, with that background, I just suggested

3   to Mr. Sher perhaps we could all agree.  Mr. Travelstead

4   will, of that $50,000 of this tax escrow reserve, which

5   was once upon a time $500,000, it's accumulated interest,

6   can be immediately released.

7            And Mr. Sher can use those funds, not only for

8   the payment of this $14,000 to special counsel, but also

9   for whatever other expenses he may have out-of-pocket over

10  the next few months that need to be defrayed.

11           The Debtor would consent to that.  The Debtor

12  would consent to even more of those funds being released

13  subject to what the liquidating agent thinks is more

14  appropriate.  That is what I suggested and I think that

15  may work.

16           THE COURT:  Mr. Sher.

17           MR. SHER:  That is fine, Your Honor.  The

18  interest, which has accrued on that CD is now in excess of

19  $60,000.  So, essentially we -- the order required me to

20  escrow $500.  But I am comfortable with an order that

21  would allow, the next time the CD matures, I don't know

22  exactly what the cycle is, that we just take out whatever

23  interest has accrued on it and use that.

24           And I would pay the balance to Mr. Almedia.

25  Hopefully that would resolve his angst.  And as of

1  March 10th, Your Honor, the CD had $561,000, so we are

2  really talking about $50 of the $61,000 in interest.  And

3  that would be fine with me.  I would just want an order

4  from Your Honor so that it is, I am not violating a prior

5  order.

6         MR. McDERMOTT:  Your Honor, may I speak as to

7  this?

8         THE COURT:  Yes, Mr. McDermott.

9         MR. McDERMOTT:  I have several concerns here.

10 Your Honor, has indicated, liability may be as great as

11 $1 million.  We are not supporting that.  We would very

12 much like the $50,000 odd number used by Mr. Travelstead

13 to be accepted by the IRS.

14        But our concern is that the liability may be

15 even greater than what is reserved.  Thus, allowing some

16 of this tax escrow to be used for the paying some legal

17 fees of

18 Mr. Travelstead in his criminal slash civil proceeding

19 over in Spain may be to the detriment of the estate.

20        Second, the nature of the services here are

21 largely to the benefit of Mr. Travelstead.  They involve

22 that criminal proceeding over in Spain.  And as I

23 understand, the guidelines for awarding fees under Section

24 330, I believe, they have to be toward the benefit of the

25 estate, not

1  Mr. Travelstead.

2          And the criminal fees are generally recognized

3  as services for the benefit of the Debtor, not the estate.

4  Therefore, it seems to me that at least some of that

5  amount, that is the amount due for the criminal aspect

6  here, should not be allowed, at the very least, at this

7  time.

8          Lastly, fees that you have no doubt heard from

9  Mr. Canet before in this matter are already in the

10  astronomical levels.  My concern is that payment to a

11  lawyer who is outside this Country, is in effect going to

12  enable him to escape the possibility of having to return

13  some of those fees at a time when the Court had to give

14  final approval.

15          For all of those reasons we would suggest that

16  the Court defer ruling on this application by the Selva

17  firm and rule upon it only after the July 31 closing that

18  we all expect.

19          THE COURT:  As far as the benefit to the estate,

20  Mr. McDermott, I think I already dealt with that when I

21  approved the fees in the first place.  We were at a

22  situation where if you had Mr. Travelstead in jail you

23  weren't going to get any cooperation.

24          This one, I think, is dealing with fees I have

25  already approved.  Not fees that are coming in for

1   something else.

2           MR. McDERMOTT:  Your Honor, I am not sure.  I

3   think there are two issues here.  The approved fees were

4   those dealing with Mr. Alfonso Martinez-Almedia.  That is

5   not a matter which is now pending before the Court, at

6   least according to the schedule.

7           THE COURT:  That is what was scheduled for

8   hearing today.

