## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

In re:                                    *

**G. WARE TRAVELSTEAD**          *        Case No. 96-5-4979-SD
                                                      (Chapter 11)
            Debtor.                   *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### THIRD APPLICATION OF SHAPIRO SHER GUINOT & SANDLER
### AND LIQUIDATING AGENT FOR INTERIM ALLOWANCE
### OF COMPENSATION AND REIMBURSEMENT OF EXPENSES
### FOR PERIOD SEPTEMBER 1, 1999 THROUGH SEPTEMBER 30, 2003

Shapiro Sher Guinot & Sandler (the "Applicant"), the court-approved counsel for Joel I.

Sher, the Liquidating Agent (the "Liquidating Agent") and the Liquidating Agent, pursuant to

Bankruptcy Rule 6004(f)(1), hereby apply for interim allowance of compensation and reimbursement

of expenses for the period September 1, 1999 through September 30, 2003 (the "Application Period")

and, in support thereof, states:

1.      This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 158 and

1334, 11 U.S.C. §§ 328, 330 and 331, Bankruptcy Rule 2016 and 6004(f)(1)and Local District

Court Rule 401.  This is a core proceeding.

## I.     INTRODUCTION

2.      On May 31, 1996, G. Ware Travelstead (the "Debtor") filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code.

3.      On December 31, 1997, the United States Bankruptcy Court for the District of

Maryland (the "Bankruptcy Court") entered its Order (the "Order") Approving Debtor's Modified

Fifth Amended Disclosure Statement and Confirming the Debtor's Third Modified Fourth Amended

Plan of Reorganization (the "Plan"). On that same date, the Bankruptcy Court entered its order authorizing the appointment of the Liquidating Agent.

4.      On January 8, 1998, the Court entered an order authorizing the Liquidating Agent to retain the Applicant as counsel.   Effective as of September 26, 2000, Shapiro and Olander changed its name to Shapiro Sher & Guinot.   Effective August 1, 2002, the Applicant's name was changed to Shapiro Sher Guinot & Sandler.

5.      On January 11, 1999, the Court entered an Order granting the Applicant's first application for interim allowance of compensation and reimbursement of expenses for the period from October 9, 1997 through October 31, 1998, awarding compensation in the amount of $322,594.50, plus reimbursement of expenses in the amount of $58,320.84.   All of the fees and expenses approved have been paid.

6.      On September 8, 1999, the Court entered an Order granting the Applicant's second application for interim allowance of compensation and reimbursement of expenses for the period November 1, 1998 through August 31, 1999, awarding compensation in the amount of $239,675.50, plus reimbursement of expenses in the amount of $45,691.61.   All of the fees and expenses approved have been paid.

7.      This is the Applicant's third interim application.   The Applicant is familiar with and is submitting this application in conformity with the Compensation Guidelines for Professionals in the United States Bankruptcy Court for the District of Maryland (the "Compensation Guidelines").

2

## II.    THE COMPENSATION REQUESTED AND THE LEGAL STANDARD TO BE APPLIED

8.    The Applicant requests payment of its fees in the amount of $478,889.00 for services rendered and seeks $177,643.10 as reimbursement for out-of-pocket expenses incurred during the four years of the Application Period, as follows:

| Total Professional Time Analysis – Third Application | | | |
|---|---|---|---|
| Name | Total Hours | Hourly Rate | Total Fees |
| Joel I. Sher | 201.3 | $345.00 | $69,554.50 |
| Joel I. Sher | 121.7 | $330.00 | $40,161.00 |
| Joel I. Sher | 166.4 | $300.00 | $49,920.00 |
| Joel I. Sher | 241.3 | $275.00 | $66,357.50 |
| Joel I. Sher | 182.5 | $265.00 | $48,362.50 |
| Charles S. Fax | .6 | $350.00 | $210.00 |
| Luis Guinot, Jr. | 7.6 | $325.00 | $2,470.00 |
| Richard M. Goldberg | 126.8 | $295.00 | $37,938.00 |
| Richard M. Goldberg | 8.8 | $275.00 | $2,420.00 |
| Richard M. Goldberg | 82.6 | $235.00 | $19,411.00 |
| Richard M. Goldberg | 136.4 | $210.00 | $28,644.00 |
| Richard M. Goldberg | 73 | $190.00 | $13,870.00 |
| Lonnie M. Ritzer | 37.5 | $335.00 | $12,562.50 |
| Lonnie M. Ritzer | 64.0 | $300.00 | $19,200.00 |
| Lonnie M. Ritzer | 4.6 | $275.00 | $1,265.00 |
| Sheryl N. Stephenson | 3.5 | $280.00 | $980.00 |
| Heather A. Klink | 5.6 | $275.00 | $1,540.00 |
| Heather A. Klink | .5 | $265.00 | $132.50 |
| Heather A. Klink | .3 | $260.00 | $78.00 |
| Carmela L. Bell | 11.4 | $260.00 | $2,964.00 |
| Kimberly M. Stoker | 1.8 | $275.00 | $495.00 |
| Kimberly M. Stoker | 7.3 | $210.00 | $1,533.00 |
| Kimberly M. Stoker | .9 | $185.00 | $166.50 |
| Kimberly M. Stoker | 1.2 | $165.00 | $198.00 |
| Philip M. Bogart | 25.9 | $180.00 | $4,662.00 |
| Scott W. Foley | 1.8 | $160.00 | $288.00 |
| Scott W. Foley | 29.9 | $145.00 | $4,335.50 |
| Diarmuid F. Gorham | 55.8 | $165.00 | $9,207.00 |
| Diarmuid F. Gorham | 14.6 | $145.00 | $2,117.00 |
| Jason P. Beaulieu | 3.5 | $175.00 | $612.50 |
| Jason P. Beaulieu | 16.9 | $165.00 | $2,788.50 |
| Hillard J. Michaud | 7.0 | $160.00 | $1,120.00 |

3

| Total Professional Time Analysis – Third Application | | | |
|---|---|---|---|
| **Name** | **Total Hours** | **Hourly Rate** | **Total Fees** |
| Mark L. Renbaum | 38.5 | $160.00 | $6,160.00 |
| Ann C. Lawrence | 58.8 | $125.00 | $7,350.00 |
| Ann C. Lawrence | 41.6 | $115.00 | $4,784.00 |
| Ann C. Lawrence | .4 | $100.00 | $40.00 |
| Ann C. Lawrence | 61.5 | $95.00 | $5,842.50 |
| Ann C. Lawrence | 105.3 | $85.00 | $8,950.50 |
| Lisa M. Thompson | 1.0 | $125.00 | $125.00 |
| Lisa M. Thompson | .5 | $90.00 | $45.00 |
| Mary H. Scott | .3 | $95.00 | $28.50 |
| **TOTALS** | 1950.9 | | $478,889.00 |

| Out of Pocket Disbursements – Third Application | |
|---|---|
| **Category** | **Amount** |
| Duplicating Expenses | $4,681.60 |
| Postage | $66.55 |
| Messenger Service/Express Mail | $1,283.36 |
| Long Distance Expenses | $3,063.75 |
| Miscellaneous Search Fees | $10.00 |
| Mileage and Parking | $104.00 |
| Travel Expenses | $157,913.80 |
| Meals | $2,191.83 |
| Telecopy | $4,807.50 |
| Filing Fees | $70.00 |
| Out of Office Duplicating | $361.42 |
| Process/Service Fees | $78.10 |
| Deposition Transcripts | $841.75 |
| Witness Fee/Mileage | $56.22 |
| Official Documents and Records | $46.00 |
| Westlaw | $165.39 |
| Lexis | $93.78 |
| Federal Express | $520.22 |
| U.P.S. | $56.78 |
| Translation Services | $1,231.05 |
| **TOTAL** | $177,643.10 |

4

9.      The expenses incurred by the Applicant are a type that are customarily not considered part of overhead by the Applicant or other attorneys in this geographic area and which the Applicant customarily requires its clients to pay.  Additionally, all of the expenses for which the Applicant seeks reimbursement are in accordance with and allowable pursuant to the Compensation Guidelines.

