IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
Baltimore Division

In re:                                    *

G. WARE TRAVELSTEAD            *    Case No:   96-5-4979-SD

        Debtor                        *            Chapter 11

    *    *    *    *    *    *    *    *    *    *    *

**ELEVENTH APPLICATION FOR ALLOWANCE OF FEES AND
REIMBURSEMENT OF EXPENSES TO WHITEFORD, TAYLOR
& PRESTON L.L.P. AS COUNSEL FOR THE DEBTOR
FOR THE PERIOD NOVEMBER 1, 2000 THROUGH
<u>NOVEMBER 30, 2003, AND FOR OTHER RELIEF</u>**

Whiteford, Taylor & Preston, L.L.P. ("WT&P" or the "Applicant"), the attorneys

for G. Ware Travelstead (the "Debtor" or "Mr. Travelstead"), hereby files this Eleventh

Application for Allowance of Fees and Reimbursement of Expenses to Whiteford, Taylor &

Preston, L.L.P. as Counsel for the Debtor (the "Application") for the Period November 1, 2000

Through November 31, 2003 (the "Application Period"), and For Other Relief pursuant to

§§ 327, 330, and 331 of the Bankruptcy Code (the "Code"), and Fed.R.Bankr.P. 2016, seeking

compensation in the amount of Three Hundred Sixty-Nine Thousand One Hundred Fifty-One

Dollars and Fifty Cents ($369,151.50) and reimbursement for out-of-pocket expenses in the

amount of Sixty Thousand Four Hundred Ninety-Two Dollars and Twenty-Eight Cents

($60,492.28), as well as the sum of Fifty-Four Thousand Five Hundred Seventy-Six Dollars and

Fifty-Seven Cents ($54,576.57) representing the amount on which the Court deferred a final

ruling with regard to WT&P's Tenth Fee Application, and in support thereof states as follows:

1.    This Court has jurisdiction over this Application pursuant to 28 U.S.C. §§ 1334 and 157 and Local District Court Rule 402.  Venue in this Court is proper pursuant to 28 U.S.C. § 1409.  This Application is a core proceeding within the meaning of 28 U.S.C. § 157.

2.    On May 31, 1996 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and continued in the possession of his properties and management of his business as a debtor-in-possession.  The Debtor has substantial business interests, personal property, and real property on three continents, i.e., North America, Europe, and Australia.  However, the Debtor's residence and other investment real property which he owned located in Talbot County, Maryland, were scheduled to be sold at public auction sales arising out of a foreclosure and sheriff's sale on May 31, 1996.  In order to avoid the public auction sale and preserve his assets, Mr. Travelstead commenced the within Chapter 11 proceeding.

3.    On June 12, 1996, this Court entered an Order Authorizing Employment of Whiteford Taylor & Preston, L.L.P. as Attorneys for the Debtor.

4.    Since the Petition Date, WT&P has provided substantial legal assistance to Mr. Travelstead and his bankruptcy estate, not only before this Court where his Third Modified Fifth Amended Plan of Reorganization was confirmed pursuant to an order entered December 31, 1997, but also the United States District Court for the Eastern District of New York, as well as the Second Circuit Court of Appeals (the "Second Circuit").  WT&P has assisted Mr. Travelstead and the estate with, among other things, regard to the sale of assets and the formulation and filing of a Plan of Reorganization and Disclosure Statement, as well as amendments thereto, which Plan was confirmed.  Additionally, WT&P was lead counsel in the damages' phase of certain

litigation in the United States District Court for the Eastern District of New York (the "New York Litigation") brought by Eduardo Canet ("Canet") in which Canet claimed damages in the amount of $20,000,000 and that he was entitled to a claim in these proceedings, and had filed a proof of claim in that amount.  The damages trial in the New York Litigation lasted several days and resulted in a judgment in Canet's favor in the amount of approximately $3,150,000, of which amount approximately one half was for pre-judgment interest.  The judgment was for substantially less than that which has been claimed throughout these proceedings by Canet.  The Debtor filed an appeal in the New York Litigation to the Second Circuit Court of Appeals and briefs were filed by both the Debtor and Canet.  WT&P also prepared and filed a reply brief with the Second Circuit.  The Debtor and Canet entered into a settlement of Canet's claim prior to the appeal being heard by the Second Circuit pursuant to which Canet received an allowed unsecured claim in the amount of $2,750,000, as more specifically set forth in the Order Confirming the Debtor's Plan.  Most recently, WT&P represented the Debtor at the closing on the sale of one of his primary assets, his interest in Blockless Investments, B.V., as well as litigation with Patrick J.B. Donnelly and Roland Benner as to their entitlement to a portion of the sale proceeds from the Blockless sale.

       5.      On December 31, 1997, this Court entered an Order Approving  Debtor's Modified Fifth Amended Disclosure Statement and Confirming Debtor's Third Modified Fourth Amended Plan of Reorganization.  Pursuant to the provisions of the confirmed Plan, Joel I. Sher was appointed Liquidating Agent for the Debtor's assets.  As a result, in addition to working with the Debtor and providing general representation and assistance for the liquidation of his assets,

WT&P also has worked with the Liquidating Agent and provided him with requested information and assistance in performing his duties.

      6.      Several WT&P attorneys and paralegals have provided legal services to the estate. Paul M. Nussbaum and Stephen F. Fruin have been Mr. Travelstead's primary counsel as well as primary bankruptcy counsel during these proceedings. Kenneth Oestreicher, John Carlton, and Howard Feldman also provided substantial legal services during the Application Period with regard to litigation issues. Other attorneys and paralegals have been utilized when necessary and on an as needed basis for various projects. As this Application covers more than three years, and WT&P adjusts billing rates annually, many of the WT&P timekeepers had three different rates during the Application Period. The hours spent in this case during the Application Period for which WT&P seeks compensation, the hourly rates deemed appropriate for each attorney and legal assistant, and the resulting fees are as follows, listed in order of billable rate:

