### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

In re:                                        *

**G. WARE TRAVELSTEAD,**          *          Case No. 96-5-4979-SD
                                                          (Chapter 11)
              Debtor.                       *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### LIQUIDATING AGENT'S INTERIM STATUS REPORT

Comes now Joel I. Sher, Liquidating Agent and files this Interim Status Report, stating:

### Introduction

On December 31, 1997, the Bankruptcy Court entered an Order Confirming the Debtor's Third Modified Fourth Amended Plan of Reorganization (the "Plan").  On December 31, 1997, the Court entered an Order appointing Joel I. Sher as the Liquidating Agent in conformity with the terms of the Plan.  The Plan provides for the Liquidating Agent to file status reports indicating (i) the status of the disposition of assets to be liquidated under the Plan, (ii) any sale contracts entered into, the proposed contract sale price, the identity of the proposed purchaser, and (iii) the current condition of the assets to be liquidated.  This report details activities for the period of May 1, 1999 through the date of this report (the "Period").

### General Overview

1.      The Liquidating Agent has undertaken various activities during the Period in an effort to liquidate all known assets of the Debtor.  In addition, the Liquidating Agent was required to participate in litigation in the United States and Spain.  As more fully discussed hereinafter, the actions of the Liquidating Agent have resulted in gross collections (inclusive of interest earned on deposits) during the Period of approximately $1,712,000.

A.      **Disposition Of Assets**

1.      **Artwork, Personal Items**

2.      The Liquidating Agent continued to work with his art consultant Susan Perrin, to

formulate a process to sell at the highest price the various items of art, antiques and collectibles (the

"Personal Items") owned by the Debtor.   During the Period, certain Personal Items were sold, either

at auction or private sale, as follows:

(a)     On July 2, 1998 a consignment agreement was entered into with Corporate
        Art Directions ("CAP") of New York City.  The agreement, which relates to
        the sale of six (6) paintings, grants CAP an exclusive right to sell the
        paintings, provides for a ten percent (10%) commission based upon the
        purchase price, and establishes a confidential minimum bid price for each
        painting.  The agreement was approved by order of the Court entered on
        October 8, 1998.  In October, 1999, one of the Debtor's paintings was sold
        for $40,000, from which the Liquidating Agent netted $36,000 after the
        deduction of commission.  In March, 2000, another of the Debtor's paintings
        was sold for $32,000, which netted the estate $28,800 after the deduction of
        commission.  In February 2001, CAP sold an oil painting for the gross
        amount of $100,000, which netted the estate $90,000 after the deduction of
        commission. Shortly thereafter, the Liquidating Agent terminated the CAP
        agreement, and all remaining artwork was consigned to Sotheby's.  In May,
        2002, Sotheby's sold the remaining painting for $1,000, of which the estate
        received the net sum of $800.

(b)     Sotheby's consignment agreement provided for the sale of the artwork by
        either live auction or via the internet, and set the following commissions:  (i)
        live auction: 10%, plus 1% for insurance and $600 per color illustration; (ii)
        internet sales:  20% of sale price.  The Sotheby's consignment agreement was
        approved by an order entered April 20, 2001.  In June, 2001, Sotheby's
        conducted a live auction and sold one piece of artwork for the gross price of
        $85,000, of which the Liquidating Agent received the net sum of $74,000
        after the deduction of commissions.

(c)     On July 14, 1998 a consignment agreement was entered into with
        Addison/Ripley Fine Arts ("AFA") of Washington, D.C.  The agreement,
        which related to the sale of five (5) additional paintings, granted AFA an
        exclusive right to sell the paintings and provided for a twenty percent (20%)
        commission based upon the purchase price, and set a confidential minimum
        bid price for each painting.  The agreement was approved by order of the

Court entered on October 8, 1998.   During the Period, two paintings were sold and the Liquidating Agent received the net sums of $800.00 and $5,950.00 after the deduction of commissions.  The remaining painting was commissioned to Jean Cramer, who sold it in March, 2003, netting the estate $3,480.00.

(d)     By Order entered April 27, 1999 the Liquidating Agent obtained authority to enter into a consignment agreement with Christie's.  Thereafter on June 7, 1999 and June 10, 1999, Christie's sold certain jewelry of the Debtor.  After the deduction of commissions and expenses the Liquidating Agent received the sums of $16,269.80 and $17,132.00.  Thereafter one additional item was sold by Christie's and in March 2000, the Liquidating Agent received the net sum of $1,700.10.

