## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| **G. WARE TRAVELSTEAD** | * | Case No. 96-5-4979-DK |
| | | (Chapter 11) |
| Debtor. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### FOURTH APPLICATION OF SHAPIRO SHER GUINOT & SANDLER
### AND LIQUIDATING AGENT FOR INTERIM ALLOWANCE
### OF COMPENSATION AND REIMBURSEMENT OF EXPENSES
### FOR PERIOD OCTOBER 1, 2003 THROUGH NOVEMBER 30, 2006

Shapiro Sher Guinot & Sandler (the "Applicant"), the court-approved counsel for Joel I. Sher, the Liquidating Agent (the "Liquidating Agent"), pursuant to Bankruptcy Rule 6004(f)(1), hereby apply for interim allowance of compensation and reimbursement of expenses for the period October 1, 2003 through November 30, 2006 (the "Application Period") and, in support thereof, states:

1.      This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 158 and 1334, 11 U.S.C. §§ 328, 330 and 331, Bankruptcy Rule 2016 and 6004(f)(1)and Local District Court Rule 401.  This is a core proceeding.

## I.   INTRODUCTION

2.      On May 31, 1996, G. Ware Travelstead (the "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

3.      On December 31, 1997, the United States Bankruptcy Court for the District of Maryland (the "Bankruptcy Court") entered its Order (the "Order") Approving Debtor's Modified Fifth Amended Disclosure Statement and Confirming the Debtor's Third Modified Fourth Amended

Plan of Reorganization (the "Plan").  On that same date, the Bankruptcy Court entered its order authorizing the appointment of the Liquidating Agent.

4.      On January 8, 1998, the Court entered an order authorizing the Liquidating Agent to retain the Applicant as counsel.   Effective as of September 26, 2000, Shapiro and Olander changed its name to Shapiro Sher & Guinot.  Effective August 1, 2002, the Applicant's name was changed to Shapiro Sher Guinot & Sandler.

5.      On January 11, 1999, the Court entered an Order granting the Applicant's first application for interim allowance of compensation and reimbursement of expenses for the period from October 9, 1997 through October 31, 1998, awarding compensation in the amount of $322,594.50, plus reimbursement of expenses in the amount of $58,320.84.   All of the fees and expenses approved have been paid.

6.      On September 8, 1999, the Court entered an Order granting the Applicant's second application for interim allowance of compensation and reimbursement of expenses for the period November 1, 1998 through August 31, 1999, awarding compensation in the amount of $239,675.50, plus reimbursement of expenses in the amount of $45,691.61.  All of the fees and expenses approved have been paid.

7.      On January 23, 2004, the Court entered an Order granting the Applicant's third application for interim allowance of compensation and reimbursement of expenses for the period September 1, 1999 through September 30, 2003, awarding compensation in the amount of $424,529.00, plus reimbursement of expenses in the amount of $177,643.10.

8.      This is the Applicant's fourth interim application.  The Applicant is familiar with and is submitting this application in conformity with the Compensation Guidelines for Professionals in the United States Bankruptcy Court for the District of Maryland (the "Compensation Guidelines").

## II.   THE COMPENSATION REQUESTED AND THE LEGAL STANDARD TO BE APPLIED

9.      The Applicant requests payment of its fees in the amount of $93,895.50 for services rendered and $15,677.12 as reimbursement for out-of-pocket expenses incurred during the three years of the Application Period, as follows:

| Total Professional Time Analysis –Fourth Application | | | |
|---|---|---|---|
| **Name** | **Total Hours** | **Hourly Rate** | **Total Fees** |
| Joel I. Sher | 52 | $420.00 | $21,840.00 |
| Joel I. Sher | 45 | $405.00 | $18,225.00 |
| Joel I. Sher | 19.7 | $395.00 | $7,781.50 |
| Lonnie M. Ritzer | 8.1 | $375.00 | $3,037.50 |
| Richard M. Goldberg | 2.5 | $375.00 | $937.50 |
| Richard M. Goldberg | 6.9 | $360.00 | $2,484.00 |
| Paula D. Miller | .5 | $310.00 | $155.00 |
| Paula D. Miller | 4.4 | $300.00 | $1,320.00 |
| Scott W. Foley | 24.3 | $280.00 | $6,804.00 |
| Scott W. Foley | 17.2 | $260.00 | $4,472.00 |
| Paul Danielson | 8.2 | $270.00 | $2,214.00 |
| Paul Danielson | 29.7 | $250.00 | $7,425.00 |
| Diarmuid F. Gorham | 5.9 | $265.00 | $1,563.50 |
| Benjamin L. Polakoff | 13.1 | $200.00 | $2,620.00 |
| Ann C. Lawrence | 32.5 | $145.00 | $4,712.50 |
| Ann C. Lawrence | 56.1 | $140.00 | $7,854.00 |
| Ann C. Lawrence | 3.6 | $125.00 | $450.00 |
| **TOTALS** | 329.7 | | $93,895.50 |