9           MR. McDERMOTT:  I don't -- Your Honor, I think

10  it's the second matter.  The one for the firm of De

11  Olivar, Selva and Zegri as special counsel.

12          MR. NUSSBAUM:  Your Honor is correct.  It is the

13  matter for the payment of the previously allowed fee in

14  respect to Alfonso Martinez-Almedia that is on for today.

15  We did raise the issue regarding pending fee application

16  of

17  Mr. Selva, who is the criminal and civil counsel in Spain.

18          So, Your Honor, I believe was accurate.  And

19  your understanding of what is on for today and what the

20  two matters involve.

21          THE COURT:  And the other thing, I did not --.

22          MR. McDERMOTT:  I apologize, Your Honor, if I --

23  .

24          THE COURT:  But not what I am aware of is that

25  you filed any objection to this fee application to the

1  other firm, Mr. McDermott.

2           MR. McDERMOTT:  I think, Your Honor, we have a

3  longstanding motion that is pending.  And that dealt with

4  a stay of all further fee payments.

5           MR. NUSSBAUM:  Your Honor, that matter that he

6  is referring to has nothing to do with stay of all fee

7  payments and no relief has been granted on that.  And Mr.

8  McDermott, or excuse me, Mr. Canet has not filed an

9  objection to this fee application in a timely way.  And it

10  is ripe for consideration.  Needless to say, we have now

11  heard his objection.

12           MR. McDERMOTT:  Yes.

13           THE COURT:  All right.  Well, I was dealing with

14  the payment of the fee application we were already dealing

15  with.  Now, we don't know when the certificate of deposit

16  comes due in a cycle.

17           MR. SHER:  No, Your Honor.  But I could find out

18  pretty quickly.  I think it is every 30 days.  I don't

19  know.  I don't recall.  I can advise everyone.  But you

20  are right, it's the payment to --.

21           THE COURT:  Yes.  What I would like to do with

22  this order is to not direct you to pay it within 24 hours

23  or anything like that.  But to direct you to pay it within

24  60 days or something like that that would be a comfortable

25  time frame for you generating some money to do it.

1        And I don't know quite how to do that without

2   knowing what --.

3        MR. SHER:  I don't think you can.  I don't mean

4   -- I mean, you obviously can sign any order you want.  You

5   are the Judge.  But I think as a practical matter, if I

6   don't close -- I have to get one of two reliefs to pay.  I

7   either have to get the interest freed up from the CD.  Or

8   I have to close on the Hinsua deal.

9        If either of those two happen, I will pay this

10  gentleman right away.  He is in, by the way he lives in

11  Miami and in Madrid.  And he is not going to be -- I mean

12  the prospect of disgorging the fees is a small amount.  I

13  wasn't even ever considering that.  But, he is a 327E

14  counsel.  And I mean, I am happy to let him get paid.

15       The problem is that the other -- I am holding

16  the --- from Hinsua, I don't believe that I can pay them

17  for anything other than Mr. Sullivan.

18       THE COURT:  You said you thought the CD came to

19  every 30 days.  You are willing to use the interest to pay

20  this.  And so I said, well, if I directed you to pay

21  something within 60 days or so.

22       MR. SHER:  You would have to also let me break

23  the CD.  Your Honor, if you --.

24       THE COURT:  Why am I breaking the CD?

25       MR. SHER:  Because there is an order that says

jtw                                                                      76

 1   that all the money has to be held subject to further order

 2   of the Court.  I just need relief from your prior order

 3   that lets me use some of that money.  And I will pay him.

 4             THE COURT:  I am not trying to do that.  You

 5   said the interest.

 6             MR. SHER:  Yes.

 7             THE COURT:  You have to renew it?

 8             MR. SHER:  Yes.

 9             THE COURT:  You post $500,000 and you renew it.

10             MR. SHER:  Yes.

11             THE COURT:  And you have been renewing it for

12   that and the accumulated interest.  Is that what the order

13   says.  That it would be the accumulated interest that you

14   would renew it for or not?