10.     The Applicant's request for compensation is made pursuant to the twelve criteria originally enumerated in *Johnson v. Georgia Highway Express. Inc.*, 488 F.2d 714, 714-719 (5th Cir. 1974), and expressly adopted by the United States Court of Appeals for the Fourth Circuit in *Barber v. Kimbrells. Inc.*, 577 F.2d 216 (4th Cir. 1978), *Anderson v. Boothe*, 658 F.2d 246 (4th Cir. 1978), and *Harman v. Levin (In re: Robertson)*, 772 F.2d 1150 (4th Cir. 1985).  Those twelve criteria are as follows:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount of controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between the attorney and client; and (12) attorney awards in similar cases.

*Barber v. Kimbrells Inc.*, 577 F.2d at 226 n. 28.  These criteria are discussed in detail below.  The Liquidating Agent's request for compensation is made pursuant to the confirmed Plan.

11.     When considering an attorney's application for compensation, the Court should first determine the attorney's "lodestar" by multiplying the number of hours reasonably expended by a reasonable hourly rate. *In re LBH Associates Ltd. Partnership*, 109 B.R. 157, 158-62 (Banker. D.Md 1989). *See also, In re Leonard Jed Co.*, 118 B.R. 339, 345 (Banker. D.Md 1990).

5

12.     Fees should be adjusted upward if the results achieved by the attorney are exceptional in light of the hourly rate charged. *Blum v. Stenson*, 465 U.S. 889 (1984). *See generally Pennsylvania v. Delaware Valley Citizens' Counsel*, 478 U.S. 546 (1986); *Hansley v. Eckerhardt*, 461 U.S. 424 (1983). Notwithstanding the Applicant's compliance with this standard, it is not seeking an upward adjustment of fees. Conversely, although there is no basis for any downward adjustment of the Applicant's fees, in the exercise of billing judgment, the Applicant has reduced its total fees and expenses by approximately $19,000.00.

13.     The total fees requested by the Applicant are reasonable under the circumstances, and the *Johnson* twelve-factor analysis, as discussed below, supports an award of interim compensation in the amount requested.

### III.    THE SERVICES RENDERED AND THE MANNER OF RECORDING THE APPLICANT'S FEES AND EXPENSES RELATING THERETO

14.     During the Application Period, the Applicant performed services in five separately designated categories.   Those categories are: (a) General Services; (b) XPRES Corporation; (c) Gibson Transaction; (d) Spain – General Issues; and (e) Hinsua Matters.   The Applicant has attempted in all instances to allocate the services rendered to the proper file.   However, due to the size and complexity of this case and the extent and nature of the services performed, all services performed by the Applicant do not fall solely into one specific category.   Moroever, many of the services provided by the Applicant in Spain – General Issues and Hinsua Matters were inter-related and were therefore recorded in the category which the Applicant believed most appropriate under the circumstances.

6

15. In accordance with the Compensation Guidelines, this Application contains a description of the services rendered in each of the separate files in which work has been performed during the Application Period.

16. All of the time expended and the nature of the services rendered by the Applicant were recorded on time sheets maintained on a daily basis. Attached hereto and collectively marked Exhibit A is a compilation of all of the billing reports for the files in which the Applicant performed services. The billing reports set forth, for each file, the date of each service rendered, the professional rendering the service, a description of the services rendered and the amount of time spent performing each service. Certain time entries cannot be written in any more substantive detail because one or more privileges would be violated. The Applicant attempted, in accordance with the Compensation Guidelines, not to lump services; for significantly all entries in excess of one hour of time, the time entries provide a breakdown of the amount of time spent on a specific activity included in that time entry if more than one service was rendered.

17. Due to the significant amount of work required to be performed by the Applicant, the Applicant adopted a "team approach" to complete successfully many of the tasks it was required to perform. By way of example, but not limitation, there were many instances in which several of the Applicant's professionals were each required to perform separate tasks simultaneously. An example would be when the Liquidating Agent was in Spain, he would have professionals of the Applicant simultaneously doing research or drafting documents for his use. The Applicant's professionals, however, did not engage in duplication of effort.

18. Based upon the Applicant's experience, it believes that the team approach is the most effective, efficient and least costly manner of handling extremely large and sophisticated tasks, such

7

as those encountered in this case, in short periods of time, while at the same time providing the highest level of representation to the Liquidating Agent. In addition to the entries recorded on Exhibit A, the Application contains charts which set forth in summary fashion the aggregate value of the services rendered and the aggregate amount of disbursements. However, it should be noted that the actual request for compensation is less than these aggregate amounts. While the Applicant believes that all of the services rendered are reasonable and therefore compensable, the Applicant wrote off approximately $19,000.00 of time as part of the normal exercise of billing judgment that it provides for all its clients.

19.     The Applicant's fees were computed at the standard hourly rates charged by the Applicant to all of its creditor, debtor, committee and non-bankruptcy clients. The hourly rates vary by professional depending upon experience, subject matter, expertise and seniority, and are within the range of (and are typically lower than) customary hourly rates of compensation in this geographic area for the services performed in a case of this magnitude.

20.     Each February 1, the Applicant increases the rates of its professionals in accordance with its regular practice. Therefore, because the Application Period encompasses over four years, there are several rate adjustments for certain of the Applicant's professionals. These rate adjustments reflect increased experience and expertise and are consistent with, or less than, rates charged by professionals with comparable experience in this region.

## IV.    SERVICES RENDERED AND EXPENSES INCURRED

### A.    GENERAL SERVICES PERFORMED FOR THE LIQUIDATING AGENT

21.     The Debtor is a United States citizen with business interests and holdings in several different countries, mainly the United States, Spain, the Netherlands and Australia. The Debtor's

8

business, though multi-faceted, consisted principally of real property development and investment. The primary task which originally confronted the Applicant was to assess the extent and value of all of the Debtor's holdings. This was crucial because the Plan is a liquidating plan and called for the liquidation of all of the Debtor's assets by the Liquidating Agent with the cooperation of the Debtor.

22.     During the course of the Application Period, the Applicant spent a significant amount of time providing services to the Liquidating Agent in a category entitled general services. Due to the varied activities of the Liquidating Agent during the Application Period and the varied nature of the Debtor's assets, during this period of time the Applicant was involved in a number of matters including the continued (i) liquidation of fine jewelry, artwork, and personal property; (ii) examination of the Debtor's interest in various entities located throughout the world; (iii) involvement in certain litigation in which the Debtor was engaged; (iv) maintenance of books and accounts maintained by the Liquidating Agent; and (v) interim distributions to creditors pursuant to the Plan.

23.     During the Application Period, the Applicant arranged for the auction of certain of the Debtor's assets which the Debtor left in London, England during his residence in that country. The Applicant traveled to London and met with an auction house and arranged for and assisted in the conduct of an auction of a significant amount of the Debtor's personal assets which the Liquidating Agent located in London. In addition, the Applicant visited an art gallery in London where the Debtor had left a piece of art for disposition. As required by the Plan, the Applicant accounted for the proceeds of those sales of the Debtor's assets referred to above, filed appropriate reports of sale, and ensured that the proceeds were maintained in the Liquidating Agent's escrow account.

9

24.     During the Application Period, the Applicant negotiated and drafted an application for approval of a consignment arrangement with Alex Cooper Auctioneers, a local highly reputable auction firm, for an auction of certain of the Debtor's assets. The Applicant met with and negotiated agreements with Sotheby's and Corporate Art Directions providing for the ultimate sale of certain of the Debtor's artwork and jewelry which had been located by the Liquidating Agent in New York City. The Applicant also worked with his court-approved consultant, Susan Perrin, to dispose of a number of remaining pieces of art during the Application Period, including certain gallery quality items of artwork.

25.     During the Application Period, the Applicant also continued the investigation of the complicated tax attributes of the Debtor and his affiliated entities. Because a significant portion of the Debtor's holdings were comprised of substantial real estate projects located throughout the world, the Debtor's tax returns, as well as an analysis of tax attributes associated with the foregoing, was extremely complicated. The Applicant determined that it was crucial to understand the tax consequences so the Liquidating Agent could understand the potential tax ramifications of the disposition of assets subject to the Liquidating Agent's control and direction.

26.     During the Application Period, the Debtor sought and obtained an order of the Court authorizing the Liquidating Agent to reimburse the Debtor for certain expenses the Debtor asserted he would incur when he moved back to the United States from Barcelona, Spain. In accordance with that order, the Liquidating Agent verified the bona fides of those expenses, reviewing submissions from the Debtor and paid only those amounts consistent with the order authorizing the Debtor's reimbursement.