| NAME | POSITION | TIME | HOURLY RATE | FEES EARNED |
|------|----------|------|-------------|-------------|
|  |  |  |  |  |
| Nussbaum, Paul M. | Partner | 112.90 | 305.00 | 34,434.50 |
| Nussbaum, Paul M. | Partner | 124.20 | 335.00 | 41,607.00 |
| Nussbaum, Paul M. | Partner | 63.40 | 375.00 | 23,775.00 |
| Oestreicher, Kenneth | Partner | 219.60 | 305.00 | 66,978.00 |
| Oestreicher, Kenneth | Partner | 125.80 | 335.00 | 42,143.00 |
| Oestreicher, Kenneth | Partner | 20.60 | 375.00 | 7,725.00 |
| Fruin, Stephen F. | Partner | 115.20 | 295.00 | 33,984.00 |
| Fruin, Stephen F. | Partner | 27.50 | 325.00 | 8,937.50 |
| Fruin, Stephen F. | Partner | 21.90 | 350.00 | 7,665.00 |
| Carlton, John F. | Partner | 35.30 | 270.00 | 9,531.00 |
| Carlton, John F. | Partner | 6.10 | 320.00 | 1,952.00 |
| Carlton, John F. | Partner | 7.30 | 350.00 | 2,555.00 |
| Kopec, Mark C. | Partner | 82.60 | 240.00 | 19,824.00 |

| NAME | POSITION | TIME | HOURLY RATE | FEES EARNED |
|---|---|---|---|---|
| | | | | |
| Posner, Gary S. | Partner | 1.40 | 290.00 | 406.00 |
| Posner, Gary S. | Partner | 9.40 | 315.00 | 2,961.00 |
| Feldman, Howard R. | Partner | 16.50 | 220.00 | 3,630.00 |
| Feldman, Howard R. | Partner | 98.90 | 275.00 | 27,197.50 |
| Feldman, Howard R. | Partner | 3.70 | 300.00 | 1,110.00 |
| Kessler, Pamela | Associate | 10.20 | 215.00 | 2,193.00 |
| Vergnetti, Beth S. | Associate | 16.40 | 200.00 | 3,280.00 |
| Macdonald, Cameron J. | Associate | 2.90 | 185.00 | 536.50 |
| Macdonald, Cameron J. | Associate | 18.00 | 225.00 | 4,050.00 |
| Macdonald, Cameron J. | Associate | 44.70 | 270.00 | 12,069.00 |
| Askew, Amy | Associate | 54.50 | 175.00 | 9,537.50 |
| McCruden, Kathleen G. | Paralegal | 5.80 | 115.00 | 667.00 |
| McCruden, Kathleen G. | Paralegal | 3.10 | 130.00 | 403.00 |
| | | | | |
| **TOTALS** | | 1247.90 | | **$369,151.50** |

By this Application WT&P seeks Three Hundred Sixty-Nine Thousand One Hundred Fifty-One Dollars and Fifty Cents ($369,151.50) in compensation for the Application Period.  WT&P has written off fees totaling in excess of $27,000 in the exercise of billing judgment in the preparation of the within Application.

7.     The time records of WT&P submitted herewith, and incorporated herein as **Exhibits 1** through **7**, are a daily breakdown of the time spent by each person on each day and of the disbursements during the time period in question.  WT&P reviews and adjusts hourly rates on an annual basis, and inasmuch as the subject application covers more than three years, many of the WT&P timekeepers will have had as many as three different hourly rates during the Application Period.

- 5 -

8.    The disbursements of WT&P for the instant Application are detailed in

**Exhibit 8** and are as follows:

| | |
|---|---:|
| Overnight Delivery | $1,131.45 |
| Photocopies | 6,062.81 |
| Long Distance Telephone | 2,574.14 |
| Telecopier | 465.50 |
| Postage | 283.72 |
| Lexis/Westlaw | 1,810.24 |
| Courier Service | 707.00 |
| Travel Reimbursement | 28,477.55 |
| Transcripts/Depositions | 6,696.85 |
| Miscellaneous | 12,283.00 |
| **TOTAL** | **$60,492.26** |

By this Application, WT&P seeks reimbursement of out-of-pocket expenses in the sum of Sixty

Thousand Four Hundred Ninety-Two Dollars and Twenty-Six Cents ($60,492.26), which

represents a voluntary reduction of $20,000 from that which it would be entitled to receive.

Between the write-off of fees and reduction of expenses, WT&P has written off and reduced the

amount of fees and expense reimbursement it is seeking, in the exercise of billing judgment, in

the total amount in excess of $47,000, or approximately 10%.

### I.    Summary of Primary Categories of Services

9.    Just as in the prior applications of WT&P, set forth below is a brief

summary of the various legal services provided by primary categories during the Application

Period.  Following this introduction is a more detailed explanation of the legal services which

have been rendered by WT&P.

a.    **Estate Administration**.  WT&P provided general representation

to the Debtor during the Application Period, which representation does not fall into any specific

category, or the extent of such representation does not result in a separate category, and/or which representation overlapped and falls into two or more categories. WT&P devoted approximately 46.8 hours in its representation with regard to estate administration during the Application Period, having a value of $14,602.50, as set forth in **Exhibit 1** attached hereto.

        b**.**      **Employment of Professionals and Fees**.  During the Application Period, WT&P prepared and filed its Tenth Interim Application, and began preparation of the instant Application.  WT&P also prepared and filed:  a) an Application to Employ Terry Musika and PENTA Advisory Services with regard to the value of the Debtor's interest in XPres, b) an Application to Employ Javier Selva as Special Spanish Counsel, and c) an Application to Employ Cowan, Liebowitz & Lathan, P.C. as Special Trademark Counsel.  WT&P also prepared and filed an Application for Compensation with regard to services provided by Special Counsel Carruthers and Roth.  WT&P devoted approximately 51.3 hours in its representation with regard to the employment of professionals during the Application Period, having a value of $16,294, as set forth in **Exhibit 2** attached hereto.

        c.      **Canet and Tax Issues**.  Canet has been very active in these proceedings having filed numerous motions and pleadings.  During the Application Period, Canet opposed the payment of professionals and requested that the Court direct the Liquidating Agent to make a $600,000 distribution to unsecured creditors prior to any further payment of fees and expenses being made to the professionals in these proceedings.  Additionally, during the Application Period, the Liquidating Agent filed a motion to resolve the Debtor's 1999 federal income tax liability as the Liquidating Agent has a reserve of $500,000 plus accrued interest in consideration of the 1999 taxes.  During the Application Period, WT&P devoted approximately

102.6 hours in its representation with regard to the Canet and Tax Issues, having a value of $31,513, as set forth in **Exhibit 3** attached hereto.

        d.        **XPres**.  WT&P had previously represented the Debtor with regard to litigation over claims which he had against XPres corporation.  The Debtor owns approximately forty-four percent (44%) of the outstanding stock of XPres.  XPres had sold its assets previously to Encore Corporation and had received in return, stock in Encore Corporation. During the Application Period the Debtor was notified by XPres that the assets of XPres were to be liquidated.  The Applicant opposed the liquidation of the XPres assets as that would eliminate the value of any interest which the Debtor might have in XPres.  During the Application Period, WT&P devoted approximately 120.7 hours in its representation with regard to XPres issues, having a value of $31,067.50, as set forth in **Exhibit 4** attached hereto.