(e)     In 2001, a consignment agreement was entered into with Alex Cooper Auctioneers, Inc. ("Cooper") of Baltimore, Maryland.  The agreement related to various items of furniture, and non-gallery quality artwork, for which it was determined that an estate sale auction was the best method of disposition.  The agreement provided for a sliding scale of commissions ranging between ten percent (10%) and twenty percent (20%), although a commission in the amount of ten percent (10%) was ultimately charged.  The consignment agreement was approved by an order entered April 20, 2001.   Thereafter Cooper sold the items and the estate received the sum of $12,988.00 in May and June, 2001.

(f)     In 1999, the Liquidating Agent determined that certain of the Debtor's household goods were being held by a storage company in London, subject to a warehousemen's lien.  The Liquidating Agent negotiated a resolution of the lien and sold the household goods.  Thereafter the Liquidating Agent received the sums of $1,363.01 and $13,755.40 as net proceeds of the sale after payoff of the warehousemen's lien.

2.     **Distribution of Blockless Proceeds**

3.     Prior to the Period, the Liquidating Agent sold the Debtor's interest in Blockless

Investments, B.V ("Blockless") and received the approximate net sum of $6,500,000 ("Blockless

Proceeds").  The Blockless Proceeds were held by the Liquidating Agent in escrow pending the

disposition of the competing claims of the Debtor, Patrick Donnelly and Roland Benner.  Following

an evidentiary hearing, the Court entered an order on May 27, 1999, establishing each party's

aggregate percentage distribution (the "First Distribution Order").   Messrs. Donnelly and Benner

appealed the First Distribution Order to the United States District Court for the District of Maryland.

This appeal ultimately proved unsuccessful.

4.        Thereafter, the Liquidating Agent filed a Motion for Authority to Make Distribution,

in which he sought authority to distribute the aggregate amount of $2,550,525 as follows: (a)

$150,525.47 as payment in full of priority tax claims and (b) $2.4 million *pro rata* distribution to

Class 6, General Unsecured Creditors.   Additionally, the Liquidating Agent sought approval to

reserve the sums of (a) $500,000 for any potential tax liabilities that might arise as a result of the

disposition of Blockless[1], and (b) $2,087,760 to Donnelly and Benner.  On December 7, 1999, the

Court entered an order authorizing the Liquidating Agent to make said distributions, as well as

establishing the amount of $2,067,146 to be distributed to Messrs. Donnelly and Benner (the

"Second Distribution Order").

5.        Thereafter, on or about December 23, 1999 the Liquidating Agent made his first

distribution to allowed unsecured creditors in the amount of $2,405,547.17  (an approximate 50%

distribution) and to Messrs. Donnelly and Benner in the amount of $2,067,146.   The Liquidating

Agent made subsequent distributions to unsecured creditors whose claims had been objected to as of

the time of the first distributions as follows: Virginia Kowalsky-$85,089.59, Homestead Gardens-

$24,337.69, Sterling Doubleday-$31,908.60.  Attached hereto as Exhibit A is a reconciliation of the

distributions made to unsecured creditors pursuant to the December 7, 1999 order.

---

[1]   The $500,000 is being held by the Liquidating Agent in a separate escrow account  pending resolution of an
adversary proceeding initiated by the Debtor against the IRS to determine the actual amount of the Debtor's tax
obligation for the calendar year of the closing.  The Debtor and the IRS are engaged in settlement discussions.

6.      Messrs. Donnelly and Benner filed a subsequent motion seeking the payment of interest on their share of the distribution.   This was allowed by the Court and, on March 10, 2000, the Liquidating Agent made an additional distribution to them of $66,354.38.

**3.      Express Litigation**

6.      Among the assets of the Debtor was his 44.64% stock ownership of XPRESS Corporation ("XPRES").  During the pendency of the Chapter 11 case, the Debtor filed an adversary proceeding against XPRES.  After his appointment, the Liquidating Agent monitored that litigation and began, along with counsel to the Debtor, settlement discussions with XPRES.   Thereafter in 1998, the parties entered into a  settlement agreement, which was approved by the Court and which provide that  (i) all of the parties to the XPRES litigation (in addition to certain non-parties) gave mutual releases, (ii) XPRES paid $275,000 to the Liquidating Agent on or about May 18, 1998, (iii) the Debtor retained his equity interest in XPRES, and (v) certain other claims against the estate by former and present insiders of XPRES in excess of $998,000 were withdrawn.  Based upon the Liquidating Agent's analysis, that settlement had an immediate cash value to the estate in excess of $1,300,000.