| Out of Pocket Disbursements –Fourth Application | |
|---|---|
| **Category** | **Amount** |
| Duplicating Expenses | $1,210.80 |
| Postage | $82.81 |
| Messenger Service/Express Mail | $60.16 |
| Long Distance Expenses | $67.51 |
| Filing Fees | $521.50 |
| Travel Expenses | $11,735.51 |
| Miscellaneous Search Fees | $10.32 |
| Process/Service Fees | $145.00 |
| `Telecopy | $40.50 |
| Out of Office Duplicating | $36.50 |
| Westlaw | $1,672.78 |
| Lexis | $8.56 |
| Pacer Quarterly Charges | $26.50 |
| U.P.S. | $58.67 |
| **TOTAL** | $15,677.12 |

10.     The expenses incurred by the Applicant are a type that are customarily not considered part of overhead by the Applicant or other attorneys in this geographic area and which the Applicant customarily requires its clients to pay. Additionally, all the expenses for which the Applicant seeks reimbursement are in accordance with and allowable pursuant to the Compensation Guidelines.

11.     The Applicant's request for compensation is made pursuant to the twelve criteria originally enumerated in *Johnson v. Georgia Highway Express. Inc.*, 488 F.2d 714, 714-719 (5th Cir. 1974), and expressly adopted by the United States Court of Appeals for the Fourth Circuit in *Barber v. Kimbrells. Inc.*, 577 F.2d 216 (4th Cir. 1978), *Anderson v. Boothe*, 658 F.2d 246 (4th Cir. 1978), and *Harman v. Levin (In re: Robertson)*, 772 F.2d 1150 (4th Cir. 1985). Those twelve criteria are as follows:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) customary fee for like work; (6) the attorney's

4

> expectations at the outset of the litigation; (7) the time limitations
> imposed by the client or circumstances; (8) the amount of controversy
> and the results obtained; (9) the experience, reputation and ability of
> the attorney; (10) the undesirability of the case within the legal
> community in which the suit arose; (11) the nature and length of the
> professional relationship between the attorney and client; and (12)
> attorney awards in similar cases.

*Barber v. Kimbrells Inc.*, 577 F.2d at 226 n. 28. These criteria are discussed in detail below. The

Liquidating Agent's request for compensation is made pursuant to the confirmed Plan.

12.     When considering an attorney's application for compensation, the Court should first

determine the attorney's "lodestar" by multiplying the number of hours reasonably expended by a

reasonable hourly rate. *In re LBH Associates Ltd. Partnership*, 109 B.R. 157, 158-62 (Banker. D.Md

1989). *See also, In re Leonard Jed Co.*, 118 B.R. 339, 345 (Banker. D.Md 1990).

13.     Fees should be adjusted upward if the results achieved by the attorney are exceptional

in light of the hourly rate charged. *Blum v. Stenson*, 465 U.S. 889 (1984). *See generally

Pennsylvania v. Delaware Valley Citizens' Counsel*, 478 U.S. 546 (1986); *Hansley v. Eckerhardt*,

461 U.S. 424 (1983). Notwithstanding the Applicant's compliance with this standard, it is not

seeking an upward adjustment of fees. Conversely, although there is no basis for any downward

adjustment of the Applicant's fees, in the exercise of billing judgment, the Applicant has reduced its

total fees and expenses by approximately $17,000.

14.     The total fees requested by the Applicant are reasonable under the circumstances, and

the *Johnson* twelve-factor analysis, as discussed below, supports an award of interim compensation in

the amount requested.

### III.   THE SERVICES RENDERED AND THE MANNER OF RECORDING THE APPLICANT'S FEES AND EXPENSES RELATING THERETO

15.    During the Application Period, the Applicant performed services in four designated categories.   Those categories are: (a) General Services; (b) Spain – General Issues; (c) Hinsua Matters and (d) Babbitt Ranches.   The Applicant has attempted in all instances to allocate the services rendered to the proper category.   However, due to the size and complexity of this case and the extent and nature of the services performed, all services performed by the Applicant do not fall solely into one specific category.

16.    In accordance with the Compensation Guidelines, this Application contains a description of the services rendered in each of the separate files in which work has been performed during the Application Period.