15             I thought you were saying, well, no.  When the

16   interest came due, we would just renew it for the

17   $500,000.

18             MR. SHER:  We have been letting the interest

19   accrue with the CD.

20             THE COURT:  I understand you have.  But when it

21   comes over to be rolled over, is there something in the

22   order that requires you to maintain an escrow deposit of

23   more than

24   $500,000?

25             MR. SHER:  Good point.  That is a good point,

 1  Your Honor.  I guess --.

 2          THE COURT:  That is the point that was being

 3  made.

 4          MR. SHER:  I didn't follow Your Honor.  Perhaps

 5  I will just go read the order.  And, --.

 6          THE COURT:  If we could read the order and find

 7  out when the CD matures.  And I have previously approved

 8  this.  And you previously made some payout.  And the

 9  objection that you made was I don't have any money to do

10  it.

11          MR. SHER:  Well, it's two parts.  I also think

12  the Court should allow me to exercise my discretion and

13  not direct me to pay.

14          THE COURT:  I would -- I think you should be

15  paying the approved administrative fees, as you go along,

16  to the extent you are possibly able to do that.

17          MR. SHER:  I do.

18          THE COURT:  Good.  And this is one that is not

19  being paid.  So, the only response is I don't have the

20  money.  The issue that was raised was, I will have the

21  money when I close the sale and/or I will have the money

22  when the CD comes due because I can use the interest.

23          So, I am saying, fine.  I want to calm this

24  person down and shut him up because it's a small amount of

25  money and I order you to pay him.  But it's going to be 30

jtw                                                              78

1   days after you are likely to have the money.  And for sure

2   that you would have it from the CD.  Now what is wrong

3   with that?

4              MR. SHER:  Well, Your Honor, what is wrong with

5   that is since this gentleman has suggested he is filing a

6   grievance against me --

7              THE COURT:  Right.

8              MR. SHER:  Or against Mr. Oestricher.

9              THE COURT:  You don't want an order in there

10  that they can throw at the grievance commission.

11             MR. SHER:  Thank you, Your Honor.  And so what I

12  would ask Your Honor to do, is if you --

13             THE COURT:  So that is just a phraseology thing,

14  isn't it?

15             MR. SHER:  Yes, Your Honor.  And I would ask

16  Your Honor --

17             THE COURT:  So I say something about authorize

18  and I leave off the and direct in the order.  Something

19  along those lines.

20             MR. SHER:  Actually, Your Honor, I have a better

21  solution.

22             THE COURT:  What?

23             MR. SHER:  If I may?  Let me go look at your

24  prior order.  Let me, if I can take the interest, it seems

25  Your Honor could hold this matter sub curia.  I could pay

1  him.  And I could report to the Court that the issue is

2  moot.

3           And then I think counsel for the Debtor could

4  withdraw their motion.  And I think that resolves

5  everyone's concerns, Your Honor.  And does not leave me

6  subject to having to deal with whatever this gentleman

7  wants to do next.

8           THE COURT:  What I don't want you to do is to

9  say to this gentleman, you have made me mad, Mr.

10 Gentleman,

11 Mr. Martinez-Almedia and you ain't going to push me

12 around.  Do whatever you have to do and smile at him,

13 which makes him twice as made.  And refer him to Mr.

14 Oestricher which will make him three times as mad.

15           MR. SHER:  Actually, he went to Oestricher first

16 and then came to me.  Your Honor, I thought that is what

17 my response said.  What I am suggesting to Your Honor is

18 on the record, I am telling you what I am going to do.

19 And, I will  pay him.

20           THE COURT:  I need some assurance that either

21 that is going to happen or that I respond in something so

22 it doesn't get buried on the record.

23           Just like Mr. McDermott, you are going to tell

24 me what motion number in the docket it is that some

25 pending motion that I haven't ruled on that you have asked

1   for.  I literally thought I was pretty up to date in this

2   file.  Okay, Mr. McDermott?  If you could provide me by

3   letter that motion?