27.     During the Application Period, the Applicant assisted the Liquidating Agent with an interim distribution to creditors. As the Liquidating Agent had accumulated significant proceeds from the disposition of the Debtor's assets, including but not limited to, artwork, fine furniture and the Blockless sale proceeds, the Liquidating Agent was ultimately able to make a distribution of approximately 50% on the claims of unsecured creditors. However, prior to obtaining an order of the Court authorizing said distribution, the Applicant was required to respond to objections filed to the Liquidating Agent's proposed distribution by Virginia Kowalsky-Ramirez, as well as a related motion filed by Patrick J.B. Donnelly and Roland V. Benner. With respect to the Donnelly and Benner motions, the Court directed that certain costs and expenses of the Liquidating Agent associated with the sale of Blockless were to be charged against the distribution to Messrs. Donnelly and Benner. As a result, the Liquidating Agent was required to calculate the allocation, as well as engage in negotiations with the Debtor, Messrs. Donnelly and Benner and various counsel to resolve this issue.

28.     During the Application Period, the Liquidating Agent determined that one or more parties were attempting to interfere with the Liquidating Agent's disposition of the Debtor's Spanish assets (see discussion below) and, as a result, the Liquidating Agent was required to engage in an investigation concerning the parties whom the Liquidating Agent determined were causing the interference. In addition, the Liquidating Agent was required to respond to inquiries from the Court concerning one or more letters written to the Court concerning the affairs of the Debtor in Barcelona, Spain.

29.     During the Application Period, the Applicant was also engaged in a number of administrative matters, including but not limited to, maintaining the books of account for the

11

Liquidating Agent, making disbursements to the Debtor in accordance with the Plan, making payments to the Debtor's criminal counsel in Barcelona pursuant to orders of this Court, making disbursements on account of court-authorized professional fees pursuant to the orders of this Court (at the discretion granted the Liquidating Agent pursuant to the Plan) and responding to numerous inquiries from creditors.

30.    As a result of the sale of the Debtor's interest in Blockless, the Liquidating Agent sought and obtained an order of this Court authorizing the sum of $500,000.00 to be held in escrow pursuant the Plan. That escrow was established to pay taxes which might be owed by the Debtor as a result of the disposition of the Debtor's interests in Blockless. During the Application Period, the Applicant met with the Debtor's accountants, as well as continued its analysis of the Debtor's tax situation. Thereafter, the Applicant determined that it was in the best interest of the estate to seek an order pursuant to Section 505(a) of the Bankruptcy Code determining the actual amount of taxes that the Debtor owed as a result of the Blockless transaction. Based on the Applicant's analysis of the Debtor's tax return, the Applicant concluded that taxes in the approximate amount of $50,000.00 may be due and owing by the Debtor on account of the Blockless sale. Accordingly, the Applicant prepared and filed a motion pursuant to Section 505(a) of the Bankruptcy Code seeking the Court's determination of the foregoing.

31.    The Applicant has reviewed each pleading, paper and motion filed in the case, and has advised the Liquidating Agent as to the impact and effect of each pleading, paper and motion filed. The Applicant has prepared appropriate responses to all pleadings, motions and papers requiring responses.    Additionally, the Applicant and Liquidating Agent kept in regular contact with the

12

Debtor and his counsel as the Plan was predicated, in part, on the continued cooperation of the Debtor.

32.     In connection with General Services for the Liquidating Agent, the Applicant devoted a total of 372.1 hours, having a total value of $57,939.50 as follows:

| Professional Time Analysis – General Services | | | |
|---|---|---|---|
| Name | Total Hours | Hourly Rate | Total Fees |
| Joel I. Sher | 9.2 | $345.00 | $3,174.00 |
| Joel I. Sher | 10.8 | $330.00 | $3,564.00 |
| Joel I. Sher | .4 | $300.00 | $120.00 |
| Joel I. Sher | 11.6 | $275.00 | $3,190.00 |
| Joel I. Sher | 22.8 | $265.00 | $6,148.00 |
| Luis Guinot, Jr. | 1.5 | $325.00 | $487.50 |
| Richard M. Goldberg | 3.9 | $295.00 | $1,150.50 |
| Richard M. Goldberg | 4.9 | $275.00 | $1,347.50 |
| Richard M. Goldberg | 1.1 | $235.00 | $258.50 |
| Richard M. Goldberg | 5.3 | $210.00 | $1,113.00 |
| Richard M. Goldberg | 56.1 | $190.00 | $11,191.00 |
| Lonnie M. Ritzer | .9 | $275.00 | $247.50 |
| Heather A. Klink | .5 | $265.00 | $132.50 |
| Scott W. Foley | 3.4 | $145.00 | $493.00 |
| Diarmuid F. Gorham | 15.0 | $165.00 | $2,475.00 |
| Diarmuid F. Gorham | 6.7 | $145.00 | $971.50 |
| Jason P. Beaulieu | 11.5 | $165.00 | $1,897.50 |
| Ann C. Lawrence | 18.5 | $125.00 | $2,312.50 |
| Ann C. Lawrence | 35.8 | $115.00 | $4,117.00 |
| Ann C. Lawrence | .4 | $100.00 | $40.00 |
| Ann C. Lawrence | 60.6 | $95.00 | $5,757.00 |
| Ann C. Lawrence | 91.2 | $85.00 | $7,752.00 |
| TOTALS | 372.1 | | $57,939.50 |

33.     The Applicant incurred out of pocket expenses in the amount of $25,416.27 for the Application Period in connection with General Services as follows:

13

| Out of Pocket Disbursements – General Services | |
| --- | --- |
| **Category** | **Amount** |
| Duplicating Expenses | $1,700.20 |
| Postage | $60.50 |
| Miscellaneous Search Fees | $10.00 |
| Messenger Service/Express Mail | $684.49 |
| Long Distance Expenses | $1,130.18 |
| Mileage and Parking | $55.00 |
| Travel Expenses | $18,097.58 |
| Meals | $1,178.14 |
| Telecopy | $2,073.00 |
| Deposition Transcripts | $28.35 |
| Out of Office Duplicating | $34.61 |
| Official Documents and Records | $46.00 |
| Federal Express | $147.02 |
| Westlaw | $120.75 |
| UPS | $50.45 |
| **TOTAL** | $25,416.27 |

**B.    XPRES CORPORATION LITIGATION**

34.    At the time of the appointment of the Liquidating Agent, the Debtor owned approximately 44.64% of the stock of XPRES Corporation ("XPRES"), a North Carolina corporation which was in the business of transferring designs and logos onto t-shirts and mugs. During the pendency of his chapter 11 case (prior to the appointment of the Liquidating Agent), the Debtor filed an adversary proceeding against XPRES in order to recover the balance on a debenture owed to the Debtor from XPRES in the approximate amount of $975,000 as well as the amount due to the Debtor under a promissory note made by XPRES in the principal amount of $450,000.

35.    In order to determine the value to the estate of the Debtor's equity interest in XPRES, the Applicant reviewed all available XPRES corporate and financial documents including financial statements, balance sheets, projected income, business plans, by-laws, minutes and documents

14

evidencing the restructuring transaction pursuant to which the note was made and the debenture issued. Additionally, the Applicant reviewed an evaluation of the Debtor's stock performed by C.W. Amos, as well as a valuation performed by the Orr Management Company.

36.     In order to determine the potential value to the estate from the pending adversary proceeding, the Applicant met with the attorney for the Debtor, reviewed all pleadings filed, and reviewed the Note and the Debenture, as well as the theories of law pursuant to which recovery was based. After determining that the XPRES adversary proceeding potentially had a substantial value to the estate, the Liquidating Agent sought, and was granted, authority to intervene in the XPRES litigation. In conjunction with intervening in the XPRES litigation, the Applicant researched the standards for intervention generally as well as Plan provisions and the Liquidating Agent's powers and duties thereunder.

37.     XPRES defended the XPRES litigation based on the following defenses: (i) the causes of action were barred by the applicable statutes of limitation, (ii) the causes of action were barred by waiver and estoppel, (iii) the debenture was not yet due and payable by its terms, (iv) the Debtor's claims were prohibited by North Carolina Law, including N.C. Gen. Stat. ss 25-3-110 and (v) XPRES' obligations to the Debtor had been satisfied by the satisfaction of the NCNB Loan.

38.     The Applicant evaluated the bona fides of XPRES' defenses, reviewed applicable law, reviewed and analyzed all documents provided by the defendant corporation, reviewed and analyzed the depositions of all key witnesses and prepared for and attended the deposition of the Debtor.