        e.        **Litigation Against Velazquez**.  The Debtor previously filed a lawsuit against Ray Velazquez in the United States Bankruptcy Court for the District of Maryland.  The Applicant represented the Debtor with regard to certain issues which were appealed by Velazquez during the Application Period to the United States District Court.  During the Application Period, WT&P devoted approximately 304.8 hours in its representation with regard to the litigation against Velazquez, having a value of $90,343.50, as set forth in **Exhibit 5** attached hereto.

        f.        **Sogo Litigation**.    Starting in the early 1990's, one of the Debtor's business entities had been involved in different business ventures with USA Sogo and Sogo Co., Ltd. A settlement agreement was entered into between the Debtor entities and the Sogo entities and others in 1993.  In December, 1999, the Debtor sued Sogo regarding breaches of the

settlement agreement, which litigation continued during this Application Period. During the Application Period, WT&P devoted approximately 291.9 hours in its representation with regard to Sogo issues, having a value of $82,011.50, as set forth in **Exhibit 6** attached hereto.

g.    **Spanish Issues and Assets.**  During the Application Period, WT&P represented the Debtor with regard to certain criminal and civil matters in Barcelona, Spain. During the Application Period, WT&P devoted approximately 329.8 hours in its representation with regard to the Spanish issues, having a value of $103,320, as set forth in **Exhibit 7** attached hereto.

## II.    Estate Administration

10.    Throughout these proceedings, miscellaneous estate administration issues have arisen. Additionally, often a single telephone call or meeting will involve several issues which WT&P has included in this category inasmuch as the issues overlap and the time entry does not necessarily fit clearly within a single category. Most of the entries in this category are for small amounts of miscellaneous time except meetings, telephone calls, etc. which included more than one issue.

11.    As the within Application as well as previous fee applications reflect, subsequent to confirmation, WT&P has generally been required to devote less time to general estate administration. However, WT&P has continued to meet with the Debtor and communicate with the Debtor with regard to general issues affecting the Debtor in these proceedings.

## III.    Employment of Professionals and Fees

12.    During the Application Period, WT&P prepared and filed the Tenth Fee Application which covered the period May 1, 2000 through October 31, 2000.

13.    In preparation of the Tenth Fee Application, as well as this Application, WT&P reviewed files, records, and pleadings for information and background with regard to said Applications.  WT&P drafted, reviewed and revised the Tenth Fee Application and also undertook a calculation for a determination of billing judgment.  Canet objected to the Tenth Fee Application and WT&P noted Canet's deposition.  Canet refused to appear for his deposition and has never been deposed with regard to the Tenth Fee Application.  The Tenth Fee Application sought fees in the amount of $70,000.  On January 10, 2001, the Court entered an Order awarding WT&P $15,423.43 and deferred ruling on the balance of the fee request.

14.    In addition to the preparation of the WT&P Tenth Fee Application, during the Application Period the Applicant also did preliminary work on its Eleventh Fee Application as well as reviewed the fee applications of other professionals which were filed during the Application Period.

15.    Also, during the Application Period, the Applicant filed:

a.    an Application for Authority to Employ Cowan, Liebowitz and Latman as Special Counsel (for Spanish trademark issues);

b.    Debtor's Application for Authority to Employ Alfonso Martinez Almeida as Expert on Spanish Business Law;

c.    an Application to Employ PENTA Advisory Services as Consultant for the Debtor with regard to the XPres litigation;

d.    Debtor's Application for Authority to Supplement Retainer Paid to Olivar, Selva and Zegri as Special Counsel to the Debtor with regard to issues in Spain;

        e.      an Application for Allowance of Fees and Expenses to Carruthers & Roth as special counsel to the Debtor for the period February 23, 2000 through December 31, 2001 with regard to the XPres litigation;

        f.      a First and Final Application for Compensation for Services Rendered and Reimbursement of Expenses Incurred for Alfonso Martinez-Almeida as Expert on Spanish Business Law;

        g.      Debtor's Application for Approval of Payment of Fees and Further Retainer to Cowan, Liebowitz and Latman, PC as Special Counsel for Spanish trademarks;

        h.      Expedited Motion to Compel Liquidating Agent to Pay Approved Fees of Special Counsel (Alfonso Martinez-Almeida); and

        i.      an Application for Payment of Compensation for Services Rendered and for Reimbursement of Expenses Incurred by DeOlivar, Selva & Zegri as Special Counsel.

### IV.  Canet & Tax Motion

        16.      Canet is the largest unsecured creditor in these proceedings and he has taken a very active role since the early stages of the case, continuously filing pleadings, motions, etc.

        17.      The confirmed Plan, the confirmation Order, and Debtor, Creditors' Committee and U.S. Trustee's Stipulation and Consent Order to Appoint Joel I. Sher as Liquidating Agent entered on December 31, 1997, grant the Liquidating Agent the power to do certain things, including to set the amount of a monthly stipend for the Debtor and to pay the Debtor a monthly stipend.  Canet has routinely sought to have the stipend eliminated and/or

reduced and on December 26, 2000, filed a Motion of Eduardo Canet for the Termination of the Debtor's Monthly Stipend.

18.     Both the Liquidating Agent and the Applicant, on behalf of the Debtor, filed oppositions to Canet's motion to terminate the stipend.  On August 17, 2001, the Court issued a Memorandum Opinion and Order Denying Eduardo Canet's Motion for Termination of the Debtor's Monthly Stipend.

19.     Canet had also objected to the WT&P Tenth Fee Application and the Court scheduled a hearing for March 8, 2001 to consider that application and the Canet objection.  WT&P scheduled a deposition of Canet for March 6, 2001.  Canet refused to appear for his deposition and, at the request of  Canet, the March 8, 2001 hearing was continued.  To date, there has been no ruling by the Court on the WT&P Tenth Fee Application.

20.     On August 8, 2002, Canet filed an Opposition of Creditor Eduardo Canet to Tenth Application of Grant Thornton for Compensation and Cross Application for Distribution to Creditors (the " Canet Distribution Motion").  In the Canet Distribution Motion, Canet requested that no fee applications of professionals be allowed until such time as there was a further distribution in the amount of $600,000 to the pre-petition general unsecured non-priority creditors.