7.      Subsequently, XPRES and its shareholders (excluding the Debtor), without the consent of the Liquidating Agent or the Debtor, attempted to liquidate XPRES in the state courts of North Carolina in an effort to preclude any distribution on account of the Debtor's interests in XPRES.

8.      Accordingly, the Liquidating Agent, along with the Debtor's counsel, initiated suit before this Court to stop the North Carolina state court proceeding and/or to obtain an appropriate distribution on account of the Debtor's minority interest.  This Court determined that this matter

should properly be determined by the North Carolina court.   Thereafter the Liquidating Agent filed an opposition to XPRES' actions and sought to protect the estate's interest in the XPRES liquidation/dissolution. The Liquidating Agent blocked XPRES' attempt to liquidate/dissolve XPRES on a preliminary basis and forced the matter to be set for a full trial.

9.        After conducting discovery (in North Carolina), the Liquidating Agent, along with the Debtor's and XPRES, entered into settlement negotiations.  Ultimately, the matter was settled and after obtaining approval of this Court, on or about December 10, 2001 the Liquidating Agent received the sum of $80,000 from XPRES.

**4.        Spanish Interests**

10.       Through research of documents accumulated by the Liquidating Agent, as well as information gained from several trips to Spain, the Liquidating Agent determined that the Debtor had interests in over twenty different corporations in Spain, most of which the Debtor owned through intermediary holding companies incorporated  in Spain, the Netherlands and the United States.

11.        The Liquidating Agent also determined that in 1993, the Debtor had entered into a comprehensive settlement agreement with Sogo and Sogo USA (collectively "Sogo"), the Debtor's fifty percent (50%) partner in the Hotel Arts project in Barcelona.  The Hotel Arts project consisted of a luxury hotel, numerous retail and commercial sites, a parking garage, a casino, various, apartments and building lots.  The Liquidating Agent determined that the settlement agreement provided for a total restructuring of the Debtor's interest in the underlying partnerships with Sogo, and as a result, the extent and nature of the Debtor's continuing economic and/or non-economic interests in those partnerships was disputed by Sogo.

12.    Upon further investigation, the Liquidating Agent determined that most of those interests had only a nominal value.   In addition, the Liquidating Agent determined that the Debtor had an ongoing ownership interest in a Planet Hollywood franchise restaurant located adjacent to the Hotel Arts.  As a result of ongoing disputes with the stockholders of that restaurant, the restaurant was in serious financial trouble and subject to litigation in Spain.  In addition, the Debtor was subject to a criminal indictment brought pursuant to actions instituted by one of his partners in the Planet Hollywood franchise.

13.    As the stockholders of Planet Hollywood were unable to agree on any corporate governance issues, a proceeding was instituted in the courts of Barcelona to compel the stockholders to attend a court-supervised stockholders meeting.  The Liquidating Agent traveled to Barcelona in March of 2002 for the court-supervised stockholders meeting. Notwithstanding the court's supervision, the stockholders were unable to agree on corporate governance issues.  During the same trip, the Liquidating Agent attended a hearing in the criminal courts of Barcelona regarding challenges made by Ray Velazquez to the Debtor's assets that the Liquidating Agent was attempting to sell.  As a result, the Liquidating Agent was required to give written assurances to the judges of the criminal court in Barcelona that prior to disposing any of the Hinsua assets (see discussion below), the Liquidating Agent would provide prior notice both to the Bankruptcy Court in the United States and to the criminal court in Barcelona, Spain.

14.    As a result of the disputes between the stockholders, Planet Hollywood in Barcelona defaulted on its franchise agreement with Planet Hollywood International.  When Planet Hollywood International filed its own Chapter 11 bankruptcy case in the United States, the Liquidating Agent

attempted to resolve the defaults with Planet Hollywood International. The Liquidating Agent's efforts were unsuccessful, the franchise was revoked and Planet Hollywood in Barcelona was closed.

15.     The Liquidating Agent finally concluded that the only substantial asset of the Debtor located in Spain which could ultimately be monetized was the Debtor's interest in the parking spaces owned by Hinsua S.L. ("Hinsua"). Hinsua was a Spanish corporation in which the Debtor had an indirect 100% ownership interest. Hinsua originally owned approximately 120 parking spaces in a large parking garage located underneath the Hotel Arts in Barcelona. The Debtor's indirect interest in Hinsua was based on his sole ownership of Peawick Investments NV, a company organized under the laws of the Netherlands. Prior to the Liquidating Agent's appointment, the Debtor sold certain of the parking spaces and borrowed certain funds for the acquisition and/or management of Hinsua, which funds were secured by mortgages on those parking spaces. The Hinsua parking spaces were further subject to a management agreement between the Debtor and Traplaya, SL, an entity originally owned controlled by Sogo.