17.    All of the time expended and the nature of the services rendered by the Applicant were recorded on time sheets maintained on a daily basis.   Attached hereto and collectively marked Exhibit A is a compilation of all of the billing reports for the categories that the Applicant performed services.   The billing reports set forth, for each file, the date of each service rendered, the professional rendering the service, a description of the services rendered and the amount of time spent performing each service.   Certain time entries cannot be written in any more substantive detail because one or more privileges would be violated.   The Applicant attempted, in accordance with the Compensation Guidelines, not to lump services; for significantly all entries in excess of one hour of time, the time entries provide a breakdown of the amount of time spent on a specific activity included in that time entry if more than one service was rendered.

18.    Due to the significant amount of work required to be performed by the Applicant, the Applicant adopted a "team approach" to complete successfully many of the tasks it was required to

perform.  By way of example, but not limitation, there were many instances in which several of the Applicant's professionals were each required to perform separate tasks simultaneously.  The Applicant's professionals, however, did not engage in duplication of effort.

19.     Based upon the Applicant's experience, it believes that the team approach is the most effective, efficient and least costly manner of handling extremely large and sophisticated tasks, such as those encountered in this case, in short periods of time, while at the same time providing the highest level of representation to the Liquidating Agent.  In addition to the entries recorded on Exhibit A, the Application contains charts which set forth in summary fashion the aggregate value of the services rendered and the aggregate amount of disbursements.  However, it should be noted that the actual request for compensation is less than these aggregate amounts.  While the Applicant believes that all of the services rendered are reasonable and therefore compensable, prior to generating Exhibit A, the Applicant wrote off approximately $17,000 in fees as part of the normal exercise of billing judgment that it provides for all its clients.

20.     The Applicant's fees were computed at the standard hourly rates charged by the Applicant to all of its creditor, debtor, committee and non-bankruptcy clients.  The hourly rates vary by professional depending upon experience, subject matter, expertise and seniority, and are within the range of (and are typically lower than) customary hourly rates of compensation in this geographic area for the services performed in a case of this magnitude.

21.     The Applicant annually adjusts the rates of its professionals in accordance with its regular practice. Therefore, because the Application Period encompasses over three calendar years, there are rate adjustments for certain of the Applicant's professionals.  These rate adjustments reflect

increased experience and expertise and are consistent with, or generally less than, rates charged by professionals with comparable experience in this region.

## IV.    SERVICES RENDERED AND EXPENSES INCURRED

### A.    GENERAL SERVICES PERFORMED FOR THE LIQUIDATING AGENT

22.    The Debtor is a United States citizen whose business interests and holdings were in several different countries, including Spain, the Netherlands and Australia.  The Debtor's business, though multi-faceted, consisted principally of real property development and investment.  The primary task which originally confronted the Applicant was to assess the extent and value of all of the Debtor's holdings. This was crucial because the Plan is a liquidating plan and called for the liquidation of all of the Debtor's assets by the Liquidating Agent with the cooperation of the Debtor.

23.    During the Application Period, the Applicant spent a significant amount of time providing general services to the Liquidating Agent.  Included in this category was time spent by the Applicant in responding to creditors' claims, maintaining accurate information about the receipts and disbursements made by the Liquidating Agent, and filing one or more reports of sale with respect to the sale of certain of the Debtor's artwork sold by the Liquidating Agent.

24.    During the Application Period, the Applicant was required to spend certain time defending an objection to the Applicant's Third Interim Fee Application filed by Eduardo Canet. The Applicant prepared for and attended a contested hearing in January of 2004 concerning that interim application.

25.    During the Application Period, the Applicant met with Grant Thornton, the Debtor's former accountant, in an attempt to resolve the ongoing dispute between the Debtor and the Internal

Revenue Service over the amount of taxes due from the 1999 sale of the Debtor's interest in Blockless. As of the date of this application that dispute has not been resolved.

26.     During the Application Period, the Applicant also prepared an interim status report identifying all activities undertaken by the Liquidating Agent during a several year period, as well as all receipts and disbursements made by the Liquidating Agent.

27.     The Applicant also continued to liquidate the remaining artwork and personal property of the Debtor during the Application Period.

28.     During the Application Period, the Applicant was also engaged in a number of administrative matters, including but not limited to, maintaining the books of account for the Liquidating Agent, making disbursements in accordance with the Plan, monitoring and making disbursements for court-authorized professional fees pursuant to the orders of this Court and responding to inquiries from creditors.