4           MR. McDERMOTT:  Sure.  It was, Your Honor, filed

5   last fall.  It was a motion, it dealt with a fee

6   application by Grant Thornton.

7           MR. NUSSBAUM:  That fee application was granted

8   in full, Your Honor, over the objection.  The objection

9   Mr. McDermott is referring to that he filed was an

10  objection to the Grant Thornton fee application, as well

11  as a cross motion for distributions.  That was the

12  remaining portion of that objection, of that paper, that

13  has been continuously been held over or rescheduled.

14          THE COURT:  It has been?

15          MR. NUSSBAUM:  Yes, sir.

16          MR. McDERMOTT:  Yes.

17          MR. NUSSBAUM:  That was -- we discussed that on

18  June 2nd in the conference call and that was put over to a

19  date, I believe sometime in July for hearing.

20          MR. McDERMOTT:  I think, Your Honor, it will

21  come up after we get a ruling from the IRS.  That is the

22  idea.

23          THE COURT:  Oh, that was tied up with that.

24  Okay.

25          MR. McDERMOTT:  Yes, it was all tied up.

jtw                                                                      81

 1             MR. NUSSBAUM:  The motion is to take the reserve

 2    and have it distributed to Mr. Canet.  And that has been

 3    opposed by the Debtor and by the liquidating agent.

 4             THE COURT:  I certainly would like that to have

 5    that happen.

 6             MR. NUSSBAUM:  It will go somewhere.

 7             THE COURT:  It needs to go somewhere.  Yes.

 8             MR. SHER:  So, I guess we are back where we

 9    started.

10             THE COURT:  Back to you, we are Mr. Alfonso

11    Martinez-Almedia.  And Mr. Martinez-Almedia would like to

12    have the balance of his fee paid.

13             MR. NUSSBAUM:  He is entitled to it.

14             THE COURT:  Well, there are a lot of people

15    entitled to be paid.  And he would like to get paid ahead

16    of other people, apparently.  But that wasn't part of your

17    answer that that was the problem with all of this.  You

18    said you made a prorata distribution.  You said you didn't

19    have any more money.

20             Would you check the CD and advise me as to what

21    that is.

22             MR. SHER:  Yes.  I thought the prior order

23    restricted even the interest only.  But I will take a

24    harder look at it, Your Honor.  I have to find the order.

25             THE COURT:  It probably is -- oh, you mean it

jtw                                                                    82

 1   was $500,000 plus all interest accruing thereon?

 2              MR. SHER:  Probably not.  You know what, I would

 3   assume that we didn't even think about interest back then.

 4   We probably just said, reserve $500,000.

 5              THE COURT:  That is what I am assuming.

 6              MR. SHER:  And so, if that is the order, then I

 7   will -- we will get --- and pay him.

 8              THE COURT:  When the CD comes due is what I

 9   would like to know.

10              MR. SHER:  Well, I could advise Your Honor of

11   that later today or tomorrow.

12              THE COURT:  That would be just fine.  Because I

13   don't mind ruling on them motion as being moot.

14              MR. SHER:  Thank you, Your Honor.  I will

15   communicate with Chambers by the end of today.

16              THE COURT:  Thank you.  Anything else we can

17   take care of?

18              (No audible response.)

19              THE COURT:  Good luck in your discussions,

20   gentlemen.

21              MR. NUSSBAUM:  Thank you, Your Honor.  Good to

22   see you again.

23              THE COURT:  Thank you.

24              (Whereupon, the hearing was concluded.)

25

jtw                                                                              83

1

2

3

4

5

6

7

8

9

<u>C E R T I F I C A T E</u>

I certify that the foregoing is a correct

transcript from the duplicated electronic sound recording

of the proceedings in the above-entitled matter.


_____          _____
Janice T. Warner, Transcriber                  Date