39.     Throughout the XPRES Litigation, the Applicant continually monitored XPRES' financial condition. This was crucial because the Applicant and XPRES initially entered into negotiations to settle the XPRES litigation which would involve not only the settlement of the

Debtor's claims under the note and the debenture, but would include a buyout of the Debtor's equity interest in XPRES. After intensive negotiations, the parties were unable to come to mutually agreeable settlement terms and the Applicant was required to prepare for trial.

40.     The trial on the XPRES Litigation was scheduled for April 23, 1998. Prior to trial, the Applicant prepared and reviewed witness and exhibit lists, and prepared to represent the Liquidating Agent at trial.

41.     On the eve of trial, and after intensive and lengthy negotiations, the Applicant, the Debtor and XPRES entered into an agreement to settle the XPRES litigation. Pursuant to the settlement agreement, (i) all of the parties to the XPRES litigation (in addition to certain non-parties) gave each other full releases, (ii) XPRES paid $275,000 to the Liquidating Agent, (iii) the Debtor retained his equity interest in XPRES, and (v) certain other claims against the estate by former and present insiders of XPRES in excess of $998,000,000 were withdrawn. Based upon the Liquidating Agent's analysis, that settlement had an immediate cash value to the estate in excess of $1,300,000.00.

42.     On the date scheduled for trial, the Applicant, the Debtor and XPRES appeared in Court in order to put the settlement agreement on the record. Subsequently, on May 13, 1998, the settlement agreement was properly noticed, and subsequently approved by the Court. Subsequently, the Applicant drafted a Settlement Agreement which incorporated the terms upon which the parties settled the XPRES litigation.

43.     Subsequently, XPRES and its shareholders (excluding the Debtor), without the consent of the Liquidating Agent or the Debtor, attempted to liquidate under North Carolina law in

16

the North Carolina trial court system in an effort to preclude any distribution on account of the Debtor's interests in XPRES.

44.     The Applicant attempted to resolve the matter without litigation, but XPRES refused. Accordingly, the Applicant, along with the Debtor's counsel, initiated suit before this Court to stop the North Carolina state court process and/or to obtain an appropriate distribution on account of the Debtor's minority interest.  This Court determined that this particular matter should properly be determined by the North Carolina court.  The Applicant therefore filed an appropriate opposition to XPRES' papers and vigorously sought to protect the estate's interest in the XPRES liquidation/dissolution. The Applicant successfully blocked XPRES' attempt to liquidate/dissolve XPRES on a preliminary basis and forced the matter into a true trial process.

45.     The Applicant was extensively and primarily responsible for conducting discovery and, along with the Debtor's counsel, prosecuting the defense to XPRES' improper actions. Additionally, the Applicant was required to conduct an extensive review of documents and other information with respect to XPRES, the shareholder agreements and the valuation of the Debtor's interests in XPRES.

46.     Additionally, the Applicant retained an expert witness to assist in conducting an accurate determination of XPRES' value for trial purposes. The Applicant met extensively with the expert in preparation for trial.

47.     After conducting extensive discovery (all in North Carolina), the Applicant, along with the Debtor's counsel, and XPRES entered into extensive settlement negotiations. Ultimately, the Applicant was instrumental and successful in obtaining an $80,000 payment from XPRES, which was approved by this Court.

17

48.    In connection with EXPRES Corporation, the Applicant devoted a total of 276.1 hours, having a total value of $59,277.00 as follows:

| Professional Time Analysis – EXPRES Corporation | | | |
|---|---|---|---|
| Name | Total Hours | Hourly Rate | Total Fees |
| Joel I. Sher | 15.7 | $300.00 | $4,710.00 |
| Joel I. Sher | 8.4 | $275.00 | $2,310.00 |
| Richard M. Goldberg | 78.3 | $235.00 | $18,400.50 |
| Richard M. Goldberg | 121.2 | $210.00 | $25,452.00 |
| Diarmuid F. Gorham | 40.8 | $165.00 | $6,732.00 |
| Diarmuid F. Gorham | 7.9 | $145.00 | $1,145.50 |
| Scott W. Foley | 3.4 | $145.00 | $493.00 |
| Ann C. Lawrence | .4 | $85.00 | $34.00 |
| TOTALS | 276.1 | | $59,277.00 |

49.    The Applicant incurred out of pocket expenses in the amount of $6,304.51 for the Application Period in connection with EXPRES Corporation as follows:

| Out of Pocket Disbursements – XPRESS Corporation | |
|---|---|
| Category | Amount |
| Duplicating Expenses | $1,125.40 |
| Long Distance Expenses | $67.89 |
| Messenger/Express Mail | $52.25 |
| Mileage | $25.00 |
| Travel Expenses | $3,740.82 |
| Meals | $74.95 |
| Deposition Transcripts | $813.40 |
| Telecopy | $394.50 |
| Federal Express | $10.30 |
| TOTAL | $6,304.51 |

## C.    GIBSON TRANSACTION

50.    A third category requiring the Applicant's attention was the liquidation of the Debtor's interests in Blockless Investments, BV to Gibson Investments Limited ("Gibson").

51.     Prior to the Application Period, the Court approved the Liquidating Agent's proposed sale of the Debtor's interest in Blockless to the nominee of Gibson, an entity holding real estate interests in Australia and throughout the world. The Liquidating Agent consummated the Gibson transaction in March of 1999.

52.     During the Application Period, the Applicant was required to resolve certain remaining matters relative to the Gibson transaction. Specifically, Patrick Donnelly and Roland Benner filed an appeal from the order of this Court approving the Gibson transaction and subsequently sought a stay of a proposed distribution of proceeds that had been approved by the Court in conjunction with the Gibson transaction. The Applicant was required to file an opposition to the motion of Messrs. Donnelly and Benner for a stay pending appeal, and to appear at the hearing before the United States District Court for the District of Maryland concerning the same.

53.     In addition, during the Application Period the Applicant corresponded with Gibson with regard to matters relating to the transaction.

54.     In connection with the Gibson transaction, the Applicant devoted a total of 40.2 hours, having a total value of $9,121.50 during the Application Period, as follows:

| Professional Time Analysis – Gibson Transaction | | | |
|---|---|---|---|
| Name | Total Hours | Hourly Rate | Total Fees |
| Joel I. Sher | 1.0 | $345.00 | $345.00 |
| Joel I. Sher | 8.6 | $265.00 | $2,279.00 |
| Richard M. Goldberg | 3.8 | $295.00 | $1,121.00 |
| Richard M. Goldberg | 12.1 | $190.00 | $2,299.00 |
| Lonnie M. Ritzer | 3.5 | $300.00 | $1,050.00 |
| Lonnie M. Ritzer | 3.7 | $275.00 | $1,017.50 |
| Mark L. Renbaum | 4.7 | $160.00 | $752.00 |
| Ann C. Lawrence | .5 | $125.00 | $62.50 |
| Ann C. Lawrence | 2.3 | $85.00 | $195.50 |
| **TOTALS** | **40.2** | | **$9,121.50** |

19

55.     The Applicant incurred out of pocket expenses in the amount of $16.12 for the Application Period in connection with the Gibson Transaction as follows:

| Out of Pocket Disbursements – Gibson Transaction | |
| --- | --- |
| **Category** | **Amount** |
| Duplicating Expenses | $5.80 |
| Long Distance Expenses | $2.82 |
| Telecopy | $7.50 |
| **TOTAL** | $ 16.12 |

**D.      SPAIN-GENERAL ISSUES**

56.     Another discrete category of services provided by the Applicant involved the liquidation of the Debtor's assets in Spain, which has proven, by far, to be the most complicated aspect of the Liquidating Agent's duty.

57.     During the Application Period, the Applicant spent extensive time and effort to identify all of the business enterprises of the Debtor in Spain, as well as to fully understand the myriad of issues involved with disposing of those assets.   Through research of documents accumulated by the Applicant, as well as information gained from several trips to Spain, the Applicant determined that the Debtor had interests in over twenty different corporations, most of which the Debtor owned through additional intermediary holding companies incorporated  in the Netherlands and the United States.

58.     The Applicant determined that the Debtor's interests in many of those assets were subject to conflicting claims or interests of one or more parties with whom the Debtor had business dealings in pre-bankruptcy days.