21.     Both the Liquidating Agent and the Debtor filed oppositions to the Canet Distribution Motion.  In his Opposition, the Liquidating Agent noted that Canet was attempting to modify the confirmed Plan by requesting that the Court order the Liquidating Agent to make a distribution to the pre-petition unsecured creditors prior to paying the approved fees of professionals incurred post-petition, contrary to the provisions of the confirmed Plan.  Similarly,

the Applicant in its opposition filed on behalf of the Debtor to the Canet Distribution Motion,
stated that the confirmed Plan requires the Liquidating Agent to reserve funds to pay the claims
of administrative creditors, such as professionals, and that through the Canet Distribution
Motion, Canet was attempting to leap frog over the administrative claims of professionals, in
direct contravention of the confirmed Plan which Canet had supported.

22.     Canet filed a reply to the oppositions of the Debtor and the Liquidating
Agent to the Canet Distribution Motion alleging that the Liquidating Agent had substantial funds
on hand from which to make a distribution.  However, much of the cash that Canet was claiming
was available for distribution by the Liquidating Agent was represented by the $500,000 tax
reserve maintained by the Liquidating Agent and established as a result of the provisions of the
Order Granting the Liquidating Agent's Cross-Motion for Authority to Make Distribution (the
"Distribution Order") entered by the Court on December 23, 1999.  On September 25, 2002, the
Debtor served Interrogatories, a Request for Production of Documents, and a Deposition Notice
for October 29, 2002, as the Debtor needed to determine the basis for the allegations and claims
being made by Canet with regard to the Canet Distribution Motion.

23.     On October 28, 2002, the day before the scheduled deposition, Canet
filed a Motion for Protective Order (the "Protective Order Motion") requesting that the
deposition be conducted by phone rather than Canet being deposed in Baltimore pursuant to the
deposition notice.  In the Protective Order Motion, Canet also protested the cost of traveling to
Baltimore for the deposition and also protested that he had not chosen Baltimore as the venue for
the dispute.  The Debtor filed an opposition to the Protective Order Motion for, among other
reasons, that the Applicant had previously offered to travel to New York to conduct Canet's

deposition, as well as the fact that Canet had provided no basis in the Protective Order Motion

for the Court to grant the request.  Eventually, the Debtor and Canet resolved the deposition

dispute and, on November 3, 2002, the parties filed a Stipulation and Consent Order Resolving

Discovery Dispute Over Canet Cross Application for Distribution, pursuant to which Canet

agreed to be deposed in person in New York and to pay for the Applicant's travel to New York.

As such, the Applicant conducted Canet's deposition in New York during December, 2002.

   24. On September 26, 2002, the Liquidating Agent filed a Motion of

Liquidating Agent to Determine and Pay Debtor's Income Tax Obligation (the "Tax Motion") in

which the Liquidating Agent requested that the Court determine the Debtor's income tax liability

for 1999 to be $53,760, and that he be authorized to pay that amount, plus any applicable interest

and penalties in satisfaction of the Debtor's 1999 tax liabilities and further that he be authorized

to transfer the remainder of the funds which had been segregated pursuant to the Distribution

Order into the Liquidating Agent's Disbursing Account.  The Distribution Order was entered so

that the Liquidating Agent would have funds on hand if needed to pay income taxes arising out

of the 1999 sale of the Debtor's interest in Blockless.

   25. Although the Liquidating Agent's Tax Motion is independent of the Canet

Distribution Motion, Canet has attempted to tie them together by requesting that hearings on the

two motions be held on the same date and repeatedly continuing the hearing on the Canet

Distribution Motion until there is a resolution on the Tax Motion.

   26. During the Application Period, the Applicant, on behalf of the Debtor, has

had numerous discussions with the Liquidating Agent, the Debtor's accountants and

representatives of the IRS in an attempt to resolve the issues raised in the Tax Motion and reach a

final determination on any liability the Debtor may have for 1999 income taxes.  Your Applicant

is hopeful that an agreement can be reached with the IRS to resolve the issue of the Debtor's

1999 federal income tax liability.

## V.    XPres Corporation

27.    Prior to the commencement of these proceedings, the Debtor owned

approximately forty-four percent (44%) of the corporate stock of a North Carolina manufacturing

corporation known as XPres Corp ("XPres").  The Debtor had also made loans to XPres as

evidenced by certain notes and debentures and also owed obligations to individuals associated

with XPres.

28.    The Debtor previously sued XPres Corp. with regard to the outstanding

obligations owed to him by XPres.  That litigation which was handled by WT&P resulted in a

settlement and a payment by XPres to the Liquidating Agent.

29.    In February, 2000, the Debtor received notice from XPres that it was in the

process of entering into an Asset Sale Agreement to sell its assets to a California corporation

known as Encore Group, Inc. ("Encore").  Although it was subsequently learned that the

negotiations between XPres and Encore had been going on for quite some time, the Debtor

received his first notice of the potential transaction approximately ten (10) days prior to a board

meeting specially scheduled by XPres for the approval of the sale.

30.    WT&P reviewed the limited materials which had been provided by XPres

with regard to the pending sale with the Liquidating Agent, the Debtor, and the Debtor's

accountant.  A review of the information which XPres had provided, after demand was made on

behalf of the Debtor, led to the conclusion that the proposed sale of assets by XPres would result

in the satisfaction of secured debt owed by XPres and outstanding obligations owed by XPres to shareholders other than the Debtor, with nothing remaining at the end of the day for payment to the Debtor or for the benefit of his creditors.

31.     WT&P received notice that XPres had called for a special meeting of the shareholders and directors to adopt a Plan of Liquidation.  Again, the management of XPres scheduled meetings with regard to its liquidation and dissolution without regard to the availability of either the Debtor or the Liquidating Agent to attend such meetings.  The other XPres shareholders and directors proceeded to meet without the Debtor or the Liquidating Agent despite the objection of the Debtor and Liquidating Agent to conduct such meetings.  After adopting the Plan of Dissolution, XPres filed a Petition for Judicial Dissolution with the Superior Court of North Carolina.

32.     The Liquidating Agent and the Debtor had great concerns that the actions being taken by XPres were designed to and would result in the elimination of any value of the Debtor's interest in XPres.  The Applicant prepared and filed a Motion for a Temporary Restraining Order and/or Preliminary Injunction (the "Motion for TRO") against XPres and its shareholders, directors and officers in these proceedings.  The Motion for TRO was denied by this Court at a hearing on September 7, 2000.