16.     In January, 2002, the criminal trial of the Debtor in Barcelona commenced. At the request of the Debtor's criminal counsel, the Liquidating Agent traveled to Barcelona to attend the criminal trial and was called as a witness. Ultimately, the courts in Barcelona found the Debtor not guilty on all counts and, as a result, the Liquidating Agent was finally able to dispose of the parking spaces free and clear of potential claims from that proceeding. On or about July 30, 2003, after approval from the Bankruptcy Court, the Liquidating Agent paid the Debtor's criminal attorney the sum of $63,678.88 (the source of this payment was interest which had accrued on the $500,000 Blockless tax escrow).

17.     On a monthly basis Hinsua received net proceeds from the collection of fees paid to park in the garage. Most of that income was used by Hinsua to meet its ongoing mortgage payments, tax obligations and other normal expenses. However, in May 2002, the Liquidating Agent determined that Hinsua has accumulated excess cash that it could upstream to the Debtor. Accordingly, on or about May 10, 2002, the Liquidating Agent received the sum of $53,555 from Hinsua.

18.     Thereafter, on May 7, 2003, the Applicant filed the Motion of Liquidating Agent for Authority to Sell Interests in or Assets of Hinsua Barcelona, S.L. Free and Clear of Liens, Claims and Encumbrances to BCN (the "Sale Motion").   The Sale Motion and notice thereof established the intent of the Liquidating Agent, subject to court authority, to sell the Hinsua spaces to BCN or to any higher and better offer.   Prior to the hearing on the Sale Motion, the Debtor submitted what the Debtor believed was a higher and better offer.   That offer involved the Debtor obtaining funds from a third-party in the amount of $550,000 which he would pay to the Liquidating Agent.   In addition, the Debtor's offer provided that his attorneys would waive fees in the approximate amount of $200,000, provided the Liquidating Agent abandoned all the estate's interest in the Hinsua spaces.

19.     On June 24, 2003, the Court entered its Order granting the Sale Motion.   Pursuant to the terms of the Order, the Liquidating Agent was granted the sole discretion to either (i) consummate the sale of the spaces with BCN pursuant to either a stock sale or a sale of the assets, or (ii) consummate the terms of the offer made by the Debtor.   That Order also provided that the Liquidating Agent could consider modifications to the respective offers of BCN and the Debtor, such that an eventual deal would be closed on terms no less favorable to the estate than those set forth in either the Letter of Intent with BCN or the Debtor's offer.

20.    Thereafter, the Liquidating Agent entered into negotiations with both the Debtor and BCN to arrive at a final highest and best offer.  The Liquidating Agent had numerous discussions with counsel in the Netherlands and Spain in order to fully determine all of the tax implications associated with a sale to BCN.  At the same time, the Applicant continued negotiating with the Debtor to determine if his offer could be enhanced.

21.    Ultimately, due to various uncertainties and the significant taxes that would be due under the BCN transaction, the Liquidating Agent concluded that a final modified offer of the Debtor was the highest and best offer.  That offer provided cash consideration to the estate of $600,000, plus an increased reduction in attorneys' fees otherwise due to Debtor's counsel in the amount of $250,000. Furthermore, Debtor's counsel agreed that the reduction of their fees would be in the nature of a true-up, such that if there was an administrative insolvency, the reduction would be increased in order to insure that the actual dollar savings to the estate was equal to $250,000.  On August 19, 2003, the Liquidating Agent received the sum of $600,000 from the Debtor and closed upon the sale of the parking spaces to the Debtor.

**5.    Interest in Babbitt Ranches**

22.    Based upon his investigation, the Liquidating Agent determined that the Debtor acquired a 2.844% membership interest in Babbitt Ranches in December 1993, pursuant to three separate assignments of membership interests representing (i) approximately 524 shares (the "Shares") of C.O. Bar, Inc., and (ii) 524 units of ownership interest (the "Units") (collectively the Shares and the Units are referred to as the "Ownership Interests") in Babbitt Ranches.

23.     On or about October 30, 2003, without the prior consent of the Liquidating Agent or an order from this Court, the Debtor purportedly executed and delivered to Larry West ("West") a

document entitled Pledge of Shares of Stock.  The Pledge of Shares of Stock states, *inter alia*, that the Debtor pledged the Shares as collateral security to secure the payment of an alleged $281,000 debt owed to West by the Debtor.