29.     The Applicant has reviewed each pleading, paper and motion filed in the case, and has advised the Liquidating Agent as to the impact and effect of each pleading, paper and motion filed. The Applicant has prepared appropriate responses to all pleadings, motions and papers requiring responses. Additionally, the Applicant and Liquidating Agent kept in regular contact with the Debtor and his counsel as the Plan was predicated, in part, on the continued cooperation of the Debtor.

30.     In connection with General Services for the Liquidating Agent, the Applicant devoted a total of 89.7 hours, having a total value of $20,294.00 as follows:

| Professional Time Analysis – General Services | | | |
|---|---|---|---|
| **Name** | **Total Hours** | **Hourly Rate** | **Total Fees** |
| Joel I. Sher | 13.5 | $420.00 | $5,670.00 |
| Joel I. Sher | .3 | $405.00 | $121.50 |
| Joel I. Sher | 12.2 | $395.00 | $4,819.00 |
| Diarmuid F. Gorham | 5.9 | $265.00 | $1,563.50 |
| Ann C. Lawrence | 16.4 | $145.00 | $2,378.00 |
| Ann C. Lawrence | 37.8 | $140.00 | $5,292.00 |
| Ann C. Lawrence | 3.6 | $125.00 | $450.00 |
| **TOTALS** | 89.7 | | $20,294.00 |

31.    The Applicant incurred out of pocket expenses in the amount of $1,120.64 for the

Application Period in connection with General Services as follows:

| Out of Pocket Disbursements – General Services | |
|---|---|
| **Category** | **Amount** |
| Duplicating Expenses | $558.20 |
| Postage | $37.35 |
| Miscellaneous Search Fees | $10.32 |
| Messenger Service/Express Mail | $32.22 |
| Long Distance Expenses | $53.38 |
| Travel Expenses | $229.15 |
| Process/Service Fees | $145.00 |
| Telecopy | $25.50 |
| Westlaw Research | 0 |
| Pacer Quarterly Charges | $13.92 |
| UPS | $15.60 |
| **TOTAL** | $1,120.64 |

**B.**    **SPAIN-GENERAL ISSUES**

32.    Another discrete category of services provided by the Applicant involved the

liquidation of the Debtor's remaining assets in Spain, which has proven, by far, to be the most

complicated aspect of the Liquidating Agent's duty.

10

33.     Prior to the Application Period, the Applicant spent extensive time and effort to identify all of the Debtor's Spanish business enterprises in order to fully understand the myriad of issues involved with disposing of those assets.  Through research of documents accumulated by the Applicant, as well as information gained from several trips to Spain, the Applicant determined that the Debtor had interests in over twenty different corporations, most of which the Debtor owned through intermediary holding companies incorporated in the Netherlands and the United States.

34.     The Applicant determined that the Debtor's interests in many of those assets were subject to conflicting claims or interests of one or more parties with whom the Debtor had business dealings.

35.     During the Application Period, the Liquidating Agent negotiated and finalized the sale of certain trademarks owned by the Debtor and/or two entities in which the Debtor has direct and/or indirect ownership: The Travelstead Group, Inc. (the "Group") and Travelstead Barcelona Limited Partnership ("TBLP").

36.     The Group was the owner of the following three (3) design trademarks, all registered in Spain:  (i) "Arts Barcelona" Serial Number 1.609.204; (ii) "Arts" Serial Number 1.609.205; and (iii) "Hotel Arts Barcelona" Serial Number 1.630.906 (collectively referred to herein as the "Trademarks").

37.     In conjunction with the 1982 Olympics, the Debtor was selected to design and develop various commercial and retail establishments on the ocean front in Barcelona, Spain (the "Project"), including most notably the Hotel Arts (the "Hotel"), which to this day continues to be one of Europe's most prestigious resort properties.  In 1993, the Group, the Debtor, and TBLP entered into a License Agreement with T-S Barcelona Partners, L.P. ("Barcelona Partners") and USA Sogo,

Inc. ("USA Sogo") (together with Barcelona Properties, the "Licensees"), majority owners of the of Hotel de la Villa Olympica, S.A ("Hovisa"), a Spanish corporation which controls and owns the Hotel.

38.     Hovisa sought to acquire the Trademarks so that it could use them for other business interests for which it was not licensed.  Given the unique and restrictive nature of the Trademarks and the limited pool of interested purchasers, the Liquidating Agent believed that pursuing the sale to Hovisa was in the best interest of the estate and, as such, entered into a Purchase and Sale Agreement with Hovisa (the "PSA"). As stated in the PSA, the Trademarks were sold to Hovisa for One Hundred Thousand Dollars ($100,000.00 USD).