20

59.     The Applicant also determined that in 1993, the Debtor had entered into a comprehensive settlement agreement with Sogo and Sogo USA (collectively "Sogo"), the Debtor's ½ partner in the Hotel Arts project in Barcelona. The Hotel Arts project consisted of a luxury hotel, numerous retail and commercial sites, a parking garage, a casino, various restaurants (including a Planet Hollywood), apartments and building lots. Through the Applicant's investigation the Applicant determined that the settlement agreement provided for a total restructuring of the Debtor's interest in the underlying partnerships with Sogo, and that the extent and nature of the Debtor's economic and/or non-economic interests in those partnerships was in dispute with Sogo.

60.     In addition, the Applicant determined that the Debtor had an ongoing ownership interest in a Planet Hollywood franchise restaurant located adjacent to the Hotel Arts. As a result of ongoing disputes with the other stockholders of that restaurant (Ray Velazquez and Sogo), the restaurant was itself in serious financial trouble and subject to litigation in Spain.

61.     During the initial periods of the Application Period, the Applicant began discussions with Sogo to attempt to analyze the conflicting claims between the Debtor and Sogo, as well as to determine if there was a way to monetize the Debtor's various interests in his partnership with Sogo. In that regard, the Applicant and Liquidating Agent conducted exhaustive research of documents turned over by the Debtor. In addition the Applicant and Liquidating Agent provided documents to Sogo, as well as obtained documents from Sogo, to further the Liquidating Agent's understanding of the Debtor's interests.

62.     In November of 1999, the Liquidating Agent traveled to Barcelona, Spain and conducted a thorough on-site inspection of the various projects in which the Debtor had an interest or claimed to have an interest. In addition, the Applicant and the Debtor and met with various

21

individuals in Barcelona to attempt to gain an independent view of the value of the Debtor's assets and/or the ability to monetize them. During that same trip, the Applicant met with the Debtor's criminal attorney in Barcelona, as the Debtor was subject to a criminal indictment brought pursuant to actions instituted by one of the Debtor's partners in the Planet Hollywood restaurant, Ray Velazquez.

63.    During that same trip, the Applicant met with Spanish counsel for the Planet Hollywood entity and reviewed extensive documentation turned over by said counsel.

64.    Later in November of 1999, the Applicant traveled to Los Angeles to meet with senior executives of Sogo. Sogo USA was headquartered in Los Angeles, California, and was represented by counsel in Los Angeles, and therefore requested that the Applicant travel to meet with them at that location. The Applicant prepared for and engaged in extensive meetings with Sogo executives in an effort to see if there was any common ground between the parties in the disposition of assets owned by and/or claimed to be owned by the Debtor. Among the assets claimed to be owned by the Debtor were certain options to purchase the apartments located atop the Hotel Arts. According to the Debtor's estimates, those options could be exercised and the apartments could then be immediately re-sold at a substantial profit, which the Debtor believed would help satisfy claims of creditors. Conversely, Sogo USA argued that those option rights had expired. The Applicant investigated the respective claims of Sogo and the Debtor with respect to those apartment options.

65.    Due to the difficulty the Liquidating Agent was having in obtaining documents from Sogo, the Applicant prepared a motion for a 2004 examination of representatives of Sogo. That motion was approved by order of this Court. However, Sogo refused to make themselves or any documents available in the United States, but instead required that the Applicant review all the

22

documents at Sogo's offices in Barcelona, Spain, where they claimed the documents were kept in the ordinary course of business. Accordingly, in June of 2000, the Applicant traveled to Barcelona, Spain. During that trip, the Applicant reviewed thousands of pages of documents turned over by Sogo and prepared for and began taking the deposition of representatives of Sogo. During the course of that examination, the Applicant suggested certain settlement parameters to Sogo. As a result, the deposition was suspended and the parties once again engaged in settlement discussions. (See discussion below.)

66.    During the same period of time, the affairs of the Planet Hollywood began to further deteriorate. As the stockholders of Planet Hollywood were unable to agree on any corporate governance issues, a proceeding was instituted in the courts of Barcelona to compel the stockholders to attend a court-supervised stockholders meeting. Because the Debtor was not authorized to make any decisions concerning his business affairs without the prior approval of the Liquidating Agent, the Liquidating Agent traveled to Barcelona, Spain in March of 2002 for this court-supervised stockholders meeting. However, notwithstanding the court's supervision, the stockholders were unable to agree on corporate governance issues at that time.

67.    During the same trip in March of 2002, the Applicant was also required to attend a hearing in the criminal courts of Barcelona because of challenges made by Ray Velazquez to the assets of the Debtor which the Liquidating Agent was attempting to sell. Specifically, the Liquidating Agent was required to give assurances to the judges of the criminal court in Barcelona that prior to disposing of any of the valuable Hinsua assets, the Liquidating Agent would provide prior notice both to the Bankruptcy Court in the United States and to the Criminal Court in Barcelona, Spain.

23

68.    Throughout the Liquidating Agent's efforts to dispose of the Debtor's assets in Spain, the Liquidating Agent was subject to attempts to manipulate his actions by one or more parties whom the Liquidating Agent suspected had an interest in acquiring the assets of the Debtor. Those actions included the misappropriation of the Liquidating Agent's credit card, letters and calls to the Liquidating Agent's home, and letters sent to the Court accusing the Liquidating Agent and others of misdeeds. Accordingly, the Applicant was required in numerous instances to respond in an appropriate fashion to those acts of intimidation.

69.    During the Application Period, the Applicant also met with various parties, including but not limited to, representatives of the Marriott Corporation to attempt to monetize the Debtor's interests in the Hotel Arts project. During the Application Period the Applicant determined that Sogo (who was the controlling partner of the Hotel Arts partnerships) was attempting to sell the Hotel Arts project. Accordingly, the Applicant met with parties such as Marriott in an attempt to bring a party to the table who would offer something for the Debtor's disputed interest in the Hotel Arts project. In addition, the Debtor himself met with various parties who were interested in the Hotel Arts project, and at the request of the Debtor, the Applicant met with representatives of those parties in an attempt to structure a disposition of those interests.

70.    During the Application Period, the Debtor also filed one or more actions against Sogo attempting to enjoin their action to enforce a call option upon the Debtor's interests in the Hotel Arts project, which the Debtor correctly feared would cause a substantial taxable event to the Debtor.

71.    Later during the Application Period, the Applicant revived settlement discussions with Sogo in an attempt to resolve all disputes between Sogo and the Debtor, and monetize the Debtor's interest in the real and/or disputed assets. As a result of those discussions, the Liquidating

Agent and Sogo entered into a non-binding term sheet pursuant to which, if consummated, Sogo would pay the Liquidating Agent $2.3M for the Debtor's interest in the Hotel Arts project. However, due to the extremely complicated tax implications associated with that term sheet, the Liquidating Agent and Sogo were unable to finalize an agreement in a tax-advantageous fashion. The Liquidating Agent determined that the structure Sogo insisted upon would ultimately trigger taxes in excess of $2.3M. Conversely, the Liquidating Agent proposed a structure which would have been more tax advantageous; however, Sogo refused to accept the Liquidating Agent's proposal. Accordingly, the parties abandoned those discussions. Moreover, during the Application Period, Sogo was placed in a receivership in Japan and the representatives of Sogo with whom the Liquidating Agent had been negotiating were either dismissed from Sogo's employment or had their duties and powers severely limited. Ultimately, Sogo USA filed a Chapter 7 bankruptcy case in the United States.

72.    The Applicant also worked during the Application Period to try to salvage the Debtor's interests in the Planet Hollywood in Barcelona. As a result of disputes between the stockholders, Planet Hollywood in Barcelona defaulted on its franchise agreement with Planet Hollywood International. When Planet Hollywood International filed its own Chapter 11 bankruptcy case in the United States, the Applicant attempted to resolve the defaults with Planet Hollywood International. The Applicant's efforts and those of other professionals working on the matter in Spain were unsuccessful, the franchise was revoked and Planet Hollywood in Barcelona was closed.

73.    The Applicant finally concluded during the Application Period that the only substantial asset of the Debtor located in Spain which could ultimately be monetized was the Debtor's interest in the parking spaces owned by Hinsua, SL (although there may be certain other less valuable assets still remaining). However, the disposition of those assets was inexorably

intertwined with the Debtor's affairs in Spain (see further discussion regarding the disposition of Hinsua in the next section).