33.     During the Application Period, the Applicant attended and/or represented at depositions the Debtor, the Liquidating Agent, an expert employed by the Debtor and Liquidating Agent, and corporate counsel for XPres.

34.     The Applicant attended several meetings with counsel for the Liquidating Agent and with representatives of PENTA Advisory Services, the expert retained by the Debtor

- 16 -

to determine the value of the Debtor's interest in XPres.  The trial in this matter was scheduled

for November, 2001.  After the completion of the discovery set forth herein, a settlement was

negotiated with XPres and the XPres principals, which resulted in the Estate receiving $75,000

and the parties executing mutual releases.

### VI.    Litigation Against Velazquez

35.    Prior to the commencement of these proceedings, Ray Velazquez

("Velazquez") and the Debtor each owned a 50% interest in Fepate S.L., a corporation which

owned the development rights for four Planet Hollywood restaurants in Spain.  Velazquez,

through Calypso Acquisition Corp., acquired a certain debt owed by the Debtor which was

partially secured by the Debtor's interest in Fepate, and aggressively sought to have the automatic

stay lifted so that he could foreclose on the Debtor's interest in Fepate.  In February, 1997, this

Court entered an Order approving a settlement between Velazquez's Calypso and the Debtor,

pursuant to which Velazquez acquired the Debtor's 50% interest in Fepate in consideration of a

combination cash and debt forgiveness totaling $1,500,000.  Approximately one year later,

Velazquez sold his then 100% ownership interest in Fepate for approximately $15,000,000.

36.    WT&P prepared and filed a Verified Complaint for Damages for Breach

of Fiduciary Duty, Interference with Prospective Advantage, and Civil Conspiracy (the

"Velazquez Complaint").  The Velazquez Complaint alleged that Velazquez: (a) breached his

fiduciary duty to the Debtor as the administrator of Fepate by concealing certain actions and

negotiations he had undertaken with, as well as with regard to, Planet Hollywood; (b) advised the

Debtor's potential investors in the fall and winter of 1996/1997 that the Debtor would shortly be

losing his ownership interest in Fepate and that he, Velazquez, would control Fepate, which

actions by Velazquez resulted in potential investors in Planet Hollywood restaurants in Spain refusing to negotiate further with the Debtor; (c) conspired with third parties to defraud the Debtor in order to gain control of Fepate by falsely testifying at his deposition that Fepate had not secured a site for the location of a second Planet Hollywood restaurant in Spain, and it had not obtained financing necessary to open a second Planet Hollywood restaurant in Spain by November 30, 1997, when in fact, he had reached agreements for financing and the location of a second restaurant; and (d) fraudulently induced the Debtor to settle with Velazquez by falsely testifying that Fepate did not have the financing or site for a second Planet Hollywood restaurant.

37.     After the filing of the Velazquez Complaint, WT&P prepared and filed an Amended Complaint against Velazquez adding Calypso Acquisition Corp. as an additional party defendant.

38.     Velazquez filed a Motion to Dismiss the Velazquez Complaint on jurisdictional issues.  WT&P researched the issues raised by Velazquez in the Motion to Dismiss and filed a response to the Motion to Dismiss and a Memorandum in Opposition to the Motion to Dismiss.  A hearing on Velazquez's Motion to Dismiss and the WT&P Opposition was held by the Bankruptcy Court on March 6, 2000.  On March 10, 2000, the Court issued its ruling denying the Motion to Dismiss, which ruling was appealed by Velazquez.

39.     The United States District Court affirmed the Bankruptcy Court's decision.  Velazquez filed a Motion for Reconsideration of that Order and, as such, your Applicant prepared and filed an Opposition to the Motion for Reconsideration.  The United States District Court denied the Velazquez Motion for Reconsideration.

40.    The parties conducted extensive discovery which included interrogatories, requests for production of documents and several depositions.  The depositions, in addition to the parties to the litigation, included representatives of Planet Hollywood as well as representatives of the architectural firm which was utilized in the planning and development of Planet Hollywood restaurants.

41.    The Applicant deposed Velazquez at a several-hour deposition and represented the Debtor for two days while he was deposed.  After the conclusion of the second day of the Debtor's deposition, a dispute arose between the parties as to whether Velazquez was entitled to continue the deposition.  After substantial negotiations and a hearing, the Debtor was required to appear on a third day to be deposed.

42.    After the conclusion of the aforesaid discovery, the parties entered into extensive and prolonged settlement negotiations resulting in a settlement agreement pursuant to which the Debtor agreed to dismiss the Velazquez Complaint and Velazquez agreed to dismiss an appeal of a case against the Debtor which he had caused to be filed in Barcelona, Spain.  The total and final conclusion of the criminal actions caused to be brought by Velazquez against the Debtor in Spain also resulted in the Debtor's remaining Spanish assets again becoming available to the Debtor's estate.

### VII.    Sogo

43.    The Debtor filed suit against USA Sogo, Inc. and Sogo Co., Ltd. for injunctive relief to enjoin USA Sogo from exercising a Call Option that arose out of a Settlement Agreement between the Debtor and several of his entities and USA Sogo relating to a construction project in Barcelona, Spain (the "Sogo Complaint").

44.     One of the Debtor's partnerships, Travelstead Barcelona Limited Partnership ("TBLP") was a general partner in a general partnership, T-S Barcelona Partnership, with USA Sogo for the development and construction of a major commercial project in Barcelona, Spain (the "Hotel Arts Project" or "Project").  The Debtor was the general partner in TBLP and personally owned a 99% interest in TBLP.  Travelstead Group, Inc. ("TGI") was the limited partner of TBLP and owned 1% of TBLP.  The Debtor owns 100% of TGI.

45.     Disputes arose during the construction of the Hotel Arts Project between the Debtor and USA Sogo.  In February 1993 a settlement agreement was entered into among the Debtor, several entities related to the Debtor on the one hand and USA Sogo and Sogo Co., Ltd. on the other hand.  The Settlement Agreement provided for the management of the Hotel Arts Project to be shifted from the Debtor and his entities to USA Sogo, Inc.  A new limited partnership was formed, T-S Barcelona Limited Partnership (the "Project Partnership"), with USA Sogo, Inc. as the general partner and TBLP as the limited partner.  Under the new partnership agreement, TBLP could "put" its interest in the in the Project Partnership to USA Sogo after which TBLP and the Debtor would be released from any obligations to USA Sogo. The Put option could be exercised until December 31, 1999, after which time USA Sogo had the right for five years to exercise a "Call" option wherein it could force a sale to USA Sogo of TBLP's interest in the Project Partnership.  The same release provisions applied to the Call as applied to the Put.