24.     On or about January 15, 2005, West filed an Amended Complaint (the "Amended Complaint") in the United Sates District Court for the District of Arizona, Prescott Division (the "District Court"), Case No. 04-CV-2934 against the Debtor and various other parties seeking, *inter alia*, a declaration that he was the lawful owner of the Shares.  On February 28, 2005, the Liquidating Agent filed a motion with the District Court seeking to dismiss the Amended Complaint for improper venue, which motion was granted by the District Court by order entered on August 18, 2005.

25.     Thereafter the Liquidating Agent entered into a Purchase, Sale and Settlement Agreement (the "PSA") dated as of July 29, 2005.  Pursuant to the terms of the PSA, the Liquidating Agent agreed to sell all the Debtor's right, title and interest in the Ownership Interests to St. Francis Property LLC ("St. Francis").  St. Francis agreed to pay to the Liquidating Agent the sum of $262,000 for the Ownership Interests.  As additional consideration, St. Francis agreed to pay the Liquidating Agent (i) the sum of $38,645 in consideration of those dividends previously paid to the Debtor which the Liquidating Agent contended should have been paid to him or the estate of the Debtor and (ii) the sum of $10,000.00 to defray the legal expenses incurred by the Liquidating Agent in conjunction with his investigation of the Ownership Interests.  On September 9, 2005, the Court entered an order approving the PSA, providing, *inter alia*, that the purported liens of West would attach to the proceeds of sale.

26.     On or about September 22, 2005, closing occurred and the estate received the total consideration of $310,645.  These sums are being held by the Liquidating Agent pending resolution of West's claims.

27.     On or about March 17, 2006, the Liquidating Agent filed a Complaint to Avoid Post-Petition Transfer and for Other Declaratory Relief against West in order to resolve his claims to the proceeds of sale.  Immediately thereafter, the Liquidating Agent and West entered into a settlement agreement to resolve that adversary proceeding.  That settlement agreement (which is to be submitted to the Court for approval) provides that West will receive the sum of $32,000, in consideration for which he will release and discharge any further claims he has to the proceeds of sale.

## 6.     Trademarks

28.     The Debtor also indirectly owns three Spanish trademarks relating to the Hotel Arts in Barcelona, Spain.  The Liquidating Agent has worked with the law firm of Cowan Liebowitz & Latman to assist him in protecting those trademarks.  The Liquidating Agent is hopeful that he will soon enter into an agreement to monetize those trademarks.

## General Matters

29.     Attached hereto as Exhibit B is a reconciliation of all receipts and disbursements of the Liquidating Agent from May 1, 1999 through the date of this report.  Thus, as of the date of this report, the Liquidating Agent is holding the approximate sum of $373,000, inclusive of the proceeds of the Ownership Interests (which are being held subject to the West claims).  In addition the Liquidating Agent is holding the approximate sum of $522,000 in escrow subject to the disposition of the adversary proceeding initiated by the Debtor against the IRS with respect to the Blockless Proceeds.

30.     As reflected on Exhibit B, the Liquidating Agent has also, from time to time, made payments for the expenses of the administration of this estate, including payments to various professionals for fees and expenses approved by orders of the Bankruptcy Court.  These payments have been made on an allocable basis subject to the availability of funds.  Based on information available to the Liquidating Agent, as of the date of this report, unpaid professional fees are in the approximate amount of $550,000.

31.     The Liquidating Agent continues to consider the disposition of any remaining assets.

/s/      Joel I. Sher
Joel Sher, Bar No. 00719

Shapiro and Olander
20th Floor
36 South Charles Street
Baltimore, MD  21201-3147
(410) 385-0202

*Liquidating Agent for the Estate of G. Ware Travelstead*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on 29th day of March, 2005, a copy of the foregoing was mailed

by first-class, postage prepaid, to:

Paul M. Nussbaum, Esquire
Whiteford, Taylor & Preston, L.L.P.
7 St. Paul Street, Suite 1400
Baltimore, Maryland   21202-1626

Benjamin Rosenberg, Esquire
Rosenberg, Proutt, Funk & Greenberg
25 South Charles Street, Suite 2115
Baltimore, Maryland   21201

Mark A. Neal, Esquire
Office of the U.S. Trustee
101 West Lombard, Suite 2625
Baltimore, MD 21201

Edward McDermott, Esquire
Pollack & Kaminsky
114 W. 47th Street
New York, New York 10036

/s/      Joel I. Sher
Joel I. Sher