39.     Accordingly, on May 22, 2006, the Applicant filed the Motion of the Liquidating Agent for authority to sell all of the Debtor's right, title and interests in the Trademarks.  That motion was approved by order of this Court.

40.     In order to comply with the requirements of the Spanish Trademark Office, the Applicant was required to find the original copies of the Trademarks, work with the Spanish Embassy to obtain translation of various documents and obtain an Apostille thereon (in accordance with the Hauge Convention), and arrange for a transfer of the sale proceeds to the United States. The Liquidating Agent then traveled to Barcelona, Spain during the last week of June 2006 in order to appear before a reqistered Spanish Notary and close upon the sale of the Trademarks.

41.     In connection with the category entitled Spain-General Issues, the Applicant devoted a total of 73.5 hours, having a total value of $24,975.00 for the Application Period, as follows:

| Professional Time Analysis – Spain-General Issues | | | |
|---|---|---|---|
| **Name** | **Total Hours** | **Hourly Rate** | **Total Fees** |
| Joel I. Sher | 32.5 | $420.00 | $13,650.00 |
| Joel I. Sher | 4.8 | $405.00 | $1,944.00 |
| Joel I. Sher | 7.5 | $395.00 | $2,962.50 |
| Paula D. Miller | .5 | $310.00 | $155.00 |
| Scott W. Foley | 9.1 | $280.00 | $2,548.00 |
| Paul V. Danielson | 7.6 | $270.00 | $2,052.00 |
| Ann C. Lawrence | 10.7 | $145.00 | $1,551.50 |
| Ann C. Lawrence | .8 | $140.00 | $112.00 |
| **TOTALS** | 73.50 | | $24,975.00 |

42.    The Applicant incurred out of pocket expenses in the amount of $8,033.27 for the

Application Period in connection with Spain-General Issues as follows:

| Out of Pocket Disbursements – Spain-General Issues | |
|---|---|
| **Category** | **Amount** |
| Duplicating Expenses | $66.00 |
| Postage | $10.92 |
| Messenger Service/Express Mail | $23.49 |
| Travel Expenses | $7,810.80 |
| Filing Fees | $78.50 |
| Out of Office Duplicating | $35.00 |
| Lexis Computer Research | $8.56 |
| **TOTAL** | $8,033.27 |

## C.    **Hinsua Matters**

43.    During a prior application period, the Liquidating Agent negotiated the sale of the

Debtor's interest in a parking garage associated with the Hotel in Barcelona, Spain. Those interests

were directly held by a Spanish corporation which in turn was a subsidiary of a corporation

organized under the laws of the Netherlands. As a result of the Applicant's efforts the estate

received approximately $600,000 for those interests.

13

44.     During the Application Period, the Applicant spent a modest amount of time finalizing details of that transaction involving the use of counsel in Spain and the Netherlands. Due the complicated tax issues associated with that transaction the Liquidating Agent obtained the assistance of counsel in both countries. The Applicant prepared applications for compensation for each of those counsel and obtained orders of the Court authorizing their payment.

45.     The Applicant also finalized the transfer of the funds for that sale during the Application Period. During the previous application period, the Applicant incurred certain travel expenses associated with the Liquidating Agent's travel to Spain during the course of the negotiations for the sale of the Debtor's interests which were not included in the Applicant's previous application.

46.     In connection with the category entitled Hinsua Matters, the Applicant devoted a total of 11.4 hours, having a total value of $1,861.00 for the Application Period, as follows:

| Professional Time Analysis – Hinsua Matters | | | |
|---|---|---|---|
| **Name** | **Total Hours** | **Hourly Rate** | **Total Fees** |
| Joel I. Sher | 1.0 | $405.00 | $405.00 |
| Ann C. Lawrence | 10.4 | $140.00 | $1,456.00 |
| **TOTALS** | 11.40 | | $1,861.00 |

47.     The Applicant incurred out of pocket expenses in the amount of $2,253.93 for the Application Period in connection with the Hinsua Matters Issues as follows:

| Out of Pocket Disbursements – Hinsua Matters | |
| --- | --- |
| **Category** | **Amount** |
| Duplicating Expenses | $10.00 |
| Messenger Service/Express Mail | $4.45 |
| Long Distance Expenses | $1.23 |
| Travel Expenses | $2,226.05 |
| Telecopy | $4.50 |
| Pacer Quarterly Charges | $7.70 |
| **TOTAL** | $2,253.93 |

**D.**    **BABBITT RANCHES**

48.    Another challenging project the Applicant undertook during the Application Period began with the discovery that the Debtor has pledged certain of his interest in an entity known as the Babbitt Ranches.