74.    In connection with the category entitled Spain-General Issues, the Applicant devoted a total of 594 hours, having a total value of $155,279.50 for the Application Period, as follows:

| Professional Time Analysis – Spain-General Issues | | | |
|---|---|---|---|
| Name | Total Hours | Hourly Rate | Total Fees |
| Joel I. Sher | 7.5 | $345.00 | $2,587.50 |
| Joel I. Sher | 7.0 | $330.00 | $2,310.00 |
| Joel I. Sher | 121.5 | $300.00 | $36,450.00 |
| Joel I. Sher | 152.0 | $275.00 | $41,800.00 |
| Joel I. Sher | 128.5 | $265.00 | $34,052.50 |
| Charles S. Fax | .6 | $350.00 | $210.00 |
| Luis Guinot, Jr. | 1.3 | $325.00 | $422.50 |
| Richard M. Goldberg | 2.7 | $295.00 | $796.50 |
| Richard M. Goldberg | 3.9 | $275.00 | $1,072.50 |
| Richard M. Goldberg | 2.8 | $235.00 | $658.00 |
| Richard M. Goldberg | 9.9 | $210.00 | $2,079.00 |
| Richard M. Goldberg | 4.8 | $190.00 | $912.00 |
| Lonnie M. Ritzer | 60.5 | $300.00 | $18,150.00 |
| Heather A. Klink | .3 | $260.00 | $78.00 |
| Kimberly M. Stoker | 7.3 | $210.00 | $1,533.00 |
| Kimberly M. Stoker | .9 | $185.00 | $166.50 |
| Kimberly M. Stoker | 1.2 | $165.00 | $198.00 |
| Scott W. Foley | 1.8 | $160.00 | $288.00 |
| Scott W. Foley | 23.1 | $145.00 | $3,349.50 |
| Mark L. Renbaum | 33.8 | $160.00 | $5,408.00 |
| Hillary J. Michaud | 7.0 | $160.00 | $1,120.00 |
| Jason P. Beaulieu | 1.4 | $165.00 | $231.00 |
| Ann C. Lawrence | 2.6 | $125.00 | $325.00 |
| Ann C. Lawrence | 3.1 | $115.00 | $356.50 |
| Ann C. Lawrence | .9 | $95.00 | $85.50 |
| Ann C. Lawrence | 7.0 | $85.00 | $595.00 |
| Lisa M. Thompson | .5 | $90.00 | $45.00 |
| TOTALS | 594 | | $155,279.50 |

75.    The Applicant incurred out of pocket expenses in the amount of $16,455.27 for the Application Period in connection with Spain-General Issues as follows:

26

| Out of Pocket Disbursements – Spain-General Issues | |
|---|---|
| Category | Amount |
| Duplicating Expenses | $1,333.00 |
| Postage | $6.05 |
| Messenger Service/Express Mail | $375.10 |
| Long Distance Expenses | $1,379.41 |
| Mileage and Parking | $24.00 |
| Travel Expenses | $9,051.40 |
| Meals | $555.20 |
| Telecopy | $2,154.00 |
| Filing Fees | $60.00 |
| Out of Office Duplicating | $326.81 |
| Process/Service Fees | $78.10 |
| Witness Fee/Mileage | $56.22 |
| Lexis | $93.78 |
| Federal Express | $362.90 |
| Translation Services | $589.30 |
| **TOTAL** | $16,445.27 |

E.    **HINSUA MATTERS**

76.    Another challenging project the Applicant undertook during the Application Period involved the negotiation and liquidation of the Debtor's interests in Hinsua, S.L.

77.    Hinsua S.L. ("Hinsua") is a Spanish corporation over which the Debtor has an indirect 100% ownership interest. Hinsua originally owned approximately 120 parking spaces in a larger garage project adjacent to the Hotel Arts in Barcelona, Spain. The Debtor had an indirect interest in Hinsua as a result of his sole ownership of Peawick Investments NV, a company organized under the laws of the Netherlands. Prior to the Liquidating Agent's appointment, the Debtor sold certain of the parking spaces and borrowed certain funds for the acquisition and/or management of Hinsua, which funds were secured by two mortgages on those parking spaces. The Hinsua parking spaces were further subject to a management agreement between the Debtor and Traplaya, SL, an entity originally owned indirectly by Sogo. Pursuant to agreements entered into before the Liquidating Agent was

27

appointed, the business affairs of Hinsua, S.L. were managed in Barcelona by Beto Cordoncillo, an accountant who owned an accounting firm by the name of Data Comp.

78.     During the early phases of the Application Period, the Applicant met with Mr. Cordoncillo to review all of the business affairs of Hinsua, including but not limited to a review of the balance sheets and profit and loss statements, as well as the management and operation of the parking garage.

79.     During a meeting between the Applicant and Mr. Cordoncillo in November of 1999, the Applicant learned for the first time that Hinsua was in arrears with respect to the payment of VAT in Barcelona and, as a result, the Debtor's interests in Hinsua were in jeopardy. Therefore, the Debtor requested that the Liquidating Agent advance certain funds from the Liquidating Agent's escrow account for the satisfaction of those obligations. Accordingly, in December of 1999, the Liquidating Agent entered into negotiations with the Debtor pursuant to which the Liquidating Agent advised the Debtor that he would support such requests, provided that the Debtor finally grant the Liquidating Agent full custody and control of all revenue and income generated by the Hinsua parking spaces, as well as confirm that, notwithstanding the terms of the Debtor's Plan, the disposition of the Hinsua parking spaces was subject to the sole authority of the Liquidating Agent. That agreement was approved by order of this Court on December 13, 1999, and, accordingly, the Liquidating Agent advanced the funds necessary to satisfy the outstanding VAT obligation.

80.     Throughout the Application Period, the Liquidating Agent conducted ongoing meetings and discussions with Mr. Cordoncillo in order to monitor the performance of the Hinsua parking spaces, as well as to gain a better understanding of their inter-relationship with the other Spanish assets which the Liquidating Agent was attempting to liquidate. In fact, a key component of

28

the discussions with Sogo was their desire to regain ownership of the Hinsua parking spaces because they were the indirect owner of the remaining spaces in the parking garage adjacent to the Hotel Arts. Mr. Cordoncillo was also intimately familiar with the management of the Hotel Arts project by representatives of Sogo and therefore he was able to assist the Liquidating Agent in his duties with respect thereto.

81.    In the spring of 2000, Ray Velazquez filed papers with the criminal courts of Barcelona alleging, *inter alia*, that the Debtor was attempting to sell his interest in Hinsua. Mr. Velazquez alleged that this would leave no assets in Spain for the satisfaction of any criminal penalties which the courts might impose upon the Debtor arising out of the criminal indictment. As a result, the courts in Barcelona required that the Debtor and the Liquidating Agent appear in Barcelona, Spain to respond to those charges. Accordingly, in June of 2000, the Liquidating Agent once again traveled to Barcelona, Spain, and met with his own counsel and criminal counsel for the Debtor to determine how to respond to the concerns of the courts in Barcelona. Moreover, because the Liquidating Agent believed that the allegations of Mr. Velazquez were false, the Liquidating Agent believed it was important to appear before the criminal courts in Barcelona to address those concerns personally. However Velazquez, who had previously attempted to engineer a purchase of the Hinsua spaces, seemed intent on getting the courts in Barcelona to place an embargo upon the spaces prohibiting either the Debtor or the Liquidating Agent from disposing of the same. Therefore, on the advice of counsel, the Liquidating Agent appeared before the courts in Barcelona and filed a line in which the Liquidating Agent assured the courts in Barcelona that the parking spaces would not be disposed of without prior notice to the Bankruptcy Court in the United States and the criminal court in Barcelona. While the parking spaces were not under a formal embargo as of that time, the

29

assurances given by the Liquidating Agent created a *de facto* embargo on the spaces, which prohibited the Liquidating Agent from disposing of them until such time as the criminal charges against the Debtor were resolved.

82.    Throughout the entire Application Period (as described above), the Applicant was attempting to structure one or more deals for the disposition of the Spanish assets, including the Hinsua assets. Certain of those deals involved just the sale of the Hinsua assets, while other proposed deals involved a larger transaction which included all of the Debtor's actual and/or disputed interest in the Spanish assets, including Hinsua. Thus, the Applicant had meetings with various parties both in the United States and in Spain with respect to those potential transactions.