46.     Because the Debtor was relinquishing control over the Hotel Arts Project, in order to keep informed about the project and the value of TBLP's continued 50% ownership in

the Project and for tax purposes, the Debtor obtained in the new limited partnership agreement, i.e., the Project Partnership, the right of access to the Project's book's records.

47.    The Debtor alleged in the Sogo Complaint that USA Sogo wrongfully failed to provide access to the Project's books and records as required by the Project Partnership agreement and that the breach was material.  The Debtor sought injunctive relief against USA Sogo to stop it from exercising the Call option, recovery of damages and an accounting of the Project's finances.

48.    Sogo USA filed a Motion to Dismiss the Sogo Complaint.  As service on Sogo, Japan was required to be pursuant to the Hague Convention, it took approximately one year to make service on Sogo, Japan, which then also filed a motion to dismiss the Sogo Complaint.

49.    During 2001, the Liquidating Agent and Sogo USA advised that they had negotiated a settlement of the various disputes.  However, all of the interested parties were not able to reach a final universal agreement and the settlement was never concluded.

50.    Sogo Japan had filed a bankruptcy proceeding in Japan and the Sogo Complaint was dismissed as to Sogo, Japan, but the motion to dismiss was denied with regard to Sogo USA with the Court ruling that the Sogo Complaint with regard to Sogo USA should go to arbitration.  As such, an arbitration proceeding was initiated and an arbitrator selected.

51.    After the selection of the arbitrator, the Debtor proceed to conduct discovery of Sogo.  However, on March 31, 2003, Sogo USA filed a chapter 7 bankruptcy petition and, as a result, the arbitration proceeding has been stayed.

## VIII.   Spanish Issues and Assets

52.    During the Application Period, the Debtor was approached by investors (the "Dutch Group") which expressed an interest in buying the Hotel Arts Project.  The Debtor entered into agreements, including a Consulting Agreement, with the Dutch Group which the Dutch Group felt would enhance their ability to acquire the Hotel Arts Project.

53.    In addition to the Consulting Agreement, WT&P assisted the Debtor in negotiating an Escrow Agreement and the terms of a release of certain claims which the Debtor had with regard to the Hotel Arts Project and the Partnership Project.  Unfortunately, the Dutch Group was not ultimately successful in their negotiations for the Hotel Arts Project and the various agreements which had been negotiated with the Dutch Group were never consummated.

54.    Velazquez had caused certain criminal and civil proceedings to be brought against the Debtor in Barcelona, Spain.  This resulted in the need for the Debtor and the Applicant to make numerous trips to Spain to respond to the allegations, retain Spanish counsel, appear at court proceedings, etc.  It was also necessary that the Liquidating Agent post an appearance bond for the benefit of the Debtor in order for the Debtor to be allowed to leave Spain.

55.    After several postponements of the trial of these matters, none of the postponements being at the Debtor's request, the trial on the allegations against the Debtor finally took place in early 2002.  The Spanish Court ruled in favor of the Debtor on both the criminal and civil claims.  The Spanish prosecutor chose not to proceed further with the criminal charges, but Velazquez filed an appeal with respect to the civil claims.  This appeal was eventually withdrawn by Velazquez as part of the settlement of the Velazquez Complaint.

56.    The Debtor, through entities that he owned and controlled, owned certain trademarks associated with the Hotel Arts in Barcelona, Spain.  These trademarks were scheduled to expire during the Application Period.  It was necessary for WT&P to review various aspects of trademarks and corporate law for the purpose of maintaining and safeguarding the Spanish trademarks.  It was also necessary that the Applicant retain special trademark counsel to assist in the renewal and preservation of the trademarks.

57.    As a result of the resolution of the litigation and dispute between the Debtor and Velazquez in both Spain and the United States, the impediment to the disposition of the Debtor' interest in 116 parking spaces (the "Hinsua Spaces") in Barcelona, Spain through his ownership of Hinsua was removed.

58.    On May 7, 2003, the Liquidating Agent filed the Motion of Liquidating Agent for Authority to Sell Interests in or Assets of Hinsua Barcelona, S.L. Free and Clear of Liens, Claims and Encumbrances (the "Motion to Sell").  In the Motion to Sell, the Liquidating Agent sought approval to sell the Hinsua Spaces for One Million Six Hundred Thousand (1,600,000) Euros, or alternatively, all the corporate stock of Hinsua for One Million Eighty Thousand (1,080,000) Euros to BCN, an entity in which Javier Faus was the administrator.  Mr. Faus was formerly the Debtor's counsel in Spain.  Part of the reason the Liquidating Agent sought discretionary authority to dispose of the Hinsua Spaces was so that such a transaction could be structured in the most advantageous way tax wise to the parties.

59.    A hearing was held on the Motion to Sell on June 17, 2003.  WT&P appeared on behalf of the Debtor at that hearing to represent the Debtor's interest pursuant to an offer made to the Liquidating Agent by later date June 16, 2003.  At the conclusion of the

hearing, the Court ruled that both BCN and the Debtor had made good faith offers for the Hinsua Spaces that that both were found to be bona fide purchasers. On June 24, 2003, the Court entered its Order (the "Sale Order") granting the Motion to Sell and authorized the Liquidating Agent in his sole discretion, to sell the Hinsua Spaces or the corporate stock of Hinsua, to either BCN or the Debtor on the terms received from either the Debtor or Hinsua, upon improved offers.

60.    Consistent with the terms of the Sale Order, in July, 2003, the Liquidating Agent closed on a sale of the Hinsua Spaces to the Debtor for consideration to the estate of $600,000. This offer was determined by the Liquidating Agent to be superior to that of BCN because of various tax uncertainties and potential significant tax consequences which might be incurred upon a sale to BCN.

## IX.    Prior Fee Applications

61.    On January 10, 2001 the Court entered an Order Granting Tenth Interim Fee Application of Whiteford, Taylor & Preston, L.L.P. for the Period May 1, 2000 through October 31, 2000 (the "Tenth Fee Order"). Canet had filed an objection to the Tenth Fee Application claiming that litigation against Sogo and XPres generated no recovery for the estate and WT&P's efforts duplicated services provided by the Liquidation Agent.

62.    In the Tenth Fee Order WT&P was awarded the sum of $15,423.43 and the Court further stated that the "… order is without prejudice to a renewal of the fee application for the balance of 54,576.57 in fees when the Liquidating Agent's fee application is prepared or further information or benefit to the estate develops."