49.    Babbitt Ranches is an Arizona limited liability company, whose primary assets are two cattle ranches located approximately 165 miles north of Phoenix, Arizona.  In 1993, the Debtor acquired a 2.844% membership interest in Babbitt Ranches, consisting of (i) certain shares (the "Shares") of C.O. Bar, Inc., and (ii) an equal number of units of ownership interest (the "Units") (collectively the Shares and the Units are referred to as the "Ownership Interests") in Babbitt Ranches.  The Liquidating Agent determined that the Ownership Interests were property of the Debtor's estate and subject to the rights of the Liquidating Agent.

50.    The Operating Agreement for Babbitt Ranches contained restrictions on assigning membership interests, such that the value of the Debtor's interest in Babbitt Ranches was limited.

51.    In January, 2005, Larry J. West, as trustee of West Companies Defined Benefit Pension Plan and Trust ("West"), filed an Amended Complaint in the Arizona Court, against the Debtor and the Babbitt Parties.   In the Complaint West alleged, *inter alia,* that in October, 2003, he

15

received an assignment of the Shares from the Debtor, in consideration of a loan that West allegedly made to the Debtor in the approximate amount of $500,000.00. Through the District Court Litigation, West sought (i) a declaration that he was the lawful owners of the Shares and (ii) an injunction prohibiting the Debtor from making any further assignment of the Shares.

52.     Upon learning of the District Court Litigation, the Applicant filed a (i) Motion to Intervene and (ii) Motion To Dismiss The Amended Complaint For Improper Venue  Or In The Alternative, To Transfer Venue (collectively, the "Liquidating Agent's Motions").   The motion to dismiss was granted by the District Court.

53.     The Applicant believed that the purported assignment of the Shares to West was invalid and *void ab initio* because (i) the Debtor lacked the authority to transfer the Shares without the Liquidating Agent and the Bankruptcy Court's approval thereof—neither of which were obtained, (ii) the Debtor and West failed to advise or consult with the Liquidating Agent before the alleged assignment, (iii) the purported assignment failed to comply with the terms of the Operating Agreement and (iv) the purported assignment failed to comply with applicable law.

54.     At the same time the Applicant consulted with representatives of Babbitt Ranches to determine if they would be interested in acquiring the Debtor's interests in Babbitt Ranches.  The Applicant also reviewed a number of financial records relating to Babbitt Ranches and an appraisal of the two ranches.    Simultaneously, the Liquidating Agent entered into negotiations with representatives of Babbitt Ranches concerning the disposition of the Ownership Interests.  As a result of those negotiations, the Liquidating Agent entered into a Purchase, Sale and Settlement Agreement (the "PSA") dated as of July 29, 2005.  Pursuant to the terms of the PSA, the Liquidating Agent

agreed to sell all the Debtor's right, title and interest in the Ownership Interests to St. Francis Property LLC ("St. Francis"), an affiliate of Babbitt Ranches.

55.    As more fully set forth in the PSA, St. Francis agreed to pay to the Liquidating Agent the sum of $262,000 for the Ownership Interests. As additional consideration, St. Francis agreed to pay the Liquidating Agent (i) the sum of $38,645 in consideration of those dividends previously paid to the Debtor which the Liquidating Agent contends should have been paid to the estate of the Debtor and (ii) the sum of $10,000.00 to defray the legal expenses incurred by the Liquidating Agent in conjunction with his investigation of the Ownership Interests.

56.    Therefore the Applicant filed a Motion on behalf of the Liquidating Agent for Authority to Sell All of the Debtor's Right, Title and Interests in and Associated with Babbitt Ranches, L.L.C., Free and Clear of Liens, Claims and Encumbrances. The motion was uncontested and, on September 2, 2005, the Court entered the order authorizing the sale of the Debtor's interests in the Babbitt Ranches. Shortly thereafter, the transaction closed and amount of $310,645 was received by the Liquidating Agent.

57.    Despite demand by the Liquidating Agent, West failed and refused to waive or release his claim on the sale proceeds of the Ownership Interests. Negotiations broke off.

58.    On March 22, 2006, Applicant initiated an adversary proceeding seeking declaratory relief against West, requesting that the Court determine that West did not have a lien, pledge, assignment or any interest whatsoever in the Ownership Interests. Immediately thereafter the Liquidating Agent and West resolved that matter. That settlement provided for West's release of his lien on the sale proceeds in return for a payment of $32,000. As a result of the Applicant's efforts the estate received a net return of approximately $278,000.