83.    In January of 2002, the criminal trial of the Debtor in Barcelona commenced. At the request of the Debtor's criminal counsel, the Liquidating Agent traveled to Barcelona to attend the criminal trial and was called as a witness. Ultimately, the courts in Barcelona found the Debtor not guilty on all counts and, as a result, the Liquidating Agent was finally able to dispose of the parking spaces free and clear of potential claims from that court.

84.    Notwithstanding the resolution of the criminal proceedings, during 2002 the uncertainty relating to the competing interests of the Debtor and Sogo as well as the bankruptcy and receivership proceedings of Sogo made disposition of the Spanish assets very difficult. However, by the spring of 2002, the Liquidating Agent determined that Sogo had circumvented the Debtor in the ongoing litigation and had sold most of the underlying interest it controlled in Spain to a consortium controlled by Deutsche Bank. By that time, the Liquidating Agent had also concluded that, with the exception of any litigation claims the Debtor had against Sogo and/or USA Sogo, the Debtor's interest in the remaining assets in Spain (with the exception of Hinsua and potential trade-makers

30

owned by the Debtor) were of nominal value. Thus, the Liquidating Agent focused primarily on disposing of the Hinsua assets in a tax advantageous fashion.

85.    In the latter part of 2002 and early 2003, the Liquidating Agent began discussions in earnest with parties concerning the sale of the Hinsua parking spaces. Ultimately, the Debtor met with Javier Faus, an attorney in Barcelona who in the past had worked with the Debtor, and who at present was the administrator for the Hotel Arts project. Mr. Faus and the Liquidating Agent began having discussions in late 2002; however, during the month of December 2002, Mr. Faus acquired the former interest of Sogo (then held by Deutsche Bank) in the other parking spaces in the garage where the Hinsua spaces were located.

86.    After Mr. Faus acquired interest in those parking spaces, his discussions with the Liquidating Agent intensified. In April 2003, the Liquidating Agent met with Mr. Faus and began working out the parameters for the purchase of the spaces based on appraisals which the Liquidating Agent reviewed. However, because the Hinsua spaces were not owned in fee by Hinsua but rather were subject to a concession granted by the federal government of Spain, the valuation of the spaces was complicated, as was the structure of any transaction relating to the disposition thereof.

87.    On or about April 29, 2003, the Liquidating Agent and Mr. Faus, on behalf of BCN, 2001 ("BCN") entered into a Letter of Intent pursuant to which the Liquidating Agent agreed to sell the Debtor's interest in Hinsua for the sum of One Million One Hundred Sixty Thousand euros. The Letter of Intent also provided that the Liquidating Agent and BCN would agree to negotiate in good faith the final structure of the transaction either as a transfer of the stock of Hinsua or of the underlying properties, taking into account international and national financial, corporate and tax concerns. In this way, the Liquidating Agent attempted to structure the transaction in a way that

31

would maximize the funds which the Liquidating Agent would have available to pay the Debtor's creditors.

88.     During the Liquidating Agent's due diligence, he determined that the disposition of the parking spaces would render the proceeds subject to corporate taxes in Spain and the Netherlands, as well as cause the Debtor to incur capital gains and/or ordinary income tax obligations in the United States. Thus, although the Liquidating Agent determined that the sale price of One Million One Hundred Sixty Thousand euros was a reasonable offer for the parking spaces, he was concerned that the complicated tax issues related to that sale might undermine the ability of the estate to realize an optimum net recovery.

89.     Accordingly, on May 7, 2003, the Applicant filed the Motion of Liquidating Agent for Authority to Sell Interests in or Assets of Hinsua Barcelona, S.L. Free and Clear of Liens, Claims and Encumbrances (the "Sale Motion").

90.     The Sale Motion and notice thereof established the intent of the Liquidating Agent, subject to court authority, to sell the Hinsua spaces for the highest and best offer. Therefore, pursuant to the Letter of Intent, while the Liquidating Agent was prepared to sell the assets if a favorable tax structure could be arrived at with the purchaser, the Liquidating Agent hoped that the Sale Motion might engender higher and better offers. Prior to the hearing on the Sale Motion, the Applicant was approached by the Debtor who submitted what the Debtor believed was a higher and better offer. That offer involved the Debtor obtaining funds from a third-party in the amount of $550,000 which he would pay to the Liquidating Agent. In addition, the Debtor's offer provided that his court-authorized attorneys would waive fees in the approximate amount of $200,000, provided the Liquidating Agent abandoned all the estate's interest in the Hinsua spaces.

32

91.     The Liquidating Agent prepared for and attended the hearing on the Sale Motion. As a result, on June 24, 2003, the Court entered its Order granting the Sale Motion. Pursuant to the terms of that Order, the Liquidating Agent was granted the sole discretion to either (i) consummate the sale of the spaces with BCN pursuant to either a stock sale or a sale of the assets, or (ii) consummate the terms of the offer made by the Debtor. That Order also provided that the Liquidating Agent could consider modifications to the respective offers of BCN and the Debtor, such that an eventual deal would be closed on terms no less favorable to the estate than those set forth in either the Letter of Intent with BCN or the Debtor's offer.

92.     Thereafter, the Liquidating Agent entered into exhaustive and continual negotiations with both the Debtor and Mr. Faus to arrive at a final highest and best offer. The Liquidating Agent had numerous discussions with various counsel in the Netherlands and Spain in order to fully and finally determine all the tax implications associated with a sale to BCN. At the same time, the Applicant continued negotiating with the Debtor to determine if his offer could be enhanced.

93.     Throughout July of 2003, the Liquidating Agent commenced what ended up being in the nature of an auction between the Debtor and BCN. Throughout that period, both the Debtor and BCN modified and improved their offers. Ultimately, due to various tax uncertainties and the significant taxes that would be due under the BCN transaction, the Liquidating Agent concluded that the final modified offer of the Debtor was the highest and best offer. That offer provided consideration to the estate of $600,000, plus an increased reduction of attorneys' fees by the Debtor's counsel in the amount of $250,000. Furthermore, Debtor's counsel agreed that the reduction of their fees would be in the nature of a true-up, such that if there was an administrative insolvency, the

33

reduction would be increased in order to insure that the actual dollar savings to the estate was equal to $250,000.00.

94.    In connection with the category entitled Hinsua Transaction, the Applicant devoted a total of 668.6 hours, having a total value of $197,271.50 during the Application Period, as follows:

| Professional Time Analysis – Hinsua Transaction | | | |
|---|---|---|---|
| Name | Total Hours | Hourly Rate | Total Fees |
| Joel I. Sher | 183.6 | $345.00 | $63,342.00 |
| Joel I. Sher | 103.9 | $330.00 | $34,287.00 |
| Joel I. Sher | 28.8 | $300.00 | $8,640.00 |
| Joel I. Sher | 69.3 | $275.00 | $19,057.50 |
| Joel I. Sher | 22.6 | $265.00 | $5,989.00 |
| Luis Guinot, Jr. | 4.8 | $325.00 | $1,560.00 |
| Richard M. Goldberg | 116.4 | $295.00 | $34,338.00 |
| Richard M. Goldberg | .4 | $235.00 | $94.00 |
| Sheryl N. Stephenson | 3.5 | $280.00 | $980.00 |
| Lonnie M. Ritzer | 37.5 | $335.00 | $12,562.50 |
| Heather A. Klink | 5.6 | $275.00 | $1,540.00 |
| Kimberly M. Stoker | 1.8 | $275.00 | $495.00 |
| Carmela L. Bell | 11.4 | $260.00 | $2,964.00 |
| Philip M. Bogart | 25.9 | $180.00 | $4,662.00 |
| Jason P. Beaulieu | 3.5 | $175.00 | $612.50 |
| Jason P. Beaulieu | 4.0 | $165.00 | $660.00 |
| Ann C. Lawrence | 37.2 | $125.00 | $4,650.00 |
| Ann C. Lawrence | 2.7 | $115.00 | $310.50 |
| Ann C. Lawrence | 4.4 | $85.00 | $374.00 |
| Lisa M. Thompson | 1.0 | $125.00 | $125.00 |
| Mary H. Scott | .3 | $95.00 | $28.50 |
| TOTALS | 668.6 | | $197,271.50 |

95.    The Applicant incurred out of pocket expenses in the amount of $129,460.93 for the Application Period in connection with the Hinsua Transaction as follows:

34

| Out of Pocket Disbursements - Hinsua Transaction | |
|---|---|
| **Category** | **Amount** |
| Duplicating Expenses | $517.20 |
| Messenger Service/Express Mail | $171.52 |
| Long Distance Expenses | $483.45 |
| Travel Expenses [1] | $127,024.00 |
| Meals | $383.54 |
| Telecopy | $178.50 |
| Filing Fees | $10.00 |
| Westlaw | $44.64 |
| UPS | $6.33 |
| Translation Services | $641.75 |
| **TOTAL** | **$129,460.93** |

## Novelty and Difficulty of Questions Raised

96.     This case has presented substantial novel and difficult issues.  This is an extremely complex case which has required the Applicant to use its experience in numerous contested hearings Moreover, the Applicant was required to liquidate assets in Spain and to understand the myriad of international corporate and tax issues associated with those dispositions.     Additionally, the Applicant was required to consider and wade through the maze of conflicting positions of the Debtor and other parties with respect to what assets the Debtor actually owned, and the value thereof.