63.     Subsequent to the entry of the Tenth Fee Order, the litigation with XPres was concluded and XPres paid the Estate the sum of $75,000.  The services provided by WT&P to the Debtor and by the Liquidating Agent were not duplicative but were distinct and necessary. As such , now that that litigation has been concluded and in further consideration that the Liquidation Agent has filed a fee application, WT&P would request that the Court grant at this time that portion of the Tenth Fee Application related to XPres.

64.     Likewise, WT&P's efforts and services against Sogo was critical to protecting the interests of the Debtor and the Estate with regard to the Debtor's interests in T-S Barcelona Limited Partnership.  Obviously the ultimate filing of a bankruptcy by Sogo could not have been anticipated by the Debtor or WT&P.  The portion of the Tenth Fee Application relating to the Sogo litigation not included in the Ten Fee Order should also be granted at this time.

## X.     Legal Standard for Awarding Compensation

65.     Under § 330(a)(1) of the Code, the Court may award attorneys for the estate reasonable compensation for actual, necessary services rendered by such attorneys and paraprofessionals employed by such attorneys based on the nature, extent and value of the services rendered, time spent on such services and the cost of comparable services other than in a bankruptcy case.  The Court may also award reimbursement for actual, necessary expenses.

66.     The expenses incurred by WT&P, as set forth above, include reasonable and necessary charges for services such as photocopying, telecopying, long distance telephone and messenger services.  Copying charges are assessed at Eighteen Cents (18¢) per copy, which WT&P believes to be considerably below the average charge for copies in this area and which

have been set by the bankruptcy court as an appropriate charge in Chapter 11 cases. Delivery charges were only utilized when circumstances required prompt delivery. The cost of such items as deposition transcripts are outside of the control of WT&P.

67.     Courts frequently look to the "lodestar" formula in assessing attorneys' fees. Under this approach, courts consider the number of hours of service reasonably devoted to the case multiplied by the attorneys' reasonable rates. This sum may be adjusted to reflect the characteristics of the particular case and the reputation of the attorney. See, e.g., Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354, 361 (D.D.C. 1983), aff'd in part rev'd in part, 746 F.2d 4 (D.C. Cir. 1984), cert. denied, 472 U.S. 1021, 105 S. Ct. 3488 (1985).

68.     Many courts have frequently considered the specific lodestar factors set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974) and applied to bankruptcy cases in In re First Colonial Corporation of America, 544 F.2d 1291, 1298-99 (5th Cir.), cert. denied, 431 U.S. 904 (1977). These tests were adopted by the Fourth Circuit Court of Appeals in Barber v. Kimbrells, Inc., 577 F.2d 216, 226 (4th Cir.), cert. denied, 439 U.S. 934 (1978). In Anderson v. Morris, 658 F.2d 246, 249 (4th Cir. 1981), the Fourth Circuit held that the District Court should consider the lodestar approach, which encompasses the Johnson factors (a) and (d) as set forth below, and then adjust the fee on the basis of the remaining Johnson factors.

69.     In In re Bernard Hill, 133 B.R. 61 (Bankr. D. Md. 1991), the court supplemented the general lodestar principles by establishing ten (10) "cardinal rules" with which fee applications should comply:

(i)     Fee applications must make sense;

(ii)    Fee applications must indicate what work was performed, when it was performed and how much money is being charged for performing it;

(iii)    Services rendered should be reported in several broad, general categories;

(iv)    Fee applications must contain a "lodestar" analysis;

(v)    Numbers must add up;

(vi)    The names of the individuals who rendered services, together with their hourly rates and years of experience, must be disclosed;

(vii)    Time records must be submitted with the fee application;

(viii)    Out-of-pocket expenses for which reimbursement is sought must be set forth in the application; and,

(ix)    When more than one professional or a firm of professionals is appointed to represent or furnish similar services to a debtor, the fee application(s) must indicate a clear division of labor and non-duplicative effort.  See In re Bernard Hill, 133 B.R. at 62-63.

70.    WT&P submits that an evaluation of the lodestar formula and the Johnson factors in the present case supports its request for fees for the following reasons:

(i)    The time and labor required. The amount of time required to represent the Debtor was extensive as a result of the number and variety of issues which have arisen in these proceedings.

(ii)    Novelty and difficulty of the questions involved and the skill applied. This case is unique, particularly in consideration of the Debtor's assets and the claims against the Debtor.

(iii)    <u>The preclusion of other employment by the firm due to acceptance of this</u> <u>case</u>.  WT&P has devoted valuable resources to its representation of the Debtor.  As this case has progressed, however, WT&P has decreasingly needed to divert its attention from other matters in which it was or might have been involved to devote itself to the competent representation of the Debtor.  Accordingly, this category is no longer applicable.

(iv)    <u>The customary fee for similar work</u>.  WT&P submits that the fees sought herein are warranted, and are generally less than or equal to competitive fees in the Baltimore/Washington legal market for firms with comparable practices, given the nature of these proceedings.  Because of the diverse financial interests involved, the Debtor took the logical and necessary step of retaining a law firm with expertise in bankruptcy, litigation and related matters and the staffing capable of handling a case of this magnitude.

(v)    <u>Whether the fee is fixed or contingent</u>.  Pursuant to the Code, all fees sought by professionals retained by the Debtor are subject to approval of this Court.

(vi)    <u>Time limitations imposed by the client or circumstances</u>.  Because of the nature of the claims raised and the litigiousness of certain of the parties in these proceedings, WT&P has continually been forced to render services to the Debtor under severe time constraints.

(vii)    <u>The amounts involved and the results obtained</u>.  Creditors filed unsecured claims in these proceedings totaling approximately Two Hundred Fifty-Three Million Dollars ($253,000,000).  T the efforts to date, and the continuing efforts of WT&P, have resulted in the highest possible return to creditors on their allowed claims in the shortest time frame possible.

(viii)    <u>Experience, reputation and ability of the attorneys</u>.  The Debtor's primary representation with regard to the bankruptcy aspect of these proceedings has been provided by Paul M. Nussbaum, Stephen F. Fruin, Kenneth Oestreicher, and John F. Carlton, each of whom have previously represented debtors, creditors' committees, secured creditors and unsecured creditors in all aspects of bankruptcy proceedings, including representation of numerous debtors in large Chapter 11 cases.