59.    In connection with the category entitled Babbitt Ranches, the Applicant devoted a total of 155.1 hours, having a total value of $46,765.50 during the Application Period, as follows:

| Professional Time Analysis – Babbitt Ranches | | | |
|---|---|---|---|
| Name | Total Hours | Hourly Rate | Total Fees |
| Joel I. Sher | 6.0 | $420.00 | $2,520.00 |
| Joel I. Sher | 38.9 | $405.00 | $15,754.50 |
| Richard M. Goldberg | 2.5 | $375.00 | $937.50 |
| Richard M. Goldberg | 6.9 | $360.00 | $2,484.00 |
| Lonnie M. Ritzer | 8.1 | $375.00 | $3,037.50 |
| Paula D. Miller | 4.4 | $300.00 | $1,320.00 |
| Scott W. Foley | 15.2 | $280.00 | $4,256.00 |
| Scott W. Foley | 17.2 | $260.00 | $4,472.00 |
| Paul V. Danielson | .6 | $270.00 | $162.00 |
| Paul V. Danielson | 29.7 | $250.00 | $7,425.00 |
| Benjamin L. Polakoff | 13.1 | $200.00 | 2,620.00 |
| Ann C. Lawrence | 5.4 | $145.00 | $783.00 |
| Ann C. Lawrence | 7.1 | $140.00 | $994.00 |
| **TOTALS** | **155.1** | | **$46,765.50** |

60.    The Applicant incurred out of pocket expenses in the amount of $4,269.28 for the Application Period in connection with the Babbitt Ranches as follows:

| Out of Pocket Disbursements – Babbitt Ranches | |
|---|---|
| Category | Amount |
| Duplicating Expenses | $576.60 |
| Postage | $34.54 |
| Out-of-Office Duplicating | $1.50 |
| Long Distance Expenses | $12.90 |
| Travel Expenses | $1,469.51 |
| Telecopy | $10.50 |
| Filing Fees | $443.00 |
| Westlaw | $1,672.78 |
| Pacer Quarterly Charges | $4.88 |
| UPS | $43.07 |
| **TOTAL** | **$4,269.28** |

## Novelty and Difficulty of Questions Raised

61.     This case has presented substantial novel and difficult issues.  This is an extremely complex case which has required the Applicant to use its experience in numerous contested hearings Moreover, the Applicant was required to liquidate assets in foreign countries and to understand the myriad of international corporate and tax issues associated with those dispositions.  Additionally, the Applicant was required to consider and wade through the maze of conflicting positions of the Debtor and other parties with respect to what assets the Debtor actually owned, and the value thereof.

## Level of Skill Required

62.     The level of inter-personal and professional skills required from the Applicant is at the highest level to insure that the Liquidating Agent and the estate's interests have been and continue to be protected.  The Applicant's work required a coordinated effort among many attorneys, and involved complex issues of corporate, international, tax, real estate and bankruptcy law.  The different levels of skill required are reflected in the different hourly rates charged by the professionals who provided services to the Liquidating Agent.

## Opportunity Costs

63.     Due to the time limitations placed on the Applicant, the Applicant was required to devote a significant amount of time to this case.  Since his appointment, the Liquidating Agent has made numerous trips to various countries which were the situs of the Debtor's assets.   While in these countries, the Liquidating Agent was almost entirely unavailable to other clients.  Additionally, while the Liquidating Agent was out of the country and negotiating the sale or potential sale of assets, at least one professional was usually working to draft pleadings and/or agreements which reflected the status of the negotiations. Therefore, several of the professionals involved were able,

19

during certain intervals of the Application Period, to devote an extremely limited amount of time to other matters. Moreover, the Applicant has been required to advance thousands of dollars for travel expenses, with no assurance that it will be reimbursed in full.

## Customary Fee For Like Work

64.     The hourly rates for the individual professionals of the Applicant working in this case are the normal and customary rates charged by the Applicant for its services to debtors, trustees, and committees in other bankruptcy cases and to clients in matters not involving bankruptcy in the Baltimore area. The hourly rates are within the customary range charged by other attorneys in the Baltimore area (in many instances, the Applicant's rates are lower), and the total compensation sought is reasonable compared with fees charged by other similarly situated law firms in a case of this magnitude and complexity.  As noted above, during the Application Period, the Applicant experienced annual hourly rate increases for several of its professionals. These increases were not uniform, but reflect the increased knowledge and expertise of the professionals in their practice areas.