## Level of Skill Required

97.     The level of inter-personal and professional skills required from the Applicant is at the highest level to insure that the Liquidating Agent and the estate's interests have been and continue to be protected.  The Applicant's work required a coordinated effort among many attorneys

---

[1]   This category includes charges for the numerous trips made by the Applicant to Spain.  In addition, on various occasions, the Applicant was required to cover the costs of the Debtor's travel to Spain, in order to insure the Debtor's appearance at hearings before the courts in Barcelona.

and involved complex issues of corporate, international, tax, real estate and bankruptcy law. The different levels of skill required are reflected in the different hourly rates charged by the professionals who provided services to the Liquidating Agent.

## Opportunity Costs

98.     Due to the time limitations placed on the Applicant, the Applicant was required to devote a significant amount of time to this case. Since his appointment, the Liquidating Agent has made numerous trips to various countries which were the situs of the Debtor's assets. While in these countries, the Liquidating Agent was almost entirely unavailable to other clients. Additionally, while the Liquidating Agent was out of the country and negotiating the sale or potential sale of assets, at least one professional was usually working to draft pleadings and/or agreements which reflected the status of the negotiations. Therefore, several of the professionals involved were able, during certain intervals of the Application Period, to devote an extremely limited amount of time to other matters. Moreover, the Applicant has been required to advance tens of thousands of dollars for travel expenses, with no assurance that it will be reimbursed in full. The Applicant waited four years to file this application, believing that it should only be filed after the sale of Hinsua was consummated.

## Customary Fee For Like Work

99.     The hourly rates for the individual professionals of the Applicant working in this case are the normal and customary rates charged by the Applicant for its services to debtors, trustees, and committees in other bankruptcy cases and to clients in matters not involving bankruptcy in the Baltimore area. The hourly rates are within the customary range charged by other attorneys in the Baltimore area (in many instances, the Applicant's rates are lower), and the total compensation

sought is reasonable compared with fees charged by other similarly situated law firms in a case of this magnitude and complexity.   As noted above, during the Application Period, the Applicant experienced annual hourly rate increases for several of its professionals.  These increases were not uniform, but reflect the increased knowledge and expertise of the professionals in their practice areas.

## Applicant's Expectation at the Outset of Litigation

100.   The Applicant expected that it would be compensated for services rendered at its standard hourly rates and would be reimbursed for all out-of-pocket disbursements made on behalf of the Liquidating Agent. The Applicant has sought reimbursement only for the out-of-pocket expenses that are normally not considered overhead.

## Amount in Controversy and Results Obtained

101.   The Applicant's efforts have resulted in significant, positive gains for the estate.  As of this date, the Liquidating Agent has sold substantially all of the Debtor's tangible assets and significantly reduced claims of creditors against the estate.  The Applicant was instrumental in settling the XPRES litigation, which was worth in excess of $1 million to the estate, was instrumental in the sales of valuable artwork, recognizing significant gains for the estate.  The Applicant has made distributions on professional fees as approved by this Court.  Most importantly, however, the Applicant was able to negotiate a disposition of the Debtor's most valuable remaining Spanish asset under terms which are favorable to the estate.

## Time Limitations

102.   Many of the services required of the Applicant's attorneys have been provided under severe time limitations.  Specifically, the Applicant's most senior member was on numerous

occasions required to travel overseas for days, through different time zones, and be continually able to meet and negotiate relative to the Debtor's assets. Moreover, because the parties with whom the Applicant was required to negotiate and confer are located all over the world, the Applicant was often required to be available at odd hours of the night and day for lengthy negotiations. All of the overseas travel which has been required by this case has also had a negative impact on the personal and professional life of the Liquidating Agent. In addition to monopolizing the better part of the Applicant's bankruptcy department for days on end, the Liquidating Agent was required to be away from his home and his family for several significant periods of time.

### Undesirability of the Case

103.  This factor has only limited applicability to this case. However, as a result of its representation of the Debtor, the Applicant has necessarily been forced to accept lengthy delays in obtaining compensation, which delays do not occur in representing clients in other bankruptcy cases or other clients outside of bankruptcy.

### Nature and Length of Professional Relationship With Client

104.  The Liquidating Agent is a member of the Applicant. However, neither the Liquidating Agent nor the Applicant, either before the filing of the petition or subsequent thereto, have had an attorney/client relationship with the Debtor.

### Attorney Fee Awards in Comparable Cases

105.  The fees requested by the Applicant in this case are comparable to or lower than fees allowed in cases of similar size and complexity, based on the time dedicated, the customary hourly rates and the difficulty of the representation. The Applicant has made a concerted effort to centralize

38

responsibility for different aspects of this case and to assign responsibility to attorneys and paralegals in an economical and efficient manner.

## General Conditions

106.    All legal services for which compensation are requested in this Application were performed for and on behalf of the Liquidating Agent and not on behalf of any other person. After the filing of this case, no beneficial interests direct or indirect, or claim against, or interest of the Debtor has been acquired by the Applicant or for its account.

107.    No agreement or understanding exists between the Applicant and any other person for the sharing of compensation to be received by it for services rendered in connection with this case, except within the law firm of Shapiro Sher Guinot & Sandler. No agreement or understanding exists between the Applicant and any other person rendering services in connection with this case for the sharing of compensation of such other person.

108.    Consideration of the circumstances of this case and the twelve-factor test of *Barber v. Kimbrells, Inc.* indicates that no downward adjustment in the overall fees of the Applicant is warranted. The work performed by the Applicant has provided the estate with significant benefits.

109.    Notice of this Application has been given to the United States Trustee, all creditors, all parties-in-interest who have filed a request with the Clerk that such notices be mailed to them, and all persons entitled to receive notice pursuant to the Bankruptcy Rules.

WHEREFORE, the law firm of Shapiro Sher Guinot & Sandler and the Liquidating Agent respectfully request the following relief:

A.    That the law firm of Shapiro Sher Guinot & Sandler and the Liquidating Agent be allowed interim compensation in the amount of $478,889.00, plus reimbursement of out-of-pocket

expenses in the amount of $177,643.10 for an aggregate sum of $656,532.10 for the Application Period;

B.      That the Liquidating Agent be authorized to pay Shapiro Sher Guinot & Sandler the fees and expenses awarded; and

C.      That Shapiro Sher Guinot & Sandler and the Liquidating Agent be granted such other and further relief as is just and equitable.

/s/      Joel I. Sher
Joel I. Sher, Bar No. 00719
Richard M. Goldberg, Bar No. 07994
Shapiro Sher Guinot & Sandler
36 South Charles Street, 20th Floor
Baltimore, Maryland 21201-3147
(410) 385-0202

Attorneys for Joel I. Sher, Liquidating Agent

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of December, 2003, a copy of the Third Application of Shapiro Sher Guinot & Sandler and Liquidating Agent for Interim Allowance of Compensation and Reimbursement of Expenses for Period September 1, 1999 Through September 30, 2003 was mailed by first-class mail, postage prepaid, to:

> Paul M. Nussbaum, Esquire
> Stephen F. Fruin, Esquire
> Whiteford Taylor & Preston
> 7 St. Paul Street, Suite 1400
> Baltimore, MD   21202
>
> Benjamin Rosenberg, Esquire
> Rosenberg Proutt Funk & Greenberg
> 25 South Charles Street, Suite 2115
> Baltimore, MD   21201
>
> Mark A. Neal, Esquire
> Assistant United States Trustee
> Office of the US Trustee
> 300 West Pratt Street, Suite 350
> Baltimore, MD   21201

/s/     Joel I. Sher