(ix)    <u>The "undesirability" of the case</u>. This case could be said to be somewhat undesirable in that efficient representation of the Debtor in this matter required the skills of a full service law firm given the diverse bankruptcy and non-bankruptcy issues which have arisen. Additionally, the representation of the Debtor in this matter has required that legal services be provided on an emergency basis and typically a short time frame.  The difficulties in handling this case have been compounded by the allegations which creditors have made against WT&P and the actions of certain creditors and parties have made to make it more difficult for WT&P to recover its earned compensation.  WT&P is owed several hundred thousand dollars by the Estate.

(x)    <u>The nature and length of the firm's professional relationship with the client</u>.  WT&P was retained by the Debtor on May 28, 1996, immediately prior to the filing of these proceedings.  Since then, WT&P has continuously counseled the Debtor with respect to these proceedings and his various business interests.

(xi)    <u>Awards made in similar cases</u>.  WT&P submits that its request for compensation is well within the usual and customary awards granted in similar cases.  As set forth above, WT&P has been required to devote substantial legal services to the representation of the Debtor throughout these proceedings, often on an emergency basis.

71.    In addition to the <u>Johnson</u> factors discussed above, WT&P submits that this Application satisfies the ten (10) cardinal rules required by <u>Bernard Hill</u>:

(i)    The Application makes sense as it is structured to convey the information contained herein in an understandable and consistent manner.

(ii)    The Application contains dates and categories of work which reflect what work was performed and when it was performed.  Further, the attached Exhibits contain more detail on each specific item billed, the date the work was performed and exactly how much money is being charged for performing it.

(iii)    The Application contains several broad and general categories of work performed, and substantiation for the work.

(iv)    The Application contains a lodestar analysis.

(v)    The breakdown of services and disbursements adds up.

(vi)    The names of the individuals who rendered services, together with their hourly rates, have been disclosed on the attached Exhibits.  The experience of the primary attorneys involved has been set forth herein.

(vii)    A complete print-out of detailed time records has been submitted with the Application.

(viii)    Disbursements for out-of-pocket expenses have been set forth in the Application.

(ix)    The Application does not contain any bill for any other firm of professionals other than WT&P.

(x)     Each professional at WT&P has her or his services set forth independently in the attached Exhibits.

72.     In addition to the foregoing, the time records submitted herewith as Exhibits include a thorough and complete description of the particular services which were rendered by each WT&P attorney and paraprofessional on behalf of the Debtor.  Additionally, all efforts have been made to not lump individual tasks.  However, lumping was necessary in those limited instances where large amounts of time were necessary to execute a series of discernible and otherwise allocable tasks, such with regard to the development of a file, interviewing witnesses, and preparation for and attendance at the Canet trial.

73.     Also, duplication of effort has been avoided to the greatest extent possible. However, some duplication may have been required as a result of the intensity in the litigation in which the Debtor has been engaged, as well as the complexity of the issues which arose during the course and the urgent basis on which some WT&P's services were rendered.  Additionally, some overlap and duplication has been required as knowledge of certain issues is required by WT&P attorneys handling the bankruptcy proceedings as well as WT&P attorneys handling the litigation aspects of these proceedings.

74.     WT&P believes it has reasonably satisfied the requirements for fee applications in this District.  Further, the fees and the expenses rendered by WT&P on behalf of the Debtor for which WT&P seeks compensation and reimbursement are reasonable in light of this Court's decisions in In re Bernard Hill, Inc., 133 B.R. 61 (Bankr. D. Md. 1991), and In re Leonard Jed, 103 B.R. 7206 (Bankr. D. Md. 1989), modified, 118 B.R. 339 (Bankr. D. Md.

1990).  See also In re LBH Associates Limited Partnership, Case No. 87-5-2207-JS, reported at 2

4th Cir. & D.C. Bankr. Rep. 25.

       75.     In the exercise of billing judgment, WT&P has voluntarily written off and

reduced the amount of fees to which it would be entitled by in excess of $26,000, and reduced

the amount of expenses for which it seeks reimbursement by $5,492.26, for a total reduction in

fees and reimbursement of expenses of in excess of $32,000, which represents an approximate

6.7% reduction.  WT&P believes that this is much more than necessary given its review of its

time records, the progress of the case to date, the reduction of claims, and the extreme time

pressures and burdens encountered by WT&P.

       76.     In summary, WT&P believes that the services rendered to the Debtor and

the out-of-pocket expenses incurred in connection therewith were necessary and reasonable in

view of the nature of the Debtor's interest in this case and the number of the matters in which

counsel was necessarily involved.  Therefore, WT&P seeks allowance and authorization of

payment of fees in the amount of Three Hundred Sixty Thousand One Hundred Fifty-One

Dollars and Fifty Cents ($369,151.50) and reimbursement for out-of-pocket expenses in the

amount of Sixty Thousand Four Hundred Ninety-Two Dollars and Twenty-Eight Cents

($60,492.28).

       WHEREFORE, Whiteford, Taylor & Preston, L.L.P. respectfully requests that

this Court enter an Order:

       a.     allowing and authorizing for payment by the Debtor fees to WT&P in the

amount of $369,151.50;

b.       allowing and authorizing for payment by the Debtor to WT&P for

reimbursement of out-of-pocket expenses in the amount of $60,492.28; and

c.       allowing and authorizing for payment the sum of $54,576.57 in fees to

WT&P with regard to the XPres and Sogo portions of the Tenth Fee Application; and

d.       such other relief which is just and equitable.


/s/ Stephen F. Fruin_____
Paul M. Nussbaum, #04394
Stephen F. Fruin, #08456
Whiteford, Taylor & Preston L.L.P.
Seven Saint Paul Street
Baltimore, Maryland 21202
(410) 347-8700

Attorneys for the Debtor

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of December, 2003, a copy of the

foregoing Eleventh Application for Allowance of Fees and Reimbursement of Expenses to

Whiteford, Taylor & Preston L.L.P. as Counsel for the Debtor for the Period November 1, 2000

Through November 30, 2003, was sent, by first class mail to:

> Office of the U.S. Trustee
> 300 West Pratt Street, Suite 350
> Baltimore, Maryland 21201
>
> Joel I. Sher, Esquire, Esquire
> Liquidating Agent
> Shapiro Sher Guinot & Sandler
> 2000 Charles Center South
> 36 South Charles Street
> Baltimore, Maryland  21201
>
> Mr. G. Ware Travelstead
> 1709 Dey Cove Drive
> Virginia Beach, Virginia  23454

> /s/ Stephen F. Fruin_____
> Stephen F. Fruin

*1437566v.3*