## Applicant's Expectation at the Outset of Litigation

65.     The Applicant expected that it would be compensated for services rendered at its standard hourly rates and would be reimbursed for all out-of-pocket disbursements made on behalf of the Liquidating Agent. The Applicant has sought reimbursement only for the out-of-pocket expenses that are normally not considered overhead.

## Amount in Controversy and Results Obtained

66.     The Applicant's efforts have resulted in significant, positive gains for the estate. As of this date, the Liquidating Agent has sold substantially all of the Debtor's tangible assets and

significantly reduced claims of creditors against the estate. The Applicant was instrumental in negotiating the sales of assets resulting in the receipt of approximately $1,000,000 during the Application Period.

### Time Limitations

67.      Many of the services required of the Applicant's attorneys have been provided under strict time limitations. Specifically, the Applicant's most senior member was on several occasions required to travel overseas for days to meet and negotiate the disposition of the Debtor's assets.

### Undesirability of the Case

68.      This factor has only limited applicability to this case. However, as a result of its representation of the Debtor, the Applicant has necessarily been forced to accept lengthy delays in obtaining compensation, which delays do not occur in representing clients in other bankruptcy cases or other clients outside of bankruptcy.

### Nature and Length of Professional Relationship With Client

69.      The Liquidating Agent is a member of the Applicant. However, neither the Liquidating Agent nor the Applicant, either before the filing of the petition or subsequent thereto, have had an attorney/client relationship with the Debtor.

### Attorney Fee Awards in Comparable Cases

70.      The fees requested by the Applicant in this case are comparable to or lower than fees allowed in cases of similar size and complexity, based on the time dedicated, the customary hourly rates and the difficulty of the representation. The Applicant has made a concerted effort to centralize responsibility for different aspects of this case and to assign responsibility to attorneys and paralegals in an economical and efficient manner.

**General Conditions**

71.     All legal services for which compensation are requested in this Application were performed for and on behalf of the Liquidating Agent and not on behalf of any other person.  After the filing of this case, no beneficial interests direct or indirect, or claim against, or interest of the Debtor has been acquired by the Applicant or for its account.

72.     No agreement or understanding exists between the Applicant and any other person for the sharing of compensation to be received by it for services rendered in connection with this case, except within the law firm of Shapiro Sher Guinot & Sandler.  No agreement or understanding exists between the Applicant and any other person rendering services in connection with this case for the sharing of compensation of such other person.

73.     Consideration of the circumstances of this case and the twelve-factor test of *Barber v. Kimbrells, Inc.* indicates that no downward adjustment in the overall fees of the Applicant is warranted.  The work performed by the Applicant has provided the estate with significant benefits.

74.     Notice of this Application has been given to the United States Trustee, all creditors, all parties-in-interest who have filed a request with the Clerk that such notices be mailed to them, and all persons entitled to receive notice pursuant to the Bankruptcy Rules.

WHEREFORE, the law firm of Shapiro Sher Guinot & Sandler and the Liquidating Agent respectfully request the following relief:

A.     That the law firm of Shapiro Sher Guinot & Sandler and the Liquidating Agent be allowed interim compensation in the amount of $93,895.50, plus reimbursement of out-of-pocket expenses in the amount of $15,677.12 for an aggregate sum of $109,572.62 for the Application Period;

B.    That the Liquidating Agent be authorized to pay Shapiro Sher Guinot & Sandler the fees and expenses awarded; and

C.    That Shapiro Sher Guinot & Sandler and the Liquidating Agent be granted such other and further relief as is just and equitable.

/s/    Joel I. Sher
Joel I. Sher, Bar No. 00719
Shapiro Sher Guinot & Sandler
36 South Charles Street, 20th Floor
Baltimore, Maryland 21201-3147
(410) 385-0202

*Attorneys for Joel I. Sher, Liquidating Agent*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of January, 2007, a copy of the Fourth Application of Shapiro Sher Guinot & Sandler and Liquidating Agent for Interim Allowance of Compensation and Reimbursement of Expenses for Period October 1, 2003 Through November 30, 2006 was mailed by first-class mail, postage prepaid, to:

Paul M. Nussbaum, Esquire
Stephen F. Fruin, Esquire
Whiteford Taylor & Preston
7 St. Paul Street, Suite 1400
Baltimore, MD  21202

Mark A. Neal, Esquire
Assistant U.S. Trustee
Office of the United States Trustee
101 W. Lombard St., Ste. 2625
Baltimore, MD  21201

Edward McDermott, Esquire
Pollack & Kaminsky
114 West 47th Street, 19th Floor
New York, NY  10036

/s/    Joel I. Sher
Joel I